## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

ORCUN SELCUK; ALAN DAVID
GWILLIAM; TINGTING ZHEN; MICHAEL
BROKLOFF; and THE LEAGUE OF
UNITED LATIN AMERICAN CITIZENS OF
IOWA, on behalf of itself and its members,

        Plaintiffs,

    v.

PAUL D. PATE, in his official capacity as the
Iowa Secretary of State; BENJAMIN D.
STEINES, in his official capacity as the
Winneshiek County Auditor and Winneshiek
County Commissioner of Elections; JAMIE
FITZGERALD, in his official capacity as the
Polk County Auditor and Polk County
Commissioner of Elections; MELVYN
HOUSER, in his official capacity as the
Pottawattamie County Auditor and
Pottawattamie County Commissioner of
Elections; ERIN SHANE, in her official
capacity as the acting Johnson County Auditor
and acting Johnson County Commissioner of
Elections; and KERRI TOMPKINS, in her
official capacity as the Scott County Auditor
and Scott County Commissioner of Elections,

        Defendants.

Case No. 4:24-cv-390

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**COME NOW,** Plaintiffs Orcun Selcuk ("Dr. Selcuk"), Alan David Gwilliam ("Mr. Gwilliam"), Tingting Zhen ("Ms. Zhen"), Michael Brokloff ("Mr. Brokloff"), and the League of United Latin American Citizens of Iowa ("LULAC") both as an organization and on behalf of their members (collectively, "Plaintiffs") hereby bring this action for declaratory and injunctive relief against Defendants Paul D. Pate, in his official capacity as the Iowa Secretary of State ("Secretary" or "Pate"); Benjamin Steines, in his official capacity as the Winneshiek County Auditor and

Winnishiek County Election Commissioner; Jamie Fitzgerald, in his individual capacity as the Polk County Auditor and Polk County Election Commissioner; Melvyn Houser, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Election Commissioner; Erin Shane, in her official capacity as the acting Johnson County Auditor and acting Johnson County Election Commissioner; and Kerri Tompkins, in her official capacity as the Scott County Auditor and Scott County Election Commissioner (collectively "Defendants"); and hereby allege as follows:

1.      This action is urgently necessary to protect the fundamental right to vote that serves as the foundation of American democracy. Every American citizen possesses the fundamental right to vote, regardless of where they were born or how recently they became a citizen. This action challenges the Secretary's ill-conceived, faultily executed, and unlawful voter purge effort (the "Voter Purge Program") that abridges that right and violates the United States Constitution's Equal Protection and Due Process Clauses, as well as the federal framework set forth in the National Voter Registration Act ("NVRA") and the Voting Rights Act ("VRA") that is designed to protect the right to vote from exactly the type of infringements entailed by the Secretary's Voter Purge Program.

2.      The Voter Purge Program, which the Secretary sprung on voters with just days remaining until the 2024 general election, targets recently naturalized citizens for voter challenges, law enforcement investigations, and unwarranted scrutiny for exercising their right to vote. On October 22, 2024, the Secretary provided a covert list to county election commissioners identifying 2,176 registered voters as subject to "reasonable suspicion" of being a non-citizen. The sole basis for targeting those voters for election challenges and investigation is the Secretary's review of

Iowa Department of Transportation ("DOT") records showing those individuals to have self-reported being non-citizens at some unspecified time in the past.

3.      The Secretary knows better. According to data maintained by the State, 4,097 persons were naturalized as U.S. citizens in 2022 alone.[1] Yet, the Secretary's October 22 letter explicitly acknowledged that only **154** of the **2,176** identified individuals purport to have registered to vote *after* identifying as a non-citizen—meaning the Secretary has no clue whether or not the vast majority of individuals on his list are in fact ineligible to vote. Flagrantly disregarding the rights of Iowa's newest citizens, the Secretary's Voter Purge Program ensures that new citizens are targeted, challenged, and investigated for exercising their basic right of citizenship and participating in our democracy having recently sworn oaths of fidelity to the Constitution.

4.      Indeed, based on all currently available information, the Secretary's secret list is fatally flawed. Dr. Selcuk is one example: He registered to vote on November 7, 2023, the day after he became a United States citizen after years of effort. Yet he was placed on the Secretary's covert list and wrongfully subjected to investigation and an election challenge for following the law and exercising his right to vote. All named Plaintiffs are naturalized United States citizens after having lived in Iowa as lawful permanent residents and possess the fundamental right to vote without facing discrimination or interference.

5.      On information and belief, county investigations of individuals on the list have revealed multiple other examples of persons on the Secretary's list who are registered to vote as United States citizens. As another example, Linn County forwarded to the county sheriff's office the names of four persons on the list who have already voted; the sheriff's office then sent the names to federal immigration enforcement officers. According to a report from *The Gazette*, **all**

---

[1] *See* https://www.iowadatacenter.org/index.php/data-by-source/other/naturalizations.

***four of the individuals are U.S. citizens*** but were nonetheless subjected to an unwanted law-enforcement investigation.

