# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| ORCUN SELCUK; ALAN DAVID GWILLIAM; TINGTING ZHEN; MICHAEL BROKLOFF; and THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA, on behalf of itself and its members, *Plaintiffs*,<br><br>v.<br><br>PAUL D. PATE, in his official capacity as the Iowa Secretary of State; BENJAMIN D. STEINES, in his official capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; JAMIE FITZGERALD, in his official capacity as the Polk County Auditor and Polk County Commissioner of Elections; MELVYN HOUSER, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; ERIN SHANE, in her official capacity as the acting Johnson County Auditor and acting Johnson County Commissioner of Elections; and KERRI TOMPKINS, in her official capacity as the Scott County Auditor and Scott County Commissioner of Elections,<br><br>*Defendants*. | Case No. 4:24-cv-00390<br><br><br>**RESPONSE IN OPPOSITION TO**<br><br>**PLAINTIFF'S MOTION FOR A**<br><br>**TEMPORARY RESTRAINING ORDER** |

## STATE DEFENDANT'S RESISTANCE TO PLAINTIFFS'
## MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................................i

TABLE OF AUTHORITIES.......................................................................................................ii

INTRODUCTION .......................................................................................................................1

BACKGROUND ..........................................................................................................................3

    I.     Legal Background...........................................................................................................3

        A.    Federal law.............................................................................................................3

        B.    Iowa law ................................................................................................................4

    II.    Factual Background. ......................................................................................................5

    III.   Procedural Background. .................................................................................................7

LEGAL STANDARD ..................................................................................................................8

ARGUMENT...............................................................................................................................9

    I.     Plaintiffs Are Not Likely To Succeed On The Merits. ...........................................9

        C.    Plaintiffs' requested injunction would disrupt the status quo days before the election.
            10

        D.    Plaintiffs' claims misread State and federal law................................................12

    II.    The Other Factors Weigh Against a Preliminary Injunction.............................23

CONCLUSION .........................................................................................................................25

## TABLE OF AUTHORITIES

Cases

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ........................................................................................26
*Andino v. Middleton,*
  141 S. Ct. 9 (2020) ....................................................................................... 3, 11
*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014) .........................................................................9
*Arizona v. Intertribal Council of Ariz.,*
  570 U.S. 1 (2013) ............................................................................................19
*Beals v. Virginia Coalition for Immigrant Rights,*
  604 U.S. ----, 24A407 (Oct. 30, 2024) .........................1, 2, 11, 12, 18, 19, 20
*Bond v. United States,*
  572 U.S. 844 (2014) ........................................................................................17
*Boustani v. Blackwell,*
  460 F.Supp.2d 822 (N.D. Ohio 2006) ...............................................................
*Burdick v. Takushi,*
  504 U.S. 428 (1992) ..........................................................................................
*Carson v. Simon,*
  978 F.3d 1051 (8th Cir.
*Clarno v. People Not Politicians,*
  141 S. Ct. 206 (2020) ........................................................................................
*Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ..........................................................................................
*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ..........................................................................................
*Democratic Nat'l Comm. v. Wis. State Legislature,*
  141 S. Ct. 28 (2020) ..........................................................................................
*Eu v. San Francisco Cnty. Democratic Central Comm.,*
  489 U.S. 214 (1989) ..........................................................................................
*Fla. Democratic Party v. Hood,*
  2004 WL 2414419 (N.D. Fla. Oct. 21, 2004) ...................................................
*Fernandez v. Georgia,*
  716 F. Supp. 2d 1475 (M.D. Ga. 1989) .............................................................
*Ill. Bd. of Elections v. Socialist Workers Party,*
  440 U.S. 173 (1979) ..........................................................................................
*Jet Midwest Int'l Co., v. Jet Midwest Grp., LLC,*
  953 F.3d 1041 (8th Cir. 2020) ...........................................................................
*Little v. Reclaim Idaho,*
  140 S. Ct. 2616 (2020) ......................................................................................
*Maracich v. Spears,*
  570 U.S., 48  (2013) ..........................................................................................
*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) ........................................................................................
*Merrill v. People First of Ala.,*
  141 S. Ct. 25 (Mem.) .......................................................................................3

# TABLE OF AUTHORITIES (cont'd)

*Merrill v. People First of Ala.*,
   141 S. Ct. 190 (Mem.) ...................................................................................................

*Mi Familia Vota v. Fontes*,
   719 F. Supp. 3d 929 (D. Ariz. 2024)................................................................................

*Milligan v. Ottumwa Police Dep't*,
   937 N.W.2d 97 (Iowa 2020)............................................................................................

*Morehouse Enter., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
   78 F.4th 1011 (8th Cir. 2023)..........................................................................................

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986) ........................................................................................................

*New Georgia Project v. Raffensperger*,
   976 F.3d 976 (11th Cir. 2020).........................................................................................

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
   434 U.S. 1345 (1977) ......................................................................................................

*Org. for Black Struggle v. Ashcroft*,
   978 F.3d 603 (8th Cir.

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
   530 F.3d 724 (8th Cir. 724) ............................................................................................

*Powell v. Noble*,
   798 F.3d 690 (8th Cir. 2015)...........................................................................................

*Pub. Int. Legal Foundation v. Boockvar*,
   431 F.Supp.3d 553 (M.D. Pa. 2019) ...............................................................................

*Purcell v. Gonzales*,
   549 U.S. 1 (2006) ......................................................................................................1,

*Reno v. Condon*,
   528 U.S. 141 (2000) ........................................................................................................

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020)....................................................................................................

*Republican Nat'l Comm. v. Wetzel*,
   --- F.4th ----, 2024 WL 4579307 (5th Cir. Oct. 25, 2024).............................................

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ........................................................................................................

*Sandusky Cnty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004)...........................................................................................

*Storer v. Brown*,
   415 U.S. 724 (1974) ........................................................................................................

*Sugarman v. Dougall*,
   413 U.S. 634 (1973) ........................................................................................................

*Sw. Airlines Co. v. Saxon*,
   596 U.S. 450 (2022) ........................................................................................................

*Tashjian v. Republican Party of Connecticut*,
   479 U.S. 208 (1986) ........................................................................................................

*Tex. League of United Latin Am. Citizens v. Whitley*,
   2019 WL 7938511 (W.D. Tex. 2019) .............................................................................

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988) ........................................................................................................

*United States v. Florida*,
   870 F. Supp. 2d 1346 (N.D. Fla. 2012) ..........................................................................

# TABLE OF AUTHORITIES (cont'd)

*Watkins Inc. v. Lewis*,
  346 F.3d 841 (8th Cir. 2003) ........................................................................................................
*Wis. Cent. Ltd. v. United States*,
  545 U.S. 274 (2018) ......................................................................................................................

## Statutes

8 U.S.C. § 1373 .................................................................................................................................2
8 U.S.C. § 1644 .................................................................................................................................2
18 U.S.C. § 611 ................................................................................................................................
18 U.S.C. § 2721 ..............................................................................................................................
18 U.S.C § 2725 ...............................................................................................................................
42 U.S.C. § 1973gg–6(c)(2)(A) ......................................................................................................
52 U.S.C. § 21082(a) .......................................................................................................................
52 U.S.C. § 20501 ............................................................................................................................
52 U.S.C. § 20503 ............................................................................................................................
52 U.S.C. § 20507 ............................................................................................................................
Iowa Code § 22.7(66) .....................................................................................................................
Iowa Code § 321.11 .........................................................................................................................
Iowa Code § 48A.14 ........................................................................................................................
Iowa Code § 48A.5(2)(*a*) ...............................................................................................................
Iowa Code § 49.79 ............................................................................................................. , 8, 11
Iowa Code § 48A.15 .........................................................................................................................
U.S. Const. Art. I, § 4, cl. 1 ...........................................................................................................

## INTRODUCTION

Less than a week before the 2024 Presidential Election, Plaintiffs demand that Iowa and its election officials allow 2,176 self-identified noncitizens to cast ballots. Every ballot illegally cast by a noncitizen cancels out a valid vote. And such voting is a federal and State felony. Even worse—there is no way to later recall those illegally cast ballots. And so Plaintiffs ask the State to allow non-citizens to vote because, they contend, providing proof of citizenship to ensure the integrity of our elections goes too far. And they do so mere days before the election—and more than a week after the Secretary of State's individualized review of voter records identified these citizenship-related discrepancies.

No individual's voter registration status has been altered. What Plaintiffs misleadingly call a "purge program," Dkt. 9-1 at 16, involves not a single voter registration being removed. Indeed, every individual whose vote may be challenged can still vote with a provisional ballot and can still have that vote counted. All it requires is providing evidence of citizenship either that day or before November 12 to the county auditor. Yet an injunction or TRO against Defendants here risks allowing noncitizens to cast a ballot that cannot be recalled, thus canceling out Iowans' valid votes. That harm is truly irreparable—as would be the crisis of faith it would inject into our electoral system.

And certain silences in Plaintiffs' briefing are deafening. Nowhere do Plaintiffs cite the two most important cases in their challenge: *Purcell v. Gonzalez*, which instructs federal courts not to insert themselves into election-related disputes shortly before an election. 549 U.S. 1, 4–5 (2006) (per curiam) and *Beals v. Virginia Coalition for Immigrant Rights*, 604 U.S. —, 24A407 (October 30, 2024) (order granting stay), in which the Supreme Court allowed Virginia to remove self-reported noncitizens from its voter rolls despite a challenge brought under the same laws at issue here.

Plaintiffs decry the 2,176-person list as over-inclusive. The State is relying on self-identification as a non-citizen because the federal government refuses to hand over to the State the complete and accurate subset of known noncitizens from that list—which was, according to the federal government, compiled no later than Friday, October 25. The United States, that is, has confirmed that there are noncitizens registered to vote on the 2,176-person list, and it has identified those individuals, but is refusing to identify that subset to the State. So the State must instead rely on those individuals' own

self-identification.

The State celebrates those residents who have become naturalized and are thus eligible to vote—but without access to those naturalization records from the United States it is left to those citizens to inform the State of their change in eligibility to vote. The United States has information in its possession that would allow Iowa election officials to refine their individualized analysis of voter eligibility and ensure that only votes from eligible voters are counted—information the United States is required by federal law to share with States. *See* 8 U.S.C. § 1373; 8 U.S.C. § 1644. But it refuses to do so. As soon as it chooses to live up to its obligation, the State will update its advice to the local election officials to challenge only those confirmed noncitizens. Until then, the self-reported noncitizen status is the best information the State has.

Despite these federal roadblocks, Iowa has created a process that removes no one from its voter rolls and prevents no one from casting a ballot. Indeed, the Supreme Court just allowed Virginia to remove 1,600 self-identified noncitizen voters from its voter rolls. *See Beals v. Va. Coal. for Immigrant Rights*, 604 U.S. —, 24A407 (October 30, 2024) (order granting stay). If removing those voters from the voter-registration list does not violate the Constitution or NVRA, then Iowa's allowing voters to cast provisional ballots, while remaining an active registered voter, cannot be a violation.

Iowa election officials have merely asked local election officials to apply established ballot-challenge rules to ask voters reasonably suspected of being ineligible to vote via provisional ballots. That reasonable suspicion stems from the voters' own self-identification to the State, under penalty of perjury, as noncitizens. Ballots from eligible voters will then be counted just like any other ballot. But Plaintiffs seek to contort that process to assert illegality where none exists. Their position—that asking a voter to cast a provisional ballot is the same as removing that person from the voter rolls—contradicts not only State and federal law, but common sense. Registration challenges and ballot challenges are legally, and practically, distinct. Ballot challenges are expressly authorized under State and federal election law. Plaintiffs are thus attempting to create illegality where none exists.

The requested injunction also violates the *Purcell* doctrine, which presumes eleventh-hour challenges to State election rules are invalid. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam)

That doctrine has been accepted by the Eighth Circuit and been recently and repeatedly reaffirmed by the U.S. Supreme Court. *See, e.g., Merrill v. People First of Ala.*, 141 S. Ct. 25 (Mem.) (2020); *Andino v. Middleton*, 141 S. Ct. 9 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (Mem.) (2020); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam); *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (declining to vacate stay); *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). *Purcell* recognizes the critical interests that State officials have in protecting their elections and avoiding voter confusion. *See Wis. State Legislature*, 141 S. Ct. at 29 (Gorsuch, J., concurring); *id.* at 31 (Kavanaugh, J., concurring); *Carson*, 978 F.3d at 1062. This Court should reject this election-eve effort to disrupt Iowa's long-established election rules and undermine confidence in the integrity of Iowa's electoral process.

## BACKGROUND

### I.     Legal Background

#### A.     Federal law

Based on its finding that "the right of citizens of the United States to vote is a fundamental right," Congress enacted the National Voter Registration Act (NVRA), 52 U.S.C. §§ 20501, *et seq*. The NVRA is intended to "enhance[] the participation of eligible *citizens* as voters in elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. §§ 20501(a)(1), (b) (emphasis added).

To further those goals, the NVRA expanded voter registration opportunities while imposing restrictions on removing "registrants" from the rolls. *See* 52 U.S.C. §§ 20503(a)(1) (requiring "each State [to] establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license"); 20507(a)(3) (limiting circumstances under which registered voters may be removed from voter rolls). Relevant to Plaintiffs' allegations, the NVRA does not permit removals close to federal elections. *See id.* § 20507(c)(2). This Quiet Period Provision, or 90 Day Provision, bars States from "systematically remov[ing] the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. *Id.* It incorporates by cross-reference

3

three of the four general exceptions allowed for removals in that 90-day period—"voter request, death of the voter, and voter felony conviction, or mental incapacity." *Id.* That Quiet Period does not refer to ballot challenges.

**B.     Iowa law**

Iowa law permits both voter registration challenges and ballot challenges and provides separate legal procedures for each type of challenge.

Iowa law requires election officials "to challenge any person offering to vote whom the official knows or suspects is not duly qualified." Iowa Code § 49.79(1). That duty can arise based on voter age, residency, adjudicated incompetency, felony conviction, and citizenship status. *Id.* Once an election official challenges a known or suspected ineligible voter, the law instructs election officials to allow the challenged person to vote via provisional ballot. *Id.* §§ 49.79(1), 49.81. That voter then casts a ballot and receives written instructions explaining how to prove voting eligibility and has until the Monday after the election to provide the necessary evidence to election officials. *Id.* § 49.81(6). A specialized board then meets in each county to individually review the provisional ballots and any other information and evidence. *Id.* § 50.22. Any accepted ballot is counted, while any rejected ballot remains unopened. *Id.* § 50.22(3). Iowa law does not give that specialized board or the Secretary of State the authority to change or cancel a voter's registration status based on a ballot challenge. *See* Iowa Code chs. 49, 50. Authority is limited to whether the challenged ballot should be counted. *Id.*

Contrast the ballot challenge with the process for challenging a voter's registration—an entirely different process. Iowa law requires that voters of the same county, rather than election officials, bring a voter-registration challenge. Iowa Code § 48A.14(1). Voter-registration challenges must be made in writing to the county elections commissioner—typically the county auditor—and must state the basis for the challenge and include an attestation that the allegation is true. *Id.* §§ 48A.14(1)–(3). If the challenge meets those procedural requirements, the commissioner must notify the challenged registrant of the nature of the challenge as well as the date, time, and place of a hearing. *Id.* § 48A.15(3). The hearing must be held between twenty and thirty days after the commissioner's receipt of the challenge. *Id.* The notice must also inform the challenged registrant that he may personally appear or

4

may submit "evidence, documentation, or statements refuting the challenge." *Id.* At the hearing, the commissioner must accept evidence from the challenger and challenged registrant as well as any documents or evidence submitted. *Id.* § 48A.16(1). The commissioner then rejects the challenge or cancels the voter's registration. *Id.* Either party may appeal to that county's district court. *Id.* Registration challenges "may be filed at any time," but if the challenge is made fewer than seventy days before a regularly scheduled election, that process cannot begin until after the current election. *Id.* § 48A.14(4).[1]

In short, removal from the voter rolls is a multi-step process requiring a separate challenge and involving a full hearing and appeal process. Iowa Code §§ 48A.15–.16. That process is legally and practically distinct from a voter challenge. *Compare* Iowa Code ch. 48A *with* Iowa Code chs. 49–50. Moreover, Iowa law generally prohibits the processing of registration challenges made fewer than seventy days before a regularly scheduled election. *Id.* § 48A.14(4).

## II.     Factual Background.

Over the last year, the Iowa Secretary of State has worked with other State agencies and other States to improve methods for verifying voter eligibility, while "work[ing] towards Iowa's goal of ensuring all individuals who are eligible to vote can do so. Ex. A, Decl. of Michael Ross, ¶¶ 7, 10. In late summer 2024, Michael Ross, Chief of Staff and Deputy Secretary of State, became concerned that people who had self-identified to the Iowa Department of Transportation ("IDOT") as noncitizens were registered to vote. *Id.* ¶¶ 1, 15. Mr. Ross then contacted IDOT about the issue and received a list of self-identified noncitizens who were registered to vote in Iowa. *Id.* ¶ 16.

Mr. Ross received the list on October 7, and he and Secretary of State staff began to review it. *Id.* ¶ 19. As a first step, Secretary of State staff compared each individual's driver's license number in the Secretary of State's IVoter database to the identified individual's number on the IDOT list. *Id.* ¶ 19(a).

---

[1] This section allows challenges "filed within twenty days of the commissioner's receipt of the challenged registrant's registration form or notice of change to an existing registration." Iowa Code § 48A.14(4). In those cases, the challenge is considered a challenge to a voter's ballot and is processed using the State's ballot-challenge procedures. *Id.*

If the two numbers did not match, Secretary of State Staff looked at three other discrete data points: 1) last name, 2) date of birth, and 3) the last four digits of the individual's social security number. *Id.* ¶ 19(b). Secretary of State staff then "went through the list on an individual-by-individual basis" to refine the list. *Id.* ¶ 20. In doing so, Secretary of State staff identified individuals based on possible recordkeeping errors, so those individuals could be removed from any list of suspected noncitizen voters. *Id.* ¶ 21. Mr. Ross then "personally reviewed all identified individuals prior to compiling the final list." *Id.* ¶ 22. During Mr. Ross's "detailed review" he removed additional individuals who might be on the list incorrectly. *Id.* ¶¶ 23–24.

The finalized list of registered voters who had self-identified as noncitizens was then sent to the State's county auditors. *Id.* ¶ 26 (citing Exh. B). The Secretary of State instructed county auditors that the self-identified noncitizens identified in the Secretary of State's review should be asked to cast provisional ballots. Ex. A at 1–2. The Secretary explained that "[u]nder the Help America Vote Act ("HAVA"), an 'individual shall be permitted to cast a provisional ballot' if 'an election official asserts that the individual is not eligible to vote.'" *Id.* at 1. The provisional ballot process then will ensure that any eligibility issues "can be cured and the vote validly counted." *Id.* at 2. The Secretary explained that this process "is no different than when a voter's qualifications as to age or residency are challenged— all are vital parts of the electoral process." *Id.*

Upon their own review of the Secretary of State's list, some auditors contacted the Secretary of State because they had identified individuals on their county's list who had become citizens since their IDOT self-identification. *Id.* ¶ 28. The Secretary of State instructed that "[w]here an individual is known to a County Auditor, Precinct Election Officer, or other election officer to have become a United States citizen," "that self-identified individual's ballot should not be challenged. *Id.* ¶ 29. For example, Jones County reached out because one of the names listed "was a name known to the auditor's office in their capacity assisting was passport applications." Ex. C at 2–3. The Secretary of State's Office confirmed that "[i]f a Commissioner or [precinct election official], including an [Absentee and Special Voting Precinct] Board member, has personal knowledge that a voter is a citizen, they should not challenge the voter." *Id.* at 1.

6

Meanwhile, in October 2024, the United States Citizenship and Immigration Services ("USCIS") reached out to the Secretary of State's office "to offer assistance in further refining" the list that had been provided to county auditors. Ex. A ¶ 30. On October 29, USCIS stated to Mr. Ross that despite having checked the immigration statuses of the individuals on the list, USCIS was not able to share the updated information. *Id.* ¶ 31. USCIS told the Secretary of State that "[w]e do not want [Iowa USCIS staff] to release to release any information to the [Iowa Secretary of State]." *Id.* ¶ 32 (quoting Exh. D at 1). Senators Grassley and Ernst have both joined in calling for USCIS to transmit this data before the end of the week. *See* Charles E. Grassley & Joni K. Ernst, *Letter to Director Jaddou*, https://perma.cc/6LJA-2CXK (Oct. 31, 2024).

## III.   Procedural Background.

Plaintiffs filed their complaint late in the evening on October 30. At around 11:00 a.m. on October 31, they alerted Defendants of the Complaint and let Defendants know that they would be seeking a hearing on their yet-to-be-filed TRO request the next day, November 1. They ultimately filed that request at 4:10 p.m.

Aside from money for their lawyers, Plaintiffs make seven requests in their prayer for relief:

- A declaration that Defendants' challenging self-identified noncitizen ballots violates federal law and the U.S. Constitution;

- Rescission of the list of 2,176 names despite that list definitively including noncitizens registered to vote;

- An order that the Secretary notify county election commissioners that they may not challenge a voter's eligibility due to their status on the self-identified noncitizen voter list;

- An order that the local officials to retract notice letters sent to the self-identified noncitizens;

- An order that Defendants "restore the status of any persons who were removed from Iowa's voting rolls, including by being placed in inactive status" due to being on the list; and

- An order to take undefined "steps as are necessary" to alert "all individuals on the list of Affected Voters"—including those that are noncitizens or have not yet tried to vote—that they may vote; and

7

Dkt. 1 at 30.

The fifth request for relief is the most illustrative—because this lawsuit was brought without understanding how Iowa law works. No one has been removed from a voter roll. No one has been moved to inactive status. And Plaintiffs' request to alert the 2,176 individuals of their placement on a list as a potential noncitizen voter risks the type of intimidation or questioning that Plaintiffs purport to want to avoid. That is also true for Plaintiffs' fourth requested relief—to the extent there are worries about confusing voters, sending more notices to all individuals (including noncitizens) on the list risks encouraging ineligible voters to vote. And sending out these notices risks creating confusion.

Beyond that, there are serious concerns with Plaintiffs' third request for relief. The third scope of relief, limiting challenges to a voter's eligibility due to their noncitizen status is particularly problematic. Iowa law allows for any registered voter or precinct election official to "challenge[] as unqualified" any person offering to vote. Iowa Code § 49.79(1). Indeed, it is "the duty of each official to challenge any person offering to vote whom the official knows *or suspects* is not duly qualified." *Id.* (emphasis added). One of those reasons is that "[t]he challenged person is not a citizen of the United States." *Id.* § 49.79(2)(*a*). The relief sought here unduly interferes with an affirmative obligation of local election officials to challenge voters that they now reasonably suspect, based on those would-be voters' own self-identification to the State, that they are noncitizens.

Finally, because they waited so long to sue the State, much of the relief sought by Plaintiffs cannot functionally work. The Post Office takes around two days to deliver a letter. Even if this Court issues an injunction enjoining the State on Monday, and the Eighth Circuit does not issue any emergency relief that day, no letter will reach the self-identified noncitizens on the list until after Tuesday. That relief will not redress any of Plaintiffs' identified harms.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy," and the movant bears the burden to establish it is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). When determining whether to issue a preliminary injunction, courts consider: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will

inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Jet Midwest Int'l Co., v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020).

Election-related laws and challenges are subject to a sliding scale of scrutiny based on the *Anderson-Burdick* framework. *Org. for Black Struggle*, 978 F.3d at 607. When the imposition on the voter is not too heavy, it "trigger[s] less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* In *Organization for Black Struggle v. Ashcroft*, the Eighth Circuit found that the options of placing a ballot in the mail or voting in person presented reasonable alternatives for voters and so did not review the challenged law under strict scrutiny. *Id.* Indeed, the case Plaintiffs cite to contend that strict scrutiny applies, *Cleburne v. Cleburne Living Ctr.*, is not an election law case and, and the procedure here, unlike in *Cleburne*, has no disparate impact on "race, alienage, or national origin." 473 U.S. 432, 440 (1985). Rather, the challenge procedure is identical for any eligible voter—whether that voter is challenged based on residency, youth, felon status, or self-identification as a non-citizen.

And even if strict scrutiny applied, Plaintiffs cannot identify any narrower list for Defendants to rely on to ensure that noncitizens do not vote. They contend the list is overly expansive—and to be sure, with aid from the U.S. government, the list sent to county officials could be shorter. But this is the best information the State has, and the State has actual knowledge that individuals on the list are noncitizens. Plaintiffs point to the Iowa Data Center, which has nice visualizations but does not have individual names—nor does the Secretary of State have a list of naturalized citizens. *Cf.* Dkt. 9-1 at 3. It is incumbent on Defendants to ensure that no voters—including the Individual Plaintiffs in this suit—have their votes canceled out by an illegal vote.

## ARGUMENT

### I.    Plaintiffs Are Not Likely To Succeed On The Merits.

To prevail, Plaintiffs must establish that Iowa has "'systematically remove[d] the names of ineligible voters' from the voter rolls within the last 90 days before a federal election." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014) (quoting language now at 52 U.S.C. § 20507(c)(2)(A))). Or they must show that voting via provisional ballot violates their First

Amendment or Fourteenth Amendment rights. But the Complaint and Motion assume challenging the eligibility of voters is a de facto amendment of the State's voter rolls. Dkt. 1 ¶ 134. That premise contradicts both the law and common sense. The suspected ineligible voters that Iowa has identified remain active registered voters who will be permitted to cast ballots in the 2024 election, and any votes from eligible voters will be counted. No voters are being removed from the voter rolls—systematically or otherwise. Nor have any voters been placed on inactive status. Dkt. 1 at 30. In any event, just this week the Supreme Court entered a stay of an injunction, thus allowing Virginia to remove 1,600 noncitizens from its voter rolls. *See Beals*, 604 U.S. —, 24A407.

Plaintiffs' allegations that the ballot challenges here—absent any effect on any self-identified noncitizen's voter registration—violate the NVRA cannot be reconciled with the Supreme Court's allowing Virginia to remove noncitizens from their voter rolls altogether. Plaintiffs' sought injunction would upend Iowa established process for ballot challenges less than a week before the election based on an inaccurate reading of State and federal law, and it would do so contrary to the most recent on-point Supreme Court order. *See id.*

### C.     Plaintiffs' requested injunction would disrupt the status quo days before the election.

"'Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy.'" *Org. for Black Struggle*, 978 F.3d at 609 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). So before assessing Plaintiffs' claims, one must understand the background against which they have brought this suit.

In the realm of State election administration, the law applies a presumption against disturbing the status quo. *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). This presumption ensures that election rules are clear and instructs that "judges should normally refrain from altering them close to an election." *Id.* This is because "court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 5. To prevent such confusion and maintain election integrity, "[t]he *Purcell* principle—that federal courts should usually refrain from interfering with state election

10

laws in the lead up to an election—is well established." *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) (citing *Purcell*, 549 U.S. 1). And "[t]he Supreme Court has recently and repeatedly reaffirmed it." *Id.* (citing *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020); *Andino v. Middleton*, 141 S. Ct. 9 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2020) (per curiam))

Here, Plaintiffs ask for an order prohibiting enforcement of the Iowa election laws that create Iowa's process for ballot challenges and the provisional ballot process. Dkt. 1 ¶ 37. Iowa law set the status quo for ballot challenges long before this election. *See, e.g.*, Iowa Code § 49.79 (originally enacted in 2002). And the status quo imposes a duty on election officials "to challenge any person offering to vote whom the official knows or suspects is not duly qualified." *Id.* § 49.79(1). This duty applies to voters known or suspected of being ineligible for reasons including: age, residency, adjudicated incompetency, felony conviction, and citizenship status. The law instructs election officials to allow challenged individuals to vote via provisional ballots. *Id.* §§ 49.79(1); 49.81. That voter receives written instructions explaining how to prove voting eligibility and has until the Monday after the election to provide the necessary evidence to election officials. *Id.* § 49.81(6). A specialized board then meets in each county to review the provisional ballots and any additional information and evidence that the voter has provided. *Id.* § 50.22. Accepted ballots are then counted, while rejected ballots remain unopened. *Id.* § 50.22(3). Iowa law does not give this specialized board or the Secretary of State the authority to change or cancel a voter's registration status based on a ballot challenge. *See* Iowa Code chs. 49, 50.

This procedure is not new and has been implemented without issue in elections for more two decades. Yet Plaintiffs seek to upend that status quo less than a week before the 2024 election. The *Purcell* principle instructs the Court to reject these efforts.

Indeed, the Supreme Court earlier this week issued an order staying a district court decision that would have required Virginia to return more than 1,600 self-identified noncitizens to Virginia's voter rolls. *Beals*, 604 U.S. —, 24A407. That stay follows *Purcell*. This Court should follow the Supreme Court's most recent on-point order and deny the injunction.

11

**D.      Plaintiffs' claims misread State and federal law.**

Plaintiffs cannot overcome their *Purcell* burden, which says they must show that the merits are "entirely clear" to rule in their favor. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The request thus fails.

Iowa's actions track both State and federal law. The federal 90 Day Provision applies when States *remove* voters from the voter rolls, and even then only when removals are "systematic[]." 52 U.S.C. § 20507(c)(2)(A). Under Iowa law, registration challenges and ballot challenges are legally and practically distinct: ballot challenges do not affect registration status, even when successful. So, where, as here, voters have not been removed from the rolls, the 90 Day Provision simply does not apply. Even if voters were being removed, "the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window." *Arcia*, 772 F.3d at 1348; *cf. Beals*, 604 U.S. ----, 24A407.

Iowa is using long-established State procedure to ask suspected noncitizens to cast provisional ballots. Federal law specifically allows an individual "to cast a provisional ballot" if "an election official asserts that the individual is not eligible to vote[.]" 52 U.S.C. § 21082(a). This process balances the right to vote and the State's interest in ensuring election integrity consistent with the Constitution.

     *1.      Iowa law creates a duty to challenge the ballots of suspected ineligible voters and provides an established, federally authorized process for doing so.*

Iowa law requires election officials "to challenge any person offering to vote whom the official knows or suspects is not duly qualified." Iowa Code § 49.79(1). Citizenship status is just one situation in which that duty arises. *Id.* This duty also applies when a voter is known or suspected to be ineligible due to age, residency, adjudicated incompetency, or felony conviction. *Id.* And no challenge to a voter's ballot affects that voter's status as a registered voter.

Here, Iowa election officials have been notified that 2,176 voters have self-identified as noncitizens. In other words, they have a reason to suspect that these voters might not be eligible to cast ballots. Iowa law thus requires them to ask these suspected ineligible voters to vote via provisional ballots. *Id.* §§ 49.79(1); 49.81. These ballots are then separately reviewed by a specialized board and, if

cast by an eligible voter, counted. *Id.* § 50.22. Iowa law does not give this board or the Secretary of State the authority to change or cancel a voter's registration status based on a ballot challenge, even if is successful. *See* Iowa Code chs. 49, 50. Authority is limited to a review of the ballot itself. *Id.* And this process exists independently of any voter registration challenges. *See* Iowa Code ch. 48A.

Less than one week before the election, Plaintiffs now argue that this provisional-ballot process— one that has been in place for more than two decades—violates federal voting laws and the U.S. Constitution. This does not make sense. *First*, federal law expressly authorizes Iowa's current procedure. The Help America Vote Act ("HAVA") specifically allows an individual "to cast a provisional ballot" if "an election official asserts that the individual is not eligible to vote[.]" 52 U.S.C. § 21082(a); *see also Republican Nat'l Comm. v. Wetzel*, — F.4th —, 2024 WL 4579307, at *8 (5th Cir. Oct. 25, 2024) ("HAVA establishes a procedure for provisional voting when a voter's eligibility is in question."). This "is designed to recognize and compensate for, the improbability of 'perfect knowledge' on the part of election officials." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 570 (6th Cir. 2004) (citation omitted). Plaintiffs rely in part on *Boustani v. Blackwell*, 460 F.Supp.2d 822, 827 (N.D. Ohio 2006), but a challenge led by ACLU in that same case, seeking to force noncitizens back on the ballot, was rejected by that same court this week, *see Boustani v. LaRose*, Case No. 1:06-cv-02065-CAB, Dkt. 68 at *8 ("Not only have Plaintiffs failed to satisfy their burden of establishing by clear and convincing evidence that Defendant has violated the Court's 2006 Permanent Injunction Order, but unlike in 2006, Plaintiffs have not demonstrated an undue burden on their fundamental right to vote nor that they have suffered disparate treatment so as to warrant the exercise of the Court's remedial powers on their behalf.").

In other words, provisional ballots are meant to address the exact situation the State faces here: a situation where the State has conducted the most precise analysis it can with the information available but has been unable to obtain definitive information. The provisional-ballot process is meant to allow for further review "when, one hopes, perfect or at least more perfect knowledge will be available" and "the vote will be counted or not, depending on whether the person was indeed entitled to vote at that time and place." *Id.* (quoting *Fla. Democratic Party v. Hood*, 2004 WL 2414419, at *13 (N.D. Fla. Oct.

21, 2004)). And that also allows all eligible voters to show up to vote without impediment, to cast their ballot in a similar process to how anyone else votes; the ballot is merely kept separate until the "more perfect" evidence is provided to the relevant election authority.

*Second*, the provisional-ballot process is meant to address voters' suspected ineligibility for several reasons, not just citizenship status. *See* Iowa Code § 49.79(2)(*a*)–(*g*) (allowing voter challenges based on citizenship, age, residency, false registration information, felony conviction, and adjudicated incompetency). In other words, the provisional-voting laws do not "single[] out only naturalized citizens for unwarranted scrutiny and investigation." Dkt. 1 ¶ 116. They include every would-be voter who might be ineligible to vote—including U.S. citizens.

*Third*, and especially after *Beals*, it is not clear that the Quiet Period applies to challenging noncitizen voter registrations at all. So even if this Court analogizes the present situation to voter-registration removal, there is not a likelihood of success on the merits.

Indeed, the NVRA does not prohibit the removal from the voter rolls of persons, such as noncitizens and minors, who were never "eligible applicant[s]" and thus could not become "registrant[s]" or "voters" in the first place. *Id.* §§ 20507(a)(1), (3), (c)(2)(B). The Quiet Period Provision does not cover noncitizens at all, and thus Iowa's challenge of noncitizens' ballots—not even Virginia's removal of noncitizens within 90 days of the election—does not violate federal law.

That comes directly from the statute's text. Section 8 of the NVRA governs "the administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). It explains that "State[s] shall . . . ensure that any *eligible* applicant is registered to vote." *Id.* § 20507(a)(1) (emphasis added). So far, so simple: applicants who are "eligible" must be "registered" by the State. *Id.* Section 8 then gives different ways that an applicant with a "valid voter registration form" can register, like at the DMV. *Id.* § 20507(a)(1)(A)–(D). Once the "eligible applicant['s]" "valid voter registration form" is accepted, the statute refers to him as a "registrant," and provides him certain protections. *See id.* § 20507(a)(3).

After prescribing how an "eligible applicant" becomes a "registrant" through submitting a "valid voter registration form," Section 8's General Removal Provision sets forth how a "registrant" can be removed from the list of "eligible voters." *Id.* In short, an "eligible applicant" becomes a "registrant"

upon filing a "valid voter registration form," and is then protected from removal from the "list of eligible voters," outside four exceptions. *Id.* § 20507(c)(2)(B). Including noncitizens as "registrant[s]" protected by the NVRA would thus lead to absurd and unconstitutional results.

Indeed, if "registrant" includes noncitizens who end up on the rolls, then the NVRA bars States from removing noncitizens from its rolls at any time. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1349 (N.D. Fla. 2012) (if a noncitizen is a registrant, "[the General Removal Provision]—which applies at all times, not just in the 90 days before an election—seems to prohibit a state from ever removing from its voting list a noncitizen, even though the noncitizen should never have been registered in the first place"). The text and structure of the General Removal Provision thus make clear that "registrant" only refers to those who were originally "eligible applicants." 52 U.S.C. § 20507(a)(1). Noncitizens do not qualify; the right to vote is limited to U.S. citizens. Iowa Code § 48A.5(2)(*a*); 18 U.S.C. § 611.

*Fourth*, asking suspected ineligible voters to cast provisional ballots is consistent with the First and Fourteenth Amendments. Contrary to Plaintiffs' assertions, the Constitution does not prevent the States from imposing basic elections regulation. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (voter photo identification law was constitutionally and "amply justified by the valid interest in protecting the integrity and reliability of the electoral process") (cleaned up); *Burdick v. Takushi*, 504 U.S. 428, 441–42 (1992) (prohibiting write-in voting "does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of the State's voters").

*Finally*, asking suspected ineligible voters to cast provisional ballots is consistent with the rest of the Constitution. While "voting is of the most fundamental significance under our constitutional structure," *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979), "[i]t does not follow . . . that the right to vote in any manner . . . [is] absolute." *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986). Indeed, the Constitution allows States to prescribe "[t]he Times, Places and Manner of holding Elections for" federal, not just State, legislators. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting U.S. Const. Art. I, § 4, cl. 1). Accordingly, the Supreme Court has long recognized that "states retain the power to regulate their own elections." *Id.* (citing *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

15

Meanwhile, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989); *see also Purcell*, 549 U.S. at 4 (same). Without proper regulation, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government," and "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell*, 549 U.S. at 4. Thus, as both a constitutional and practical matter "there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 428 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

A court considering a state election law challenge thus must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Tashjian*, 479 U.S. at 231–14). Plaintiffs ignore this standard. Dkt. 9-1 at 11–12. The provisional-ballot process balances citizens' right to vote with the State's interest in maintaining the integrity of the election process. The process does not prevent registered voters from casting ballots, and it ensures that only ballots cast by eligible voters are counted. And the process applies equally to voters that election officials suspect are ineligible for other reasons, such as residency or felony conviction. *See* Iowa Code § 49.79(2).

The process is unlike those used in Plaintiffs' district-court cases, *see* Dkt. 9-1 at 12:

- *Fernandez v. Georgia* did not concern voting at all, but whether naturalized citizens may become state troopers. 716 F. Supp. 1475, 1479 (M.D. Ga. 1989).

- *United States v. Florida*, 870 F. Supp. 2d at 1347, and *Texas LULAC v. Whitley*, 2019 WL 7938511, *1 (W.D. Tex. 2019), both involved letters threatening to purge voters from the rolls.

- In *Boustani v. Blackwell,* the challenge procedures required potential voters to provide specific proof of citizenship *before* being allowed to vote and gave election officials "unfettered ability

to challenge on the basis of appearance, name, looks, accent or manner." 460 F.Supp.2d at 823–24, 827.

- Similarly, the law in *Mi Familia Vota v. Fontes* allowed for investigation based on "subjective beliefs that a naturalized citizen is a non-citizen." 719 F. Supp. 3d 929, 1018 (D. Ariz. 2024).

Here, challenges do not affect voter registrations, are based only on self-identification as noncitizens, and do not condition casting a ballot on providing proof of citizenship at the polls. These differences shift the constitutional balance considerably. Iowa election officials are upholding a long-standing State obligation and using a process authorized under both State and federal law and consistent with the U.S. Constitution.

That Plaintiffs challenge these procedures days before Election Day is puzzling. And the State is unsure how a process that is expressly authorized under federal law and consistent with the Constitution is somehow simultaneously prohibited. To reach that conclusion requires this Court to conflate registration challenges and ballot challenges and find that a ballot challenge somehow removes a voter from the voter rolls. But as explained below, this is not the law.

   2.  *Iowa has not removed any suspected ineligible voters from its voter rolls.*

When interpreting a statute, the Court's "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 545 U.S. 274, 277 (2018) (citation omitted). Courts thus "begin with the text." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). The context and structure of the statute provide invaluable tools to understand the text. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). Additionally, absurd or unconstitutional interpretations of statutes should be disfavored if the language is susceptible to another reading. *See Bond v. United States*, 572 U.S. 844, 856–57 (2014); *see* Iowa Code ch. 4.

The 90 Day Provision states that States cannot "systematically *remove* the names of ineligible voters from the official lists of eligible voters" fewer than 90 days before an election. 52 U.S.C. § 20507(c)(2)(A)) (emphasis added). In other words, "[a]ll that the 90 Day Provision prohibits is a program whose purpose is to 'systematically remove the names of ineligible voters' from the voter

rolls within the last 90 days before a federal election." *Arcia*, 772 F.3d at 1348 (quoting statute). It is also not clear enough, especially given *Purcell*, that Defendant's attempt to ensure clean voter rolls is a "program" under federal law that would be limited by the Quiet Period. *See* 52 U.S.C. § 20507(b). The only Supreme Court case squarely presented this issue stayed a district court decision that otherwise would have enjoined the State of Virginia to put 1,600 alleged noncitizens to its voter rolls. *Beals*, 604 U.S. —, 24A407. Unlike that case staying an injunction in favor of Virginia, the State here did not go so far as to affect voter registration rolls at all.

Indeed, Iowa is not removing any voters from its voter rolls at all—systematically or otherwise. All the voters that the Secretary of State has identified remain active eligible voters. All those voters will be permitted to cast ballots in the 2024 election. And on confirmation of those voters' eligibility, all those votes will be counted.

Because all 2,176 individuals remain active registered voters, Plaintiffs try to shove Defendants' square conduct into the 90 Day Provision's round prohibition. But challenging a person's vote is not a de facto removal from the voter rolls or de facto list maintenance. Under Iowa law, registration challenges and ballot challenges are separate procedures governed by separate chapters, separate laws, and separate processes. One process does not affect the other.

Removal means that the voter is no longer registered, and unregistered voters cannot cast ballots on Election Day. But every person on the State's list may cast ballots and, on proof of eligibility, those votes will be counted. This necessarily means they have not been removed from the voter rolls. Even if a voter's provisional ballot is rejected—whether due to voter ineligibility, lack of documentation, or some other reason—that voter remains registered to vote. In contrast, removal from the rolls requires a multi-step process following a separate legal challenge and involving a full hearing and appeal procedures. Iowa Code §§ 48A.15–.16. And for registration challenges made fewer than seventy days before a regularly scheduled election, that multi-step process cannot occur until after the current election. *Id.* § 48A.14(4). Even if this Court accepts Plaintiffs' position that somehow these ballot challenges will convert to registration challenges, those registration challenges cannot be processed— and those voter registrations cannot be canceled—until *after* the 2024 Election. This is precisely the

type of path that the NVRA envisions, not an action that the Quiet Period prevents.

This conclusion is consistent with the Eleventh Circuit's rationale in *Arcia*, where the court explained that "voters removed days or weeks before Election Day" may not "be able to correct the State's errors in time." 772 F.3d at 1346. As a result, systematic removals risk "disfranchising eligible voters" without "time to rectify any errors." *Id.* The Eleventh Circuit's rationale does not apply when, as here, all the suspected ineligible voters are still allowed to cast ballots, removing the risk of disenfranchising eligible voters. Also dissimilar to Florida, but similar to Virginia, Iowa has same-day voter registration. So even if somehow a person's voter registration was incorrectly removed or cancelled that can be remedied.

Further, Plaintiffs' proposed restriction on provisional ballots is not only facially absurd; it also would render the Quiet Period unconstitutional. The "Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them," and forcing States to allow noncitizens to cast regular ballots would directly regulate "who" may vote in federal elections. *Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013). Indeed, even lesser interferences with voter eligibility, such as restricting how States can gather information related to their eligibility requirements" would raise "a serious constitutional question." *Id.* at 17. Here, Plaintiffs propose to extend the NVRA to tell Iowa not only who may vote, but whose vote the State must count. Congress did not enact a law that will cause such an unconstitutional result.

### 3. *Iowa conducted an individualized review to identify potential ineligible voters.*

Even if this Court construes Iowa's proposed ballot challenges as "removing" ineligible voters from the voter rolls, "the 90 Day Provision does not in any way handcuff a state from using its resources to ensure that noncitizens are not listed in the voters rolls." *Arcia*, 772 F.3d at 1348. "[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window." *Id.*; *cf. Beals*, 604 U.S. —, 24A407.

Plaintiffs are wrong that a process that involves database matching at any stage is automatically a systematic removal. Dkt. 1 ¶ 135. There is a difference between relying entirely on database

matching—as Florida did in *Arcia*—and using a database query to create an initial list for further individualized review. Here, Michael Ross, Chief of Staff and Deputy Secretary of State, requested and received a list of self-identified noncitizens who were registered to vote in Iowa. After receiving the list, Mr. Ross and Secretary of State staff began to review the list. Ex. A ¶ 19.

As a first step, Secretary of State staff compared each individual's driver's license number in the Secretary of State's IVoter database to the identified individual's number on the IDOT list. *Id.* ¶ 19(a). t. 3numbers did not match, Secretary of State Staff looked at three other discrete data: 1) last name, 2) date of birth, and 3) the last four digits of the individual's social security number. *Id.* ¶ 19(b). Secretary of State staff then "went through the list on an individual-by-individual basis" to refine the list. *Id.* ¶ 20. In doing so, Secretary of State staff identified individuals based on possible recordkeeping errors, so those individuals could be removed from any list of suspected noncitizen voters. *Id.* ¶ 21.

Mr. Ross then "personally reviewed all identified individuals prior to compiling the final list." *Id.* ¶ 22. During Mr. Ross's "detailed review" he removed additional individuals who might be on the list incorrectly. *Id.* ¶¶ 23–24. The Secretary of State's office instructed county election officials to further refine the list of self-identified noncitizen voters "[w]here an individual is known to a County Auditor, Precinct Election Officer, or other election officer to have become a United States citizen." *Id.* ¶ 29. This detailed, individual-by-individual review is precisely the type of review the permitted under the NVRA. *See Arcia*, 772 F.3d at 1348. Indeed, *Beals* involved a challenge to Virginia checking its voter rolls against a database, and the injunction regarding that process was stayed.

Indeed, it is unclear how a State could conduct any review of voter registration rolls without being allowed to use a database query as a starting point. How else would such a process work? Would election officials need to review the entire voter list, voter by voter? As of October 1, Iowa had more than 2.2 million registered voters. Iowa Sec'y of State, *State of Iowa Voter Registration Totals by County*, https://perma.cc/G3ZV-KAL9. Such a process would be both costly and impractical. Congress cannot have intended to impose such a burden.

More, the Supreme Court's stay in *Beals* suggests that removals based on database matching are proper. *Beals*, 604 U.S. ----, 24A407. That further undercuts Plaintiffs' assertion.

*4. Plaintiffs demand the release of information that is protected under State and federal law.*

Plaintiffs ask Defendants to release the list of self-identified noncitizen voters despite that list being protected and confidential information. Releasing that information would violate State and federal law. The information here was received from the Department of Transportation subject to various memoranda of understanding both with the Secretary of State's office and with the federal government. So this Court should not order Defendants to release that information.

Iowa Code section 321.11 makes all DOT records available for public inspection, except those which are made confidential, and which are not permitted to be open. That code section goes on to state that "personal information shall not be disclosed subject to 18 U.S.C. § 2721 unless the person whose personal information is requested has provided express written consent allowing disclosure." . Under both Iowa Code section 321.11 and 18 U.S.C. § 2721, "personal information" is defined as "information that identifies a person, including a person's photograph, social security number, driver's license number, name, address, telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status or a person's zip code." 18 U.S.C. § 2725; Iowa Code § 321.11(2).  Personal information may be provided only to an officer or employee of a law enforcement agency or an employee of a federal or state agency or political subdivision acting in their official capacity, or to the Department of Inspections, Appeals and Licensing ("DIAL") for purposes of investigating. Iowa Code § 321.11(3).

Iowa Code section 22.7(66) creates a privilege for personal information contained on electronic driver's license or nonoperator's identification card records.  That is because that information is provided by the licensee or card holder to the department of transportation "for use by law enforcement, first responders, emergency medical service providers, and other medical personnel responding to or assisting with an emergency." The requested information is from the department of transportation, relating to information on their drivers' licenses, and is "for use by law enforcement." is very straightforward in its protection of personal information provided to the DOT for purposes of a driver's license or other identification document.

21

Iowa law makes clear that the DOT may not provide personal information to anyone outside of government without that persons' express written authorization. *Milligan v. Ottumwa Police Dep't* held that because the personal identifying information sought by the citizen came from the vehicle registration and driver's license database its public disclosure was "presumptively prohibited under the [Drivers Privacy and Protection Act] and Iowa Code § 321.11." *Milligan v. Ottumwa Police Dep't*, 937 N.W.2d 97, 99–100 (Iowa 2020), *as amended* (Jan. 21, 2020).

As noted in *Milligan*, the federal Drivers Privacy and Protect Act ("DPPA") prohibits a state department of motor vehicles from "knowingly disclosing or making available to any person or entity personal information about any individual obtained in connection with a motor vehicle record." 18 U.S.C. § 2721(a) (emphasis added). *Also see Maracich v. Spears,* 570 U.S., 48 57, 133 (2013) (citing *Reno v. Condon*, 528 U.S. 141, 144 (2000)). The federal definition of personal information matches Iowa Code section 321.11.

While there are no cases interpreting that federal law in Iowa or our home circuit, a case out of the Middle District of Pennsylvania is highly informative. In *Public Interest Legal Foundation v. Boockvar*, the Foundation sued Pennsylvania state officials seeking the production, under the National Voter Registration Act of records documenting that noncitizens were registering to vote through the Pennsylvania Department of Motor Vehicles due to a "glitch" in their system which allowed noncitizens to register when the renewed their licenses. *Pub. Int. Legal Foundation v. Boockvar*, 431 F.Supp.3d 553 (M.D. Pa. 2019). The court first found that the NVRA record disclosure provision was not limited to information related to the death or change in residence of a registrant. Then it explained that the requestor had identified information which was subject to disclosure under the NVRA. Given those findings, the court held the DPPA barred disclosing the protected information.

In sum, like the records requested in *Boockvar,* the records compiled by the Iowa Secretary of State involved an analysis matching noncitizen driver's license number, including the indication that the individuals attested to not being a citizen, against the driver's license numbers of registered voters. These records are protected under DPPA against any requests, whether made as a Freedom of Information request or under the disclosure provision of the NVRA. Iowa's DOT code has a

matching protection for personal information obtained by the DMV in issuing a driver's license which gives the same protections at the state level

## II.     The Other Factors Weigh Against a Preliminary Injunction.

Because Plaintiffs are unlikely to succeed, the Court need not proceed to the other factors. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724 (8th Cir. 724). But those factors also weigh against an injunction.

Plaintiffs do not face irreparable harm. Plaintiffs must show the alleged "harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015); *see Morehouse Enter., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

Iowa's provisional-ballot procedures do not create risk of disenfranchisement. The only people who will not have their ballots counted are those who were not eligible to cast them at all. All other individuals can still vote and have their votes counted—there is no irreparable deprivation there. Indeed, the process is meant to ensure that eligible voters with incomplete or missing eligibility information still have a chance to have their votes counted. There is no irreparable harm, even in the Constitutional context, when the challenged action fails to "prevent individuals from engaging in protected" activity. *Morehouse*, 78 F.4th at 1018. Here, the alleged irreparable harm is the inability to cast a ballot—but each Plaintiff here as a naturalized citizen may cast a ballot.

As to the balance of harms and public interest, those "merge when the Government is the party opposing the preliminary injunction." *Morehouse*, 78 F.4th at 1018. And the injunction against enforcing State and federal law to ensure clean and fair elections irreparably harms the State. While Plaintiffs can still show up to the polls and cast a ballot, the State is irreparably harmed by this requested restraining order. *First*, "any time a State is enjoined by a court from effectuating statutes . . .  it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist,

J., in chambers); *see Org. for Black Struggle*, 978 F.3d at 609 (similar).

*Second*, under the status quo, potential noncitizen ballots are set aside for further review. That gives local election officials the opportunity to separate out potentially invalid ballots to determine whether each ballot should be counted because it was cast by an eligible voter, or if it should be set aside because it was cast by an ineligible voter. If injunction is granted, those ballots become part of the hundreds of thousands cast and there will be no way to pull those ballots back out of the pile. It would be like finding needles in a haystack where each needle looks exactly like a piece of hay. As such, an injunction would make it difficult, if not impossible, to assure Iowa's of the integrity of their State's electoral process.

And those concerns are not merely theoretical. A 19-year-old noncitizen from China, legally in the country on a student visa, registered to vote using his student identification and voted. *See* Craig Mauger and Kim Kozlowski, *Chinese student to face criminal charges for voting in Michigan. Ballot will apparently count*, The Detroit News, https://perma.cc/PN3F-UCW6 (Oct. 30, 2024). "The student's ballot is expected to count in the upcoming election — although it was illegally cast — because there is no way for election officials to retrieve it once it's been put through a tabulator." *Id.* The noncitizen voter is being charged with two felonies and faces up to 15 years in prison. *Id.* But even if convicted, his vote will count. Defendants' efforts to ensure only citizens vote not only protects the integrity of elections but is intended to stop even unintentional felonious conduct by otherwise law-abiding noncitizens who could face years in prison and deportation if convicted of an election-related felony.

And in Iowa, elections can be close. Four years ago one U.S. House representative won by six votes—far fewer than the number of potential noncitizen votes at issue here. *See, e.g.*, Ryan J. Foley, *Iowa Board Certifies 6-Vote Republican Win in US House Race*, AP, https://apnews.com/general-news-e3f235f217707a78fcec059f8e0b4ffa (Nov. 30, 2020).

Finally, an injunction is not in the public interest. "[T]he State's 'interests in conducting an efficient

election, maintaining order, quickly certifying election results, and preventing voter fraud' . . . serve the public's interests." *Ashcroft*, 978 F.3d at 609 (quoting *New Georgia Project v. Raffensperger*, 976 F.3d 976, 1284 (11th Cir. 2020)). An injunction undermines those interests by allowing 2,176 self-identified noncitizens to cast ballots in the same manner as any other registered voter. And once the injunction is granted, there would be no way to undo its effect. This would not serve the public interest.

## CONCLUSION

Federal courts should only issue injunctions in election-related matters so close to election day when the equities are clear. The U.S. Supreme Court has already stayed one alleged NVRA Quiet Period injunction this week. For these and the other reasons explained above, the Court should deny the temporary restraining order.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric Wessan*
Eric Wessan
*Solicitor General*
Breanne A. Stoltze
*Assistant Solicitor General*
Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
breanne.stoltze@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANT

*Original filed electronically.*
*Copy electronically served on all parties of record.*

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on October 31, 2024:

☐ U.S. Mail                    ☐ FAX
☐ Hand Delivery                ☐ Overnight Courier
☐ Federal Express              ☐ Other
☒ CM/ECF

Signature: _/s/ Eric H. Wessan_