IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

ORCUN SELCUK et al,

           Plaintiffs,

    v.

PAUL D. PATE et al,

           Defendants.

Case No. 4:24-cv-390

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs respectfully submit this *Supplemental Brief* in support of their request for a temporary restraining order ("TRO") and preliminary injunction in this matter. As shown in Part I below, the facts—including declarations and other evidence provided shortly before and discussed during the November 1, 2024 hearing—show that Defendants' scheme unlawfully burdens Plaintiffs' constitutional rights. In parts II through VI below, Plaintiffs then provide answers to questions posed by the Court at the November 1, 2024 hearing.

**I.    The Well-Established Facts Show Plaintiffs Are Entitled to Immediate Relief.**

**A.    The Affected Voters' DOT Information Is Often Extremely Dated.**

During the TRO hearing, there was much discussion about both the age and reliability of the DOT data the Secretary used to compile the list. The list of Affected Voters was complied based on an Affected Voter's statement to the Iowa DOT *at some point* in the past that they were a lawful permanent resident, as opposed to a naturalized United States citizen. The Secretary's counsel stated during the hearing that those creating the list used a date cutoff such that DOT data more than eight years out of date would not have necessarily put an Affected Voter on the list.

1

But an examination of relevant evidence—including ECF 10—shows that many of the Affected Voter's statements to the DOT were made *more than 20 years ago*. Here is a screen shot (with red arrow added and the voter's name redacted), showing that one voter indicated they were not a citizen in April of 2000 (during the Clinton administration), and then registered to vote as a citizen in August of 2022 (during the Biden administration), more than 20 years later:



(ECF No. 10 at 86) (name redacted). Relying on data more than twenty years old shows just how poor of a proxy the Affected Voters list is for actually *identifying* any ineligible voters.

Other record evidence bears this out: to date, the *only* Affected Voters that have been publicly identified have *all* been United States citizens. The Secretary has not pointed to one person on the list who registered to vote and is yet ineligible.

To assist the Court's review of these facts, Plaintiffs have prepared a table comparing the date of DOT information and the date of an Affected Voter's registration on the list. The sampling of the available data shows the Secretary is *routinely* relying on old DOT data, including data more than eight years old. Whatever the Secretary claims to have done to address stale DOT data (as mentioned by his counsel during the November 1, 2024 hearing) appears to have been ineffective or incorrect:

| Citation | County | Date of DOT Data Used | Date of Voter Registration | Max Years Between |
|---|---|---|---|---|
| ECF 10 at 24-26 | Winneshiek | 4/20/2021 | 11/7/2023 | 2 |
| ECF 10 at 30 | Pottawattamie | 1/23/2020 | 9/11/2024 | 4 |
| ECF 10 at 32 | Pottawattamie | 8/26/2008 AND 4/12/2024 | 7/13/2020 | 11 |
| ECF 10 at 34 | Pottawattamie | 10/12/2002 AND 10/25/2023 | 11/2/2018 | 16 |
| ECF 10 at 36 | Pottawattamie | 4/5/2017 | 10/2/2024 | 7 |
| ECF 10 at 38 | Pottawattamie | 6/3/2015 | 10/10/2022 | 7 |
| ECF 10 at 40 | Pottawattamie | 8/16/2006 | 6/19/1999 | 7 |
| ECF 10 at 44 | Pottawattamie | 5/21/2016 | 1/26/2023 | 6 |
| ECF 10 at 46 | Pottawattamie | 10/17/2017 | 2/23/2024 | 6 |
| ECF 10 at 50 | Pottawattamie | 10/14/2017 | 12/23/2021 | 5 |
| ECF 10 at 52 | Pottawattamie | 5/5/2010 | 11/20/2012 | 2 |
| ECF 10 at 54 | Pottawattamie | 10/4/2008 | 11/8/2016 | 8 |
| ECF 10 at 56 | Pottawattamie | 10/13/2017 | 9/4/2024 | 6 |
| ECF 10 at 58 | Pottawattamie | 4/8/2014 | 10/23/2020 | 6 |
| ECF 10 at 60 | Pottawattamie | 10/6/2010 | 10/10/2019 | 9 |
| ECF 10 at 66 | Pottawattamie | 9/5/2013 | 3/22/2024 | 10 |
| ECF 10 at 68 | Pottawattamie | 8/17/2016 | 12/23/2022 | 6 |
| ECF 10 at 70 | Pottawattamie | 12/17/2009 | 7/13/2020 | 10 |
| ECF 10 at 72 | Pottawattamie | 8/28/2015 | 6/2/2020 | 4 |
| ECF 10 at 80 | Pottawattamie | 2/12/2020 | 8/15/2024 | 4 |
| ECF 10 at 82 | Pottawattamie | 10/4/2018 | 11/7/2023 | 5 |
| ECF 10 at 84 | Pottawattamie | 6/13/2014 | 9/30/2024 | 10 |
| ECF 10 at 86 | Pottawattamie | 4/27/2000 | 8/8/2022 | 22 |
| ECF 10 at 88 | Pottawattamie | 10/12/2011 | 8/20/2020 | 8 |
| ECF 10 at 90 | Pottawattamie | 10/11/2007 | 8/22/2023 | 15 |
| ECF 10 at 92 | Pottawattamie | 3/20/2007 | 11/4/2022 | 15 |

**B.** **Defendant Shane's Declaration Confirms That Many Affected Voters On The List Are Actually Eligible To Vote.**

Shortly before Friday's TRO hearing, Defendant Erin Shane ("Auditor Shane") submitted a sworn declaration to the Court on her own accord (ECF No. 26-1) (the "Shane Declaration"). The facts in the Shane Declaration further bolster Plaintiffs' claims:

> 6. When I reviewed the list of 295 alleged non-citizens, I was very concerned that many of the dates listed as when the voter had previously indicated to the DOT they were non-citizens were dates that reached back as far as 2007. In addition, I noticed people that I know personally and neighbors who were on the list. I did not share Secretary Pate's conclusive suspicion as to ineligibility to vote.
>
> 7. Given that all of the voters had sworn an affidavit at the time they registered indicating they were U.S. citizens and that there is not a legal requirement that a person provide proof of U.S. citizenship at the time of voting, voters on the list would have no way of knowing they would need to produce such documentation in order to vote.

(ECF No. 26-1 ¶¶ 6–7.) The Shane Declaration shows just how poorly tailored the Secretary's Voter Purge Program is. Moreover, the Shane Declaration shows how little notice Affected Voters have of how the Voter Purge Program affects their right to vote:

> 11. At considerable expense, we sent these letters via overnight mail. Those on the list should have received the letter on October 30, 2024. We have been fielding a steady stream of voters who are coming to the auditor's office presenting documentation. These voters are frustrated and confused about why this is happening. In many cases, they have reported that they have voted in prior elections without issue and that nothing has changed in their status.
>
> 12. Without our advance correspondence to voters, the first time they would be hearing about the challenge to their status would be when they arrived at the polls and are told they would have to cast a different ballot and provide different documentation than every other voter. We would have to rely on poll workers who have never dealt with this issue to provide the explanation for why they were only being allowed to cast a provisional ballot. Given expectations that this may again be a year of record breaking turn out, having to navigate this interaction at the polling place will inevitably be disruptive to the voting process.

(*Id.* ¶¶ 11–12.) Importantly, the Shane Declaration addresses one question the Court posed during the hearing—whether county officials must abide by the Secretary's directives. Auditor Shane answered that question with a definite *yes*: she may face prosecution by the Iowa Attorney General and/or a fine of up to $10,000 for not obeying the Secretary's directive. (ECF No. 26-1 ¶ 10.)

Plaintiffs next proceed to answer questions the Court posed during the hearing.

## II.     Question 1: What authority supports the proposition that a classification targeting all *non*-native born persons is subject to strict scrutiny?

The Court asked both parties during the hearing whether there is authority to support the proposition that a classification targeting *all* non-native persons is subject to strict scrutiny. Plaintiffs said there was (and it is cited below), and Defendants said there wasn't. Defendants are squarely wrong.

Widespread and binding precedent holds that any policy that treats naturalized U.S. citizens or other foreign-born individuals differently simply because they were born outside of the United States constitutes national-origin discrimination subject to strict scrutiny. This is true even when the discriminatory policy does not distinguish between particular countries of origin. As long as there is differential treatment between foreign-born U.S. citizens or individuals and U.S.-born citizens, strict scrutiny applies.

The most recent, on-point case is *Parada v. Anoka County*, 54 F.4th 1016 (8th Cir. 2022). In that case, a county jail contacted federal immigration authorities "every time a foreign-born individual is detained," regardless of citizenship status, and delayed the individual's release pending confirmation of their immigration status. *Id.* at 1019. The Eighth Circuit held that the policy was "subject to strict scrutiny" and affirmed a jury verdict that the county violated the foreign-born plaintiff's right to equal protection under the Fourteenth Amendment. *Id.* at 1020 ("Those born abroad must wait anywhere from 20 minutes to 6 hours longer" while their

immigration status is verified, whereas "[f]or those born in the United States, by contrast, there is no call and release is immediate."). The Court held that this policy was "a classic example of nation-origin discrimination," even though it applied equally to all foreign-born individuals and did not classify persons based on specific countries of origin.

Just as Anoka County treated every foreign-born individual—including naturalized U.S. citizens—as presumptively lacking lawful immigration status and thus subjecting them to greater burdens than U.S.-born detainees, Defendants here improperly subject more than 2,000 foreign-born individuals to greater voting burdens than U.S.-born citizens, even though both parties agree that there are U.S. citizens on the list. Under the Secretary of State's directive, naturalized U.S. citizens are uniquely required to provide a U.S. Passport or naturalization certificate in order to vote, while all other citizens need only provide a driver's license or other form of identification. *See* Iowa Code Ann. § 49.78. Just as in *Parada*, the Secretary's policy "is a classic example of national-origin discrimination. On its face, it treats people differently depending on where they were born"—no matter where that particular foreign county is, or if those people share the same foreign country. *Parada*, 54 F.4th at 1020. *Parada* is all the Court needs to review to conclude that strict scrutiny applies here.

Of course, *Parada* is not an outlier. A slew of courts, including the U.S. Supreme Court, have consistently held that disparate treatment of naturalized and native-born U.S. citizens is subject to strict scrutiny as national-origin discrimination and is presumptively unconstitutional. *See, e.g.*, *Schneider v. Rusk*, 377 U.S. 163, 169 (1964) (invalidating statute that would have restricted naturalized citizens' ability to live abroad while a "native-born citizen is free to reside abroad indefinitely without suffering loss of citizenship"); *Tiwari v. Mattis*, 363 F. Supp. 3d 1154, 1162-63 (W.D. Wash. 2019) (finding violation of equal protection because process for obtaining

security clearance was "more onerous for citizens born outside the United States than for other citizens," which "constitutes discrimination on the basis of national origin" and is subject to strict scrutiny); *Viet Anh Vo v. Gee*, 301 F. Supp. 3d 661, 665-66 (E.D. La. 2017) (applying strict scrutiny and invalidating state law that required only naturalized citizens to provide a birth certificate, because the law treated "U.S. citizens differently from U.S. born citizens merely because of where they were was born"); *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 825-26 (N.D. Ohio 2006) ("Since native-born citizens are not required to show any proof of their citizenship under R.C. § 3505.20, the statute creates an unequal application of voting requirements and lacks the justification of promoting a compelling governmental interest."); *Fernandez v. Georgia*, 716 F. Supp. 1475, 1479 (M.D. Ga. 1989) (invalidating, under strict scrutiny, Georgia's requirement that state troopers be native-born citizens, because "native-born and naturalized citizens of the United States are persons similarly situated in the view of the Constitution and should be treated alike"); *Huynh v. Carlucci*, 679 F. Supp. 61, 66 (D.D.C. 1988) ("[B]ut for their national origin, [naturalized citizen] plaintiffs would be accorded the same individualized security clearance evaluation given all other United States citizens. Government action that classifies citizens on the grounds of national origin is inherently suspect, subject to strict scrutiny and thus can be sustained only if necessary to achieve a compelling state interest."). This specifically applies in the voting context, as well. *E.g.*, *Boustani*, 460 F. Supp. 2d at 825-26. Because the Voter Purge Project classifies the Affected Voters based on their natural origin, strict scrutiny must apply.

### III.  Question 2: If strict scrutiny applies, is the Secretary's Program narrowly tailored to achieving a compelling interest of preventing non-eligible individuals from voting?

The Court also asked whether, in light of DOT information, the Secretary's program is narrowly tailored. Plaintiffs said no, and the Secretary said yes. An examination of applicable authorities show Plaintiffs are right and the Secretary is wrong.

Narrow tailoring requires that the means chosen to achieve the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose. *E.g.*, *Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 398 (8th Cit. 2020). If there are reasonable alternatives to achieving the State's asserted goals "with a lesser burden on constitutionally protected activity, a State cannot choose the way of greater interference. If it acts at all, it must choose less drastic means." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) (cleaned up). Where the state fails to consider less restrictive alternatives which could accomplish the same ends, the chosen means are not narrowly tailored and fail strict scrutiny. *Parada v. Anoka Cnty.*, 54 F.4th 1016, 1021 (8th Cir. 2022) (concluding classification based on national origin failed strict scrutiny because less restrictive means of achieving the same ends—like one conditioned on having reasonable suspicion an individual was present illegally before contacting ICE—were available but not considered); *see Republican Pty. of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005).

The Secretary's Voter Purge Program is not narrowly tailored because the Secretary has *admitted* that it is overinclusive, and that there are less restrictive alternative means of achieving the same ends. First, the record demonstrates that a substantial number of citizens are included within the ambit of the Secretary's Program, indiscriminately burdening their voting rights based only on their national origin. (*See* ECF No. 10 Exs. J ¶ 5; G, H, M, P.) Overinclusive national origin classification programs that include within their sweep a substantial number of citizens are not narrowly tailored. *See Parada*, 54 4th at 1020–21.

8

Second, less restrictive alternative means of accomplishing the Secretary's stated goal exist. The Secretary's Program could have tailored to focusing on the *date* Affected Voters first registered to vote versus the date when they reported their non-citizen status. Doing so would have allowed the Secretary to focus on the 154 Affected Voters self-identifying as non-citizen *after* registering to vote. But that is not what the Secretary's Voter Purge Program does. Courts evaluating similar programs have recognized there are tools available to state officials interested in verifying the citizenship status of registered voters. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 955–56, 958–59 (D. Ariz. 2024) (describing availability of various databases for confirming citizenship status of naturalized citizen voters). These tools—coupled with the foresight to have started the program during the "summer"—when the Secretary claims to have become concerned about this issue—would have allowed the Secretary to develop a more narrowly tailored list. Perhaps most critically, the Secretary acknowledges the list of 154 Affected Voters self-identifying as non-citizens would be a more narrowly tailored means of achieving its stated end. Because the Secretary has less restrictive means of achieving his goal available to him, the Program is not narrowly tailored and fails strict scrutiny.

## IV.     Question 3: Can the Court Order Injunctive Relief Consistent With The *Purcell* Principle?

The Court also asked whether it can order the relief Plaintiffs seek that would be consistent with the *Purcell* principle. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). Plaintiffs say yes, and the Secretary says no. Again, the Secretary is incorrect.

The core principle animating *Purcell* is the need to avoid "conflicting orders" that can "result in voter confusion and consequent incentive to remain away from the polls" as "an election draws closer." *Purcell*, 549 U.S. at 4–5. Far from foreclosing injunctive relief here, *Purcell*

underscores the *need* for the Court to redress the Secretary's eleventh-hour directive that is causing confusion for voters and election officials.

The Secretary tries to sideline the Court by claiming that *Purcell* "instruct[s] federal courts not to insert themselves into election-related disputes shortly before an election," Defs.' Resp. at 1, but *Purcell* provides no reasonable basis for the Secretary to shield his conduct from judicial review. The Secretary's directive did precisely what *Purcell* seeks to avoid: foment confusion and risk discouraging voter participation by upending election rules during election season. *See id*. At the November 1, 2024 hearing, the Secretary conceded that he had concerns about noncitizens voting *months* ago, yet he waited to issue the directive until just *fourteen days* before the General Election. *Purcell* seeks consistency and clarity during election season, a principle that cannot be squared with the suggestion that election officials have carte blanche to upend election procedures in the midst of an election.

In any event, *Purcell* did not bar courts from issuing injunctive relief to settle election procedures. As the Supreme Court explained in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, *Purcell* seeks to avoid "judicially created confusion." 589 U.S. 423, 425 (2020). The prudence of avoiding conflicting judicial orders during election season means that "lower federal courts should ordinarily not *alter* the election rules on the eve of an election" (emphasis added). That is not what Plaintiffs are seeking here. Quite the opposite, Plaintiffs are not seeking to *alter* any rules, but rather to return matters to the status quo before October 22. *Purcell*'s cautioning against upending election rules does not prevent courts from ordering election officials to return things to the status quo ex ante. *Id*.; *see also Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) ("The *Purcell* principle—that federal courts should *usually* refrain from interfering with state election laws in the lead up to an election—is well established.") (emphasis added).

Lest the main point get lost, if the Secretary were correct, he could instigate the most unconstitutional of programs in the midst of election season, and federal courts would be powerless to stop him. Whatever *Purcell* means, it cannot mean that federal courts—long the guardian of voting rights—are powerless to correct constitutional violations. None of the Secretary's authorities says otherwise.[1]

---

[1] The Secretary cites a long string of cases that purportedly reaffirm his categorization of the *Purcell* doctrine, but none supports him. Three of the cases cited merely mention *Purcell* within a dissenting or concurring opinion (and in a way that supports Plaintiffs' reading of the *Purcell* principle), two cases do not mention *Purcell* at all, and three cases cite the *Purcell* principle as being one in which federal courts should strive to avoid voter confusion by interfering with election rules shortly before an election, but that this sometimes *cannot be avoided* because federal courts still must ensure the Constitution is upheld. *See, e.g.*, *Merrill v. People First of Ala.*, 141 S. Ct. 25 (Mem.) (2020) (citing *Purcell* in a dissenting opinion for the principle that district courts should avoid "creating 'voter confusion and consequent incentive to remain away from the polls'"); *Andino v. Middleton*, 141 S. Ct. 9 (2020) (citing *Purcell* in a concurring opinion for the principle that "this Court has repeatedly emphasized that federal courts *ordinarily* should not alter election rules in the period close to an election" (emphasis added)); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (Mem.) (2020) (no reference to *Purcell*); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (Mem.) (2020) (no reference to *Purcell*); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (Mem.) (2020) (no reference to *Purcell*); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424–25 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should *ordinarily* not alter the election rules on the eve of an election. . . . [T]he wisdom of the *Purcell* principle . . . seeks to avoid this kind of judicially created confusion."(emphasis added)); *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 , 42 (Mem.) (2020) (Kagan, J., dissenting) ("At its core, *Purcell* tells courts to apply, not depart from, the usual rules of equity." (internal quotations omitted) (application to vacate stay denied); *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) ("Election rules must be clear and judges should normally refrain from altering them close to an election. Purcell protects the status quo."); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("The public has an interest in the fair and orderly operation of elections, and the Supreme Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." (internal quotation omitted)).

**V.      Question 4: How does *Crawford v. Marion County* impact the Court's analysis?**

The Court also asked how, if at all, the Supreme Court's decision in *Crawford v. Marion County Election Board*, affects its analysis. The answer is simple: it doesn't.

In *Crawford*, the Supreme Court declined to enjoin an Indiana voter photo identification statute that applied to all voters in the state. 553 U.S. 181 (2008) That case has no bearing here for several reasons. First, *Crawford* concerned a voter ID requirement that was generally applicable, "neutral," and "nondiscriminatory." *Id.* at 202-03 ("[O]n the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."). The Voter Purge Program is the opposite: it singularly imposes a higher burden on naturalized citizens but not other U.S.-born citizens.

Second, the burdens imposed on naturalized citizens in this case are significantly greater than in *Crawford*. The voter ID requirement in *Crawford* was enacted by the state legislature more than half a year in advance of the election, which gave voters some warning that an acceptable form of ID (available for free from the state) may be required; the state law also exempted indigent voters, who may satisfy the requirement via an affidavit. *See id.* at 185-86; 2005 Ind. Legis. Serv. P.L. 109-2005 (S.E.A. 483). Here, the Secretary—absent any statute passed by a duly enacted legislature—imposed a new proof-of-citizenship requirement mere days before the election, when it is virtually impossible to obtain or replace a U.S. Passport or a naturalization certificate in time. Unlike a driver's license or state-issued identification card (which is also available free of charge, Iowa Code Ann. § 48A.10A), a citizenship document typically takes *months* and may cost hundreds of dollars to obtain.[2] *See Boustani*, 460 F. Supp. 2d at 825-26 ("[A]n applicant can expect

---

[2] The time and expense of replacing a certificate of naturalization are onerous. The filing fee is over $500 ($505 for online or $555 for paper), and the current processing time *is 7.5 months*. *Check Case Processing Times*, U.S.

to wait up to one year to receive a replacement [naturalization] certificate.  Therefore, a voter challenged under R.C. § 3505.20 would be unlikely to produce the required documentation within ten days to the Board of Elections."); *see also generally Crawford*, 553 U.S. at 198 (finding that Indiana's voter ID statute might be unconstitutional "if the State required voters to pay a tax or a fee to obtain a new photo identification.") (citing *Harper v. Va. Bd. of Elec.*, 383 U.S. 663 (1966)).

And finally, unlike in *Crawford*, where voters were on notice about the statute the legislature had passed long before the election, affected voters in Iowa were not given notice of the Secretary's last-minute directive and likely will lack knowledge of it until they show up to vote on Election Day, when they will be unlikely to have citizenship documentation with them.  *See Boustani*, 460 F. Supp. 2d at 825. ("Naturalized citizens are rarely asked to produce the document, and normally do not carry it on their person."). The voter ID provision in *Crawford* is, ultimately, similar to voter ID laws common across the United States, including Iowa's longstanding requirement which is not at issue here. The Secretary's directive, which requires a certain subset of voters to provide a rarer and costlier form of identification without advance warning on the eve of an election, is far more burdensome.

---

Citizenship and Immigration Services, https://egov.uscis.gov/processing-times/ (last visited Nov. 1, 2024) (processing time for N-565 | Application for Replacement Naturalization/Citizenship Document).

The fees for a new passport book costs $165, and it currently takes up to two weeks for the passport application to be received by the passport agency, about four to six weeks for the application to be processed, and up to another two weeks for the passport to be received after it has been printed—meaning the total wait-time may be as long as *eight to ten weeks*.  *Passport Fees*, U.S. Dep't of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html (last visited Nov. 1, 2024); *Processing Times for U.S. Passports*, U.S. Dep't of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html (last visited Nov. 1, 2024).

**VI.   Question 5:  What Powers Does The Secretary Have Over Election Commissioners?**

The Court also asked whether election officials like county auditors or others must follow the Secretary's directive.

The Secretary of State is designated as the state commissioner of elections and has significant authority over county election commissioners under Iowa Code Annotated § 47.1(1). This power includes prescribing uniform election practices and procedures, prescribing necessary forms required to conduct elections, adopting rules to carry out responsibilities, and issuing guidance not subject to the rulemaking process in order to clarify election laws and rules. Iowa Code § 47.1 (1). In *Democratic Senatorial Campaign Committee v. Pate*, the Supreme Court of Iowa held that the Secretary of State had general authority through section 47.1 to issue directives to county officials to ensure uniformity and compliance with state election laws. 950 N.W.2d 1 (Iowa 2020). And Iowa Code § 47.2 states that "[t]he county commissioner of elections does not possess home rule powers with respect to the exercise of powers or duties related to the conduct of elections prescribed by statute or rule, or guidance issued pursuant to section 47.1." Iowa Code § 47.2(1). In his directive, the Secretary of State has explicitly invoked the powers of his office by stating, "under SOS authority under Iowa Code sections 47.1(1) and 47.7(6), you are hereby directed to challenge the ballots of any person in the attached list of registered voters who attempt to vote in the 2024 General Election." Ex. E. It is unclear what the Secretary was referring to in Iowa Code section 47.7(6) since that specific provision does not exist. Regardless, this categorical directive is inconsistent with the Secretary's counsel's representations at the hearing that county officials had some undefined discretion to refrain from challenging certain voters on the list depending on additional information they might have.

14

Auditor Shane's declaration underscores that county election officials must generally follow secretary directives, and if they don't, they risk certain consequences. As Secretary Shane averred, "by not following [the directive] I could be subject to a fine of up to $10,000 per voter for technical infractions (Iowa Code § 39A.6) and/or prosecution by the Iowa Attorney General (Iowa Code § 39A.2(1)(g)) for failure to perform my duties and implement the Secretary's guidance under Iowa Code § 47.1."

Thus, because county election commissioners generally do not have discretion to ignore the Secretary's directives (and for purposes of uniformity, one would not want 99 separate decisions on whether to follow a Secretary's neutral, non-discriminatory guidance), a court order enjoining the Voter Purge Program is necessary.

## VII.   What Specific Remedial Order Should The Court Enter If It Agrees With Plaintiffs?

Finally, the Court asked Plaintiffs what specific remedial order it should enter if it agrees that relief is warranted. The Court should enter an order as follows:

- The program the Secretary implemented on October 22, 2024 is unconstitutional.

- The directive the Secretary issued to county election officials on that date is rescinded.

- County election officials must not use the Secretary's list as a basis to challenge any voter on the list.

15

## CONCLUSION

For the reasons articulated herein and in their opening brief, *see* ECF No. 9-1, Plaintiffs respectfully request the Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction. *See* ECF No. 9.

Dated: November 2, 2024

/s/ *Jesse Linebaugh*

Jesse Linebaugh (AT0004744)
Email: jesse.linebaugh@faegredrinker.com
Matthew J. Scott (AT0014441)
Email: matthew.scott@faegredrinker.com
Joe R. Quinn (AT0015363)
Email: joe.quinn@faegredrinker.com
Emily R. O'Brien** (AT0015757)
Email: emily.obrien@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Telephone: +1 515 248 9000

Craig S. Coleman*
Email: craig.coleman@faegredrinker.com
Jeffrey P. Justman*
Email: jeff.justman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: +1 612 766 7000

Rita Bettis Austen (AT0011558)
Email: rita.bettis@aclu-ia.org
Thomas D. Story (AT0013130)
Email: thomas.story@aclu-ia.org
AMERICAN CIVIL LIBERTIES UNION OF
IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
Telephone: +1 515 243 3988

Ari Savitzky*
Email: asavitzky@aclu.org
Jonathan Topaz*
Email: jtopaz@aclu.org
Ming Cheung*
Email: mcheung@aclu.org
Sophia Lin Lakin*
Email: slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: +1 212 549 2500

Patricia Yan*
Email: pyan@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
915 15th Street NW
Washington, DC 20005
Telephone: +1 202 457 0800

*Pro Hac Vice Application Forthcoming
**Application for Admission Forthcoming

*Attorneys for Plaintiffs Orcun Selcuk, Alan David Gwilliam, Tingting Zhen, Michael Brokloff, and the League of United Latin American Citizens of Iowa*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true copy of the foregoing document was filed electronically through the Court's CM/ECF filing system on November 2, 2024, which will send notice to all counsel of record.

/s/ Joseph R. Quinn