6.      The Secretary's Voter Purge Program is unlawful. Putting aside the Secretary's lack of factual basis for preparing a covert list claiming that 2,176 voters are ineligible, federal law forbids systematic list maintenance to voting rolls during the so-called 90-day "quiet period" before an election, as set out under Section 8(c) of the National Voter Registration Act of 1993 ("NVRA"). Congress prohibited such programs from occurring during this period *for this exact reason*:  to protect voters targeted in systematic lists because they "will likely not be able to correct the State's errors in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Even the best designed list maintenance system undertaken with the best of intentions would be barred by federal law when so dangerously close to an election. That is reason alone to enjoin the continued operation of Defendants' Voter Purge Program.

7.      Moreover, Defendants' Voter Purge Program is far from such a well-designed, well-intended list effort to maintain Iowa's voting rolls. It is an illegal, discriminatory, and error-ridden program that imposes unjustified, harmful burdens on the right of naturalized U.S. citizens to vote and will cause a chilling effect on the act of voting for countless eligible voters. In addition to discriminating against new citizens and unjustifiably burdening a fundamental right, the Voter Purge Program violates the Due Process Clause by failing to ensure notice to affected voters and using a covert list to cast a pall of suspicion over the eligibility of new citizens to vote. Immediate injunctive relief is urgently needed to prevent mass disenfranchisement days out from the 2024 presidential general election.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA] . . . may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

9.      This action also arises under the Constitution and laws of the United States of America, including the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment and the First Amendment.

10.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1357 because the claims in the action arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201 and 2202, and the principles articulated in *Ex Parte Young*, 209 U.S. 123 (1908).

11.     This Court has personal jurisdiction over Defendants, who are all elected or appointed officials and citizens of Iowa.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants engage in their official duties in this District, a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District, at least one Defendant resides in this District, and all Defendants are Iowa residents.

## PARTIES

13.     Plaintiff Dr. Selcuk is an individual residing in Winneshiek County, Iowa. Dr. Selcuk is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

14.     Plaintiff Mr. Gwilliam is an individual residing in Johnson County, Iowa. Mr. Gwilliam is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

15.     Plaintiff Ms. Zhen is an individual residing in Polk County, Iowa. Ms. Zhen is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

16.     Plaintiff Mr. Brokloff is an individual residing in Scott County, Iowa. Mr. Brokloff is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

17.     Plaintiff LULAC is the Iowa chapter of one of the oldest and most widely recognized Hispanic civil rights member organizations in the United States. Among other things, LULAC regularly holds voter registration drives and citizenship-awareness sessions. LULAC has more than 500 active members and twenty separate councils in Iowa. LULAC's members include naturalized citizens of the United States, and at least some LULAC members are Affected Voters as defined herein. LULAC brings this action in its representational capacity on behalf of such members. Additionally, LULAC bring this action in its organizational capacity due to the direct injury it has sustained as a result of Defendants' actions. LULAC has spent both money and other resources on voter education and registration efforts over the past year without knowledge of the Voter Purge Program. LULAC now has been forced to spend resources it would otherwise have devoted to continuing efforts to instead informing concerned members about the Secretary's

unlawful directives and helping Affected Voters navigate the more burdensome voting process created by the Voter Purge Program.

18.     Defendant Paul D. Pate is the Iowa Secretary of State. The Secretary is sued in his official capacity. Pursuant to Iowa state law, the Secretary is the chief elections officer for the State and, as such, is responsible for administering state voting laws and ensuring that its elections are conducted in a legal fashion. The Secretary is also responsible for administering Iowa's responsibilities under the NVRA and the Voting Rights Act.

19.     Defendant Benjamin Steines ("Steines") is the Winneshiek County Auditor and the Winneshiek County Election Commissioner. In these roles, Steines is responsible for administering elections in Winneshiek County, Iowa. Steines is sued in his official capacity.

20.     Defendant Jamie Fitzgerald ("Fitzgerald") is the Polk County Auditor and Polk County Election Commissioner. In these roles, Fitzgerald is responsible for administering elections in Polk County, Iowa. Fitzgerald is sued in his official capacity.

21.     Defendant Melvyn Houser ("Houser") is the Pottawattamie County Auditor and Pottawattamie County Election Commission. In these roles, Houser is responsible for administering elections in Pottawattamie County, Iowa. Houser is sued in his official capacity.

22.     Defendant Erin Shane ("Shane") is the acting Johnson County Auditor and acting Johnson County Election Commissioner. In these roles, Shane is responsible for administering elections in Johnson County, Iowa. Shane is sued in her official capacity.

23.     Defendant Kerri Tompkins ("Tompkins") is the Scott County Auditor and Scott County Election Commissioner. In these roles, Tompkins is responsible for administering elections in Scott County, Iowa. Tompkins is sued in her official capacity.

**LEGAL BACKGROUND**

***The NVRA***

24.     Section 8(c)(2)(A) of the NVRA requires that all states "complete, not later than 90 days prior to the date of a primary or general election for Federal office, *any* program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). This limitation applies to "any" and all list maintenance programs—phrasing that "suggests that the 90 Day Provision has a broad meaning," *Arcia*, 772 F.3d at 1346.

25.     Section 8(c) of the NVRA contemplates a distinction between individualized list maintenance and systematic list maintenance.  Individualized removals "do not present the same risks as systematic removals because they are 'based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance of mistakes.'" *North Carolina State Conf. of NAACP v. North Carolina State Bd. Of Elections*, No. 1:16-CV-1274, 2016 WL 6581284, at *5 (M.D.N.C. Nov. 4, 2016) (quoting *Arcia*, 772 F.3d at 1346). NVRA Section 8(c) is an acknowledgement that—ninety days out from a Federal election—there is neither enough time for states to properly execute a *systematic* purge of registered voters nor correct for erroneous removals. *See Arcia*, 772 F.3d at 1346 ("Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.").

26.     The NVRA makes clear that there are only a few to this prohibition; states are permitted to remove registered individuals from the voter rolls within ninety days of a Federal

election only if: (1) the individual requests to be removed; (2) state law determines that the individual is ineligible to vote on account of a criminal conviction or mental incapacity; (3) the individual has died; or (4) for "correction of registration records" pursuant to other requirements of the NVRA. 52 U.S.C. § 20507(c)(2)(B) (specifically enumerating the exceptions to the 90-day prohibition). The exceptions listed in 52 U.S.C. § 20507(c)(2)(B) constitute an exhaustive list. *See Arcia*, 772 F.3d at 1345 (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980) to note that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

27.     The plain text of Section 8(c), accompanying case law, and the recent guidance from the U.S. Department of Justice ("DOJ") also preclude any argument that Section 8(c) restricts only immediate removals, and not other list maintenance, during the 90-day quiet period. The plain text of Section 8(c) covers "any *program the purpose of which* is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2) (emphasis added). The plain text reading of Section 8(c) is also reflected in both the relevant case law and DOJ guidance, which confirm that the 90-day quiet period applies to list maintenance activities beyond immediate removals. *See, e.g.*, *Montana Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1082 (D. Mont. 2008) (finding if "election officials are required, or even allowed, to compel an elector challenged on the basis of change-of address information to prove anything, there is a violation of federal law."); U.S. Dep't of Justice, Voter Registration List Maintenance: Guidance under Section 8 of the National Voter Registration Act, 52 U.S.C. § 20507, at 4 (Sept. 2024), https://www.justice.gov/crt/media/1366561/dl ("This 90-day deadline applies to State list maintenance verification activities such as general mailings").

28.     For purposes of the November 5, 2024 presidential general election, the 90-day quiet period began on August 7, 2024.

### *The Iowa Voter Registrar*

29.     The Secretary is responsible for maintaining Iowa's statewide registrar of voters. *See* Iowa Code § 47.7. Given the critical importance to maintaining the accuracy of the registrar of voters, Iowa law prescribes specific procedures for "adding, changing, or deleting information from the state voter registration file." *Id.* § 47.7(d).

30.     Given the importance of an established registrar well in advance of elections and outside of the 90-day quiet period outlined under federal law, Section 47.7 requires the Secretary to verify voters in the system during the "first quarter of each calendar year." *Id.* § 47.7. The statutory scheme directs issues related to the eligibility of voters to be addressed during that window, with a report submitted to the Iowa legislature by April 30 of each year and published on the internet. *Id.* § 47.7(f).

### *Federal Protection of the Fundamental Right to Vote.*

31.     The right to vote is a fundamental right protected by the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, among other constitutional provisions.

32.     In addition, Section 11(b) of the Voting Rights Act prohibits any person, whether acting under color of law or otherwise, from intimidating, threatening, coercing, or attempting to intimidate, threaten, or coerce any person for voting or attempting to vote. 52 U.S.C. § 10307(b).

## FACTUAL ALLEGATIONS

### *The Voter Purge Program*

33.     In or around October 2024, the Secretary completed a purported investigation that compared Iowa's voter rolls to DOT records showing individuals who have, at some point in the

past, purportedly self-identified as non-citizens. Based on that inquiry, the Secretary placed 2,176 individuals on a list of persons who are registered to vote in Iowa after previously self-identifying to the DOT as a non-citizen ("Affected Voters"). The Secretary explained his process and findings in a guidance he sent to county election officials on October 22, 2024 (the "Guidance")—just two weeks prior to the November 5, 2024 general election ("General Election").

34.     Upon information and belief, the DOT's records of persons identifying as non-citizens go back years, and many (likely the vast majority) of the Affected Voters are naturalized citizens who lawfully obtained a driver's license at some point prior to naturalizing. The Secretary has not specified—not in his Guidance or any other statements—that he undertook any investigation to establish whether Affected Voters naturalized as United States citizens since self-identifying as non-citizens.

35.     Notwithstanding the requirement under state and federal law to resolve the state registrar of voters well in advance of the general election, the Secretary waited until two weeks prior to the General Election to send his list of purportedly ineligible voters to county election commissioners.

36.     The Secretary's actions compounded the procedural unfairness inherent in his delay and last-minute tactics by failing to notify the Affected Voters. Instead, the Secretary disclosed the secret list specifically to county election commissioners with detailed, purportedly mandatory instructions to challenge the right of the Affected Voters to vote, as well as instructions to keep the list secret.

37.     The Secretary maintains that all persons on his covert list are reasonably suspected of being ineligible to vote. Based on that judgment, the Secretary has mandated that all county election commissioners challenge any effort by an Affected Voter to vote. Notwithstanding the

Secretary's own disregard of Iowa Code § 47.7 procedural requirements, he has instructed county election officials that they are bound by Iowa law to challenge ballots cast by Affected Voters.

38.    The Secretary further mandates that county election officials must require Affected Voters to cast a provisional ballot that will only count if the Affected Voter is able to sufficiently document their citizenship and voter eligibility.

39.    Only being permitted to cast a provisional ballot when the Affected Voter has already attested to being a U.S. citizen and fulfilling all the requirements of the NVRA places additional burdens on the Affected Voters' right to vote on a stringent timeline. The provisional ballot requires the Affected Voter to *again* attest to being a U.S. citizen, and then requires the Affected Voter to provide additional proof of citizenship in the form of written statements or documents within a few days after the General Election.

40.    To this effect, at least one county election commissioner has advised that all recently naturalized citizens bring their proof of citizenship with them to their polling place.

41.    Under Iowa law, to obtain an Iowa driver's license or non-operator's identification card, one must (among other things) submit proof of lawful status in the United States. *See* Iowa Admin. Code r. 761-601.5(321) (2022).

42.    To satisfy the lawful status requirement, an applicant may verify their lawful status by submitting, among other things, an unexpired Permanent Resident Card (Form I-551) issued by the U.S. Department of Homeland Security or the U.S. Immigration and Naturalization Service, an unexpired employment authorization document issued by the U.S. Department of Homeland Security (Form I-766 or Form I-688B), or an unexpired foreign passport with a U.S. visa affixed, accompanied by the approved I-94 Form documenting the applicant's most recent admittance into the United States  *Id.* r. 761.601.5(1), (5).

43.     Upon information and belief, all or some of the Affected Voters previously applied for an Iowa driver's license or non-operator's identification card with the DOT using one of these approved verification methods.

44.     Notably, the Iowa Administrative Code does *not* require that an applicant verify they are a naturalized U.S. citizen to obtain an Iowa driver's license or non-operator's identification card.

45.     Upon information and belief, many of the Affected Voters are now naturalized U.S. citizens and, as such, are eligible to vote.

46.     Upon information and belief, many of the Affected Voters have completed all steps necessary to register and vote in the General Election, including providing all the information required by state and federal law, such as attesting to the NVRA's citizenship requirements.

47.     By design, the only individuals on the list of Affected Voters are those that were once lawful permanent residents of the United States. In order to be a lawful permanent resident, the Affected Voters were once citizens of countries other than the United States. Inclusion on the list of Affected Voters is therefore premised on the Affected Voter's national origin, ethnicity, or race.

48.     The Secretary has admitted that the citizenship status of the Affected Voters is, at most, unclear. Specifically, the Secretary's office is aware that many of the Affected Voters are now naturalized citizens, but the Secretary nonetheless persists in requiring county election officials to regard the Affected Voters ineligible and challenge their ballots.

49.     Upon information and belief, despite the list of Affected Voters being a public record under the Iowa Open Records Act and the NVRA, the Secretary has intentionally kept the list secret, while refusing to identify the Affected Voters, disclose the list, or notify Affected Voters

in advance of their voting. Moreover, the Secretary has directed county election officials—
including Steines, Fitzgerald, Houser, Shane, and Tompkins—to keep the list of Affected Voters
secret.

50.     The Secretary's directive explicitly directed county election commissioners and
election staff—including Steines, Fitzgerald, Houser, Shane, and Tompkins—to "not release the
names or other details [of the list] publicly." It further stated: "The number of affected voters in
your county may be shared, but not any data that could identify the voters – even information that
is technically part of the voter registration record." Even as the Secretary provided those directions,
he acknowledged that the list of Affected Voters may be subject to Iowa open records
requirements.

51.     The Secretary's claims about the eligibility of the Affected Voters to vote are based
solely on purported self-reporting to the DOT of lawful permanent resident status that may be more
than ten years old and long outdated.

52.     For example, numerous Affected Voters in Pottawattamie County self-reported to
the DOT they were lawful permanent residents as far back as 2017, but when registering to vote
in 2021 indicated they were now U.S. citizens. Upon information and belief, the Secretary
performed a sweeping, systematic comparison of dates that failed to account for naturalization and
is designed to facilitate the mass challenging of voters.

53.     Another Affected Voter in Pottawattamie County self-reported being a lawful
permanent resident in **2007**, while later identifying as a U.S. citizen in **2023** when registering to
vote. The Secretary's conduct now subjects this lawful Affected Voter to arbitrary additional
burdens, investigation, and scrutiny to ensure their ballot will count in the General Election.

54.     The Secretary has directed all county election precinct staff to review the list of Affected Voters prior to the upcoming general election and challenge *any ballot* cast by an Affected Voter through a non-citizen challenge form.

55.     The Secretary has precluded county election precinct staff and county election officials—including Steines, Fitzgerald, Houser, Shane, and Tompkins—from releasing the names of the Affected Voters. Upon information and belief, The Secretary has given this directive despite acknowledging that the identity of the Affected Voters is part of the public voter registration record, and therefore subject to disclosure under both the NVRA and the Iowa Open Records Act.

56.     The Secretary's directive to keep the identity of the Affected Voters a secret makes it significantly harder for the Affected Voters to learn that they are on the list and take measures to ensure that they can nevertheless lawfully vote in the General Election.

57.     Moreover, to resolve the eligibility of Affected Voters, county election commissioners have referred voters to law enforcement for investigation. As a result, Affected Voters have been and will continue to be subject to the specter of criminal investigation for casting ballots. Upon information and belief, media reports of such criminal investigations have already created a chilling effect among newly naturalized citizens and those who live in mixed-status households.

58.     The Voter Purge Program is further designed to prevent thousands of registered voters from voting in a presidential election and with the purpose of ultimately removing those supposedly ineligible voters from the rolls.

59.     Upon information and belief, Steines has received a list of the Affected Voters registered in Winneshiek County.

60.   Upon information and belief, Steines, acting at the Secretary's directive, will not release the identity of the Affected Voters registered to vote in Winneshiek County.

61.   Upon information and belief, Steines, acting at the Secretary's directive, will challenge, and already has challenged, any ballot cast by an Affected Voter including Dr. Selcuk (as described below).

62.   Taken in total, Steines's actions (at the Secretary's directive) constitute list maintenance within the 90-day quiet period, the purpose of which is to systematically remove thousands of voters from the rolls on the basis of purported lack of citizenship.

63.   Upon information and belief, Fitzgerald has received a list of the Affected Voters registered to vote in Polk County.

64.   Upon information and belief, Fitzgerald, acting at the Secretary's directive, will not release the identity of the Affected Voters registered in Polk County.

65.   Upon information and belief, Fitzgerald, acting at the Secretary's directive, will challenge any ballot cast by an Affected Voter.

66.   Taken in total, Fitzgerald's actions (at the Secretary's directive) constitute list maintenance within the 90-day quiet period, the purpose of which is to systematically remove thousands of voters from the rolls on the basis of purported lack of citizenship.

67.   Upon information and belief, Houser has received a list of the Affected Voters registered to vote in Pottawattamie County.

68.   Upon information and belief, Houser, acting at the Secretary's directive, will not release the identity of the Affected Voters registered in Pottawattamie County.

69.   Upon information and belief, Houser, acting at the Secretary's directive, will challenge any ballot cast by an Affected Voter.

70.     Taken in total, Houser's actions (at the Secretary's directive) constitute list maintenance within the 90-day quiet period, the purpose of which is to systematically remove thousands of voters from the rolls on the basis of purported lack of citizenship.

71.     Houser has publicly advised that "[a]nybody that has recently acquired citizenship and wants to vote should bring proof of citizenship to the polls." Upon information and belief, this statement was based on the Secretary's directives pursuant and related to the Voter Purge Project.

72.     Upon information and belief, Shane has received a list of the Affected Voters registered to vote in Johnson County.

73.     Upon information and belief, Shane, acting at the Secretary's directive, will not release the identity of the Affected Voters registered in Johnson County.

74.     Upon information and belief, Shane, acting at the Secretary's directive, will challenge any ballot cast by an Affected Voter.

75.     Upon information and belief, county auditors and election commissioners are not certain that any ballot cast by an Affected Voter will be counted or rejected in the General Election.

76.     Taken in total, Shane's actions (at The Secretary's directive) constitute list maintenance within the 90-day quiet period, the purpose of which is to systematically remove thousands of voters from the rolls on the basis of purported lack of citizenship.

77.     Upon information and belief, Tompkins has received a list of the Affected Voters registered to vote in Johnson County.

78.     Upon information and belief, Tompkins, acting at the Secretary's directive, will not release the identity of the Affected Voters registered in Johnson County.

79.     Upon information and belief, Tompkins, acting at the Secretary's directive, will challenge any ballot cast by an Affected Voter.

80.     Upon information and belief, county auditors and election commissioners are not certain that any ballot cast by an Affected Voter will be counted or rejected in the General Election.

81.     Taken in total, Tompkins' actions (at The Secretary's directive) constitute list maintenance within the 90-day quiet period, the purpose of which is to systematically remove thousands of voters from the rolls on the basis of purported lack of citizenship.

82.     Upon information and belief, county precinct workers already have access to the list of Affected Voters.

83.     In addition, the Secretary has publicly announced that 154 voters—some of which may be Affected Voters—have been referred to the Iowa Department of Public Safety and the State of Iowa Office of the Attorney General for further investigation and potential criminal prosecution.

84.     The Secretary has refused to identify the potential Affected Voters that are subject to criminal prosecution.

### *Plaintiffs Attempt to Vote Through Early In-Person Voting*

85.     Dr. Selcuk is originally from Turkey and is a political science professor at Luther College in Decorah, Iowa.

86.     Dr. Selcuk moved from Turkey to the United States in 2013.

87.     Dr. Selcuk previously applied for and obtained a driver's license through the DOT. When he applied for his license, he verified his lawful permanent resident status to the DOT.

88.     Dr. Selcuk became a naturalized citizen of the United States on November 6, 2023.

89.     Since he became a naturalized citizen, Dr. Selcuk voted in two previous elections without incident.

90.     Dr. Selcuk's most recent Iowa driver's license (which is still valid and not expired) indicates he is a lawful permanent resident of the United States.

91.     Dr. Selcuk is an Affected Voter as defined herein.

92.     On October 22, 2024, Dr. Selcuk took advantage of early in-person absentee voting at the Winneshiek County Auditor's Office inside the Winneshiek County Courthouse. Dr. Selcuk submitted his absentee ballot at the courthouse that same day.

93.     On October 26, 2024, Dr. Selcuk received a letter from Steines dated October 23, 2024, informing him that his absentee ballot is being challenged based on the erroneous allegation that Dr. Selcuk is not a citizen of the United States. The letter informed Dr. Selcuk that he has until six days after the upcoming November 5, 2024 General Election, to prove that he is a citizen, or his ballot will not count.

94.     The letter from Steines was sent pursuant to the Secretary's directives as alleged herein.

95.     The letter from Steines has caused Dr. Selcuk uncertainty about whether his vote will count in the upcoming General Election.

96.     In order to prove his citizenship, Dr. Selcuk will need to provide information beyond that required in the NVRA and beyond what other, non-challenged voters are required to provide, including additional documentation of his naturalization as a United States citizen.

97.     Mr. Gwilliam is originally from Wales and is a retired attorney residing in Iowa City, Iowa.

98.     Mr. Gwilliam moved from Wales to the United States in 1981.

99.     Mr. Gwilliam previously applied for and obtained a driver's license through the DOT in 2023. When he applied for his license, he verified his lawful permanent resident status to the DOT.

100.     Mr. Gwilliam became a naturalized citizen of the United States on August 16, 2024, and registered to vote shortly thereafter.

101.     Since he became a naturalized citizen, Mr. Gwilliam has not voted in any previous elections.

102.     Mr. Gwilliam is an Affected Voter as defined herein.

103.     Mr. Gwilliam's most recent Iowa driver's license (which is still valid and not expired) indicates he is a lawful permanent resident of the United States.

104.     On or about October 29, 2024, Mr. Gwilliam was informed that he was on the list of Affected Voters in Johnson County. He was told he must prove he is a United States citizen before his vote is counted.

105.     The knowledge of his status as an Affected Voter has caused Mr. Gwilliam uncertainty about whether his vote will count in the upcoming General Election.

106.     In order to prove his citizenship, Mr. Gwilliam will need to provide information beyond that required in the NVRA and beyond what other, non-challenged voters are required to provide, including additional documentation of his naturalization as a United States citizen.

107.     Based on her previous status as a lawful permanent resident, Ms. Zhen suspects that she may be on the Secretary's list. Despite her efforts to clarify her status, neither the Polk County Auditory nor the Secretary's office has been willing to confirm whether she is subject to the list. She remains intimidated by the prospect of facing an election challenge when attempting to vote in this election.

108.    When Mr. Brokloff attempted to vote, he was flagged by poll workers and told he needs to prove his citizenship. He had to return to the Scott County Auditor's office with his passport to attempt to establish his citizenship. The office refused to confirm his eligibility to vote.

<u>COUNT ONE</u><br>
<strong>Violation of the Fourteenth Amendment Equal Protection Clause</strong><br>
<strong>All Plaintiffs Against All Defendants</strong>

109.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

110.    The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

111.    Under the Equal Protection Clause, discrimination based on naturalized citizenship and on national origin is presumptively unconstitutional and subject to strict scrutiny.

112.    The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Iowa may not engage in "arbitrary and disparate treatment" of similarly situated voters. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *see also id.* at 104 ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.").

113.    Although they are similarly situated, the Affected Voters are treated differently from other registered voters. Specifically, the Voter Purge Program effectively requires registered voters on the list of Affected Voters to re-register and provide additional documentation regarding their citizenship beyond what is required of other voters—including by undergoing an additional

verification process—to vote in the General Election (and other future elections) and to be registered to vote.

114.    By design and at the Secretary's direction, voting precincts across Iowa will have two lists of voters for the General Election—Iowa's general voter rolls and the list of Affected Voters prepared by the Secretary.

115.    As described above, inclusion on the list of Affected Voters necessarily stems from the Affected Voter's national origin, race, ethnicity, or citizenship status. The Secretary has classified the Affected Voters and treated them differently with respect to a fundamental right based on national origin, race, ethnicity, or citizenship status.

116.    The Voter Purge Program, designed by the Secretary, discriminates against naturalized citizens by creating a process that, by design, singles out only naturalized citizens for unwarranted scrutiny and investigation, while excluding all persons born in the United States from such treatment. Defendants treat naturalized citizens differently from U.S.-born citizens and burden those naturalized citizens by requiring them to cast a provisional ballot that will count only if the voters submit new and additional information to verify their citizenship. This requirement, by design, does not apply to Iowa citizens born in the United States.

117.    Defendants further treat naturalized citizens differently than citizens born in the United States by publicly referring naturalized citizens who have previously lawfully interacted with the state through the DOT for criminal investigation and subjecting them to criminal investigation for the act of voting. Citizens born in the United States are exempt from such investigation and threat of prosecution, while naturalized citizens are subject to investigation and the threat of prosecution.

118.    Defendants know and have acknowledged that the Voter Purge Program by its very terms includes, or may include, Affected Voters that are naturalized citizens. The Voter Purge Program creates a classification that discriminates against naturalized citizens, who have a fundamental right to vote that is *equal* to that of citizens born in the United States.

119.    Throughout the General Election, county election officials acting at the Secretary's direction will subject Affected Voters to automatic election challenges and unwarranted scrutiny, investigation, uncertainty, and burdens in order to vote.

120.    Aside from their race, ethnicity, and national origin, the Affected Voters and non-affected voters are similarly situated: they have all registered to vote in the General Election and fulfilled federal and state requirements to vote.

121.    The Voter Purge Program and the list of Affected Voters creates a classification that is neither justified by nor narrowly tailored to promote substantial or compelling state interests that could not be achieved through less restrictive means.

### COUNT TWO
**Violation of the Fundamental Right to Vote Under the First and Fourteenth Amendments All Plaintiffs Against All Defendants**

122.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

123.    The right to vote is protected through the U.S. Constitution under the Equal Protection Clause of the Fourteenth Amendment. State election laws and procedures cannot unduly place a burden on the right to vote.

124.    The Secretary's directive severely burdens the right to vote for Affected Voters, who will be forced to prove their citizenship—likely without advance knowledge that they will have to do so—in order to exercise their fundamental right to vote. These burdens go far beyond

what is required of all other registered voters in Iowa, and what is required under state and federal law. The Voter Purge Program subjects Affected Voters to investigation, fear of law enforcement, and the burdens of having their eligibility challenged in order to exercise their fundamental right to vote.

125.    The burdens imposed by the Secretary's directive are not necessary, narrowly tailored to achieve, or reasonably related to, any sufficiently weighty state interest. These burdens accordingly lack any adequate justification and must be enjoined.

**<u>COUNT THREE</u>**
**Violation of the Fourteenth Amendment's Due Process Clause**
**All Plaintiffs Against All Defendants**

126.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

127.    The Secretary is intentionally keeping the list of Affected Voters secret. As such, the Voter Purge Program is designed to avoid providing notice to Affected Voters.

128.    Because the list of Affected Voters is by design being kept secret, many of the Affected Voters are being denied any opportunity to contest their placement on the list—let alone a meaningful opportunity—thus placing their right to vote in the upcoming General Election in severe jeopardy.

129.    By refusing to make the list public, the Secretary is placing severe burdens on the Affected Voter's rights to cast a ballot and undermining their ability to resolve their eligibility.

130.    In some cases, the Affected Voters may not be able to provide proof of citizenship in time to survive any challenge to their ballot, thus depriving them of their legal right to vote entirely.

131.    Because the Voter Purge Program does not provide a meaningful opportunity for notice and hearing prior to imposing heavy burdens on the fundamental right to vote, it deprives the Affected Voters of procedural due process.

## COUNT FOUR
**Violation of Section 8(c) of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**
**(*Ex parte Young*, 52 U.S.C. § 20510)**

132.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

133.    The NVRA requires that Iowa complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Iowa may not take any steps to implement any program to systematically remove voters within the 90-day period before the date of a general election—the "quiet period."

134.    The Voter Purge Program violates the NVRA's 90-Day Provision because it (1) is a program with the purpose of systematically challenging the eligibility voters and amending the voting rolls, and (2) has not been completed before the 90-day quiet period before the General Election.

135.    The Voter Purge Program is the very definition of "systematic." As the Eleventh Circuit has explained, list maintenance predicted on "a mass computerized data-matching process to compare the voter rolls with other state and federal databases" constitutes systematic list maintenance. *Arcia*, 772 F.3d at 1346. The Secretary has challenged more than 2,000 voters at one time, all based on the exact same data matching process. He attests to no personal or firsthand knowledge of any of the Affected Voters and their citizenship status, citing only the DOT and

voter registration records. The Voter Purge Program thus constitutes a systematic list maintenance program barred under the 90-day quiet period.

136.    The Voter Purge Program also has the purpose of removing these voters from the rolls. The Program's express purpose is to prevent thousands of registered voters from voting in a presidential election and ultimately remove those supposedly ineligible voters from the rolls. This Program is thus squarely prohibited under NVRA Section 8(c).

137.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program is ongoing all within fewer than thirty days before the November 5, 2024 election for Federal office. Plaintiffs can therefore bring a civil action without notice to Iowa's chief election official.

**COUNT FIVE**
**Violation of Section 8(b) of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
**(*Ex parte Young*, 52 U.S.C. § 20510)**

138.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

139.    The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

140.    The Voter Purge Program violates the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory" because they identify registered voters based on national origin and type of citizenship status. Because Defendants' Purge Program is triggered by DOT data indicating a voter had previously identified as a non-citizen, the Voter Purge Program treats citizens born outside the United States differently from similarly situated

citizens born within the United States. It inevitably and predictably (indeed, by design) identifies and places additional burdens on citizens born outside the United States whom Defendants know or should know may be naturalized. Therefore, Defendants' Voter Purge Program is neither "uniform" nor "nondiscriminatory."

141.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program is ongoing, with potential purges occurring daily, all within fewer than thirty days before the November 5, 2024 election for Federal office. Plaintiffs can, therefore, bring a civil action without notice to Iowa's chief election official.

## COUNT SIX
### Violation of the National Voter Registration Act, 52 U.S.C. §§ 20508(b)(1), 20505(a)(1)-(2) (*Ex parte Young*, 52 U.S.C. § 1983)

142.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

143.    The NVRA limits proof of citizenship to an attestation under penalty of perjury that the registrant is a U.S. citizen. *See Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1 (2013); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(2)(A)–(B).

144.    The NVRA provides that a state voter registration form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(1). Under the NVRA, a state voter registration form "shall include a statement that (A) specifies each eligibility

requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* §§ 20505(a)(1)-(2), 20508(b)(2); *see also id.* § 20504(c).

145.    By requiring certain voters to provide additional evidence of their U.S. citizenship to remain registered, the Voter Purge Program violates the NVRA's command that voters need only complete a voter registration form to be a registered voter in Federal elections.

146.    Houser's statement that "[a]nybody that has recently acquired citizenship and wants to vote should bring proof of citizenship to the polls" is further evidence of this conduct. Upon information and belief, this statement is being made by Houser in response to the Secretary's direction as part of the Voter Purge Program.

147.    By inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DOT data checks and motor voter forms, the Voter Purge Program also violates the NVRA's long-established principle that states may not add unnecessary voter registration requirements at any stage of the registration process by inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the Iowa DOT data checks and motor voter forms.

148.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program is ongoing, with potential purges occurring daily, all within fewer than thirty days before the November 5, 2024 election for Federal office. Plaintiffs can, therefore, bring a civil action without notice to Iowa's chief election official.

**COUNT SEVEN**
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(i)**
(***Ex parte Young***, **52 U.S.C. §**
**1983)**

149.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

150.    The Public Disclosure of Voter Registration Activities provision (the "Public Disclosure Provision") of the NVRA provides that states "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision covers individualized records for registered voters subject to removal programs. *See PILF v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); *see also* 52 U.S.C. 20507(i)(2).

151.    Upon information and belief, the Secretary has violated the Public Disclosure Provision of the NVRA by refusing to provide records with the list of voters identified as potential non-citizens within a reasonable time period despite having those records in his office's possession at the time interested parties requested these records on October 23, 2024.

152.    The Secretary and his office's continuing refusal to provide the requested records up to and including the time of filing of this lawsuit—which now falls within the 30-day period prior to a federal election within which aggrieved parties have immediate standing to sue to vindicate their rights under the NVRA, 52 U.S.C. § 20510(b)(3)—is certainly unlawful, and the requested records must now be produced immediately.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

1.      Declare that the Voter Purge Program violates federal law and the United States Constitution;

2.      Order Defendants to rescind the Secretary's list of Affected Voters and all directives to treat voters differently based on their inclusion on the list;

3.      Order the Secretary to immediately notify all county election commissioners that the eligibility of voters cannot be challenged based on the Secretary's list of Affected Voters;

4.      Order Defendants Steines, Fitzgerald, Houser, Shane, and Tompkins to retract the notice letters already sent on the basis of the list of Affected Voters;

5.      Order Defendants to restore the status of any persons who were removed from Iowa's voting rolls, including by being placed in inactive status, as a result of the Secretary's investigation and preparation of the list;

6.      Order all Defendants to take all such steps as are necessary to alert all individuals on the list of Affected Voters and the public that any notice letters sent pursuant to an Affected Voter's status are rescinded, that all eligible voters (including Affected Voters) may vote in the November 2024 General Election, and that all eligible voters on the list of Affected Voters are on the voter rolls and need not re-register to vote;

7.      Award Plaintiffs their costs and reasonable attorneys' fees in this action;

8.      Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

9.      Grant Plaintiffs such other relief as this Court may deem just and proper.

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65, a separate motion will be filed setting forth the specific facts which entitle Plaintiffs to a temporary restraining order and preliminary injunctive relief.

Dated: October 30, 2024

/s/ Jesse Linebaugh
Jesse Linebaugh (AT0004744)
Email: jesse.linebaugh@faegredrinker.com
Matthew J. Scott (AT0014441)
Email: matthew.scott@faegredrinker.com
Joe R. Quinn (AT0015363)
Email:  joe.quinn@faegredrinker.com
Emily R. O'Brien** (AT0015757)
Email: emily.obrien@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Telephone:  +1 515 248 9000

Craig S. Coleman*
Email: craig.coleman@faegredrinker.com
Jeffrey P. Justman*
Email: jeff.justman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: +1 612 766 7000

Rita Bettis Austen (AT0011558)
Email: rita.bettis@aclu-ia.org
Thomas D. Story (AT0013130)
Email: thomas.story@aclu-ia.org
AMERICAN CIVIL LIBERTIES UNION OF
IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
Telephone: +1 515 243 3988

Ari Savitzky*
Email: asavitzky@aclu.org
Jonathan Topaz*
Email: jtopaz@aclu.org
Ming Cheung*
Email: mcheung@aclu.org

Sophia Lin Lakin*
Email: slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: +1 212 549 2500

Patricia Yan*
Email: pyan@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
915 15th Street NW
Washington, DC 20005
Telephone: +1 202 457 0800

*Pro Hac Vice Application Forthcoming
**Application for Admission Forthcoming

Attorneys for Plaintiffs Orcun Selcuk, Alan David
Gwilliam, and the League of United Latin American
Citizens of Iowa