# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| ORCUN SELCUK; ALAN DAVID GWILLIAM; TINGTING ZHEN; MICHAEL BROKLOFF; and THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA, on behalf of itself and its members,<br><br>*Plaintiffs*,<br><br>v.<br><br>PAUL D. PATE, in his official capacity as the Iowa Secretary of State; BENJAMIN D. STEINES, in his official capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; JAMIE FITZGERALD, in his official capacity as the Polk County Auditor and Polk County Commissioner of Elections; MELVYN HOUSER, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; ERIN SHANE, in her official capacity as the acting Johnson County Auditor and acting Johnson County Commissioner of Elections; and KERRI TOMPKINS, in her official capacity as the Scott County Auditor and Scott County Commissioner of Elections,<br><br>*Defendants*. | Case No. 4:24-cv-00390<br><br>**STATE DEFENDANT'S SUPPLEMENTAL RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |

i

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

INTRODUCTION ..................................................................................................................... 1

SUPPLEMENTAL BACKGROUND ....................................................................................... 2

ARGUMENT ............................................................................................................................. 3

I.      Iowa Law Authorizes the Secretary Of State to "Prescribe Uniform Election Practices and Procedures" and "Clarify Election Laws and Rules," Which Includes Laws and Rules Governing Ballot Challenges. ........................................................................................ 3

II.     Iowa Code 48A.7A Addresses the Documentation Needed to Process a Voter Registration Under Chapter 48A, Not a Ballot Challenge Under Section 49.79 ................ 6

III.    Plaintiffs' Novel Equal Protection Claim Fails on Its Merits and Under *Purcell*. ............... 7

CONCLUSION .......................................................................................................................... 9

FEDERAL RULE OF CIVIL PROCEDURE 65/FEDERAL RULE OF APPELLATE PROCEDURE RULE 8 REQUEST ........................................................................................... 9

**INTRODUCTION**

Under *Purcell*, Plaintiffs face a high burden to show that they are entitled to injunctive relief relating to longstanding election laws on the eve of an election. Even if Plaintiffs' contention that their late-filed suit's timing is not their fault, *Beals*'s similar timing, which this week allowed Virginia to remove six hundred self-identified noncitizens from its voter rolls, should be instructive to this Court. There, the timing was also shortly before the election, and the litigation moved swiftly to the Supreme Court, which took the extraordinary step of staying the district court's injunction.

Unlike *Beals*, no voters here are being removed from a voter list. Instead, challenged voters who are eligible to vote have multiple methods and opportunities to cure their ballots—rendering any harm reparable. And any remedy risks hobbling either the Secretary of State or other Defendants here from challenging would-be noncitizen voters. And local election officials that can confirm citizenship status can allow those who are eligible to vote. *See*, *e.g.*, KCRG Staff, *Johnson County Working to Confirm Citizenship of Challenged Registered Voters*, https://www.kcrg.com/2024/10/31/johnson-county-working-confirm-citizenship-challenged-registered-voters/ (Oct. 31, 2024) ("So far, they have confirmed citizenship for 63 people. Johnson County officials say they believe those people with confirmed citizenship will be able to vote with a regular ballot. One person was referred to law enforcement for additional clarification and investigation on whether they were eligible to vote.").

Ultimately, even those with challenged votes may cast full ballots after taking one extra step, consistent with longstanding Iowa law for how to deal with ballot challenges. The only people to whom the right to vote will be denied are those ineligible to exercise that right. Issuing a temporary restraining order that is properly framed to ensure that only the citizens, but not the noncitizens, on the list can vote requires being able to identify who is on which list. That feat is no easier for the Court than it is for State Defendant. And given the *Purcell* context, if such relief is not "entirely clear" for

1

Plaintiffs', then the temporary restraining order should be denied. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

**SUPPLEMENTAL BACKGROUND**

When the State learned of a risk of potential noncitizens on its rolls—a risk that has since borne out as there are hundreds of confirmed noncitizens that have registered to vote—it followed best practices in its attempt to ensure that noncitizens did not illegally vote.

The Secretary of State's office was responsible for significant planning regarding the 2024 election. *See* Ex. A, Supp. Dec. of Ross, ¶ 12. In July 2024, senior staff attended the National Association of Secretaries of State conference—at which election security was a topic of discussion. *Id.* ¶ 15. That conference included a presentation by Secretary of State staff from Georgia regarding the use of the federal SAVE files to verify the citizenship status of registered voters. *Id.* ¶ 16. During the presentation, the Secretary's team learned that accessing the SAVE database can take four to five months. *Id.* By the end of that conference, the State was already within that timeframe—so Iowa likely could not access the SAVE database before the 2024 election.

But the Secretary's team committed to ensuring that noncitizens did not improperly vote in Tuesday's election. After both internal conversations and outreach to other States, the team learned that it was possible to verify the citizenship status of registered voters by using records from their Department of Transportation and comparing that information to the State voter lists. *Id.* ¶ 18. The Iowa Department of Transportation had similar data and could assist the Iowa Secretary of State in that verification process. *Id.* ¶ 20. After identifying the initial problem, learning of a work around used by other States, and then determining that was also possible in Iowa, the Secretary of State formally requested those records from the Iowa Department of Transportation on October 1. *Id.* ¶ 21. Less than one week later, those records were transmitted to the Secretary. *Id.* ¶ 22. And over the next few weeks, along with all the other pending responsibilities with an upcoming election, the team worked

to do as much diligence as possible to verify all the data points to create the final list of self-identified noncitizens present on Iowa's voter rolls. *Id.* ¶¶ 23–24.[1]

After the list was sent to County Auditors on October 22, media articles began to raise questions about this newer application of the longstanding ballot-challenge law. So late in the evening of October 24, an agent from the Iowa field office of the United States Citizenship and Immigration Services left a message with the Secretary of State, offering to check the citizenship status of people on the list. *Id.* ¶ 28. After a call, that agent agreed to receive the 2,176-person list and to look up each person individually to confirm their citizenship statuses. *Id.* ¶¶ 29–31. That evening, the agent said that after reviewing a sample of 146 names, 18% were confirmed to be non-citizens. *Id.* ¶ 32. On October 28, the agent completed reviewing the list and told the Secretary's team that additional forms needed to be filled out before the information could be shared. *Id.* ¶¶ 33–35. The agent also alerted that 12% of the complete 2,176-person list—hundreds of the people—were confirmed noncitizens. *Id.* ¶ 36. That completed list has not yet been shared with the Secretary of State, despite calls from statewide elected officials including the Governor and both U.S. Senators. *See*, *e.g.*, @IAGovernor, https://x.com/IAGovernor/status/1852399383020540255 (posted 11/1/2024) (including full text of letter sent by Senators Grassley and Ernst).

## ARGUMENT

**I.    Iowa Law Authorizes the Secretary of State to "Prescribe Uniform Election Practices and Procedures" and "Clarify Election Laws and Rules," which Includes Laws and Rules Governing Ballot Challenges.**

The Court requested more information about the Secretary of State's statutory authority to issue its directive establishing that reasonable suspicion exists to challenge voters if they have declared

---

[1] At the hearing, the State Defendant stated to the Court that the final review of voter data on the list of 2,176 names went back to voters that had registered to vote in the prior eight years. On re-review of the actual final data on the list, that review covered the last ten years. Supp. Dec. of Ross, ¶¶ 25–26. There are also 16 other names on the list that are outside that range. *Id.* ¶ 27.

3

to the State that they are noncitizens. Plaintiffs neither raised nor questioned the Secretary of State's statutory authority in their complaint among their Constitutional and statutory claims. Plaintiffs declined to press that issue in either brief filed before the hearing. And for good reason—the statutory authority for the Secretary to oversee Iowa's elections and to instruct local election authorities is clear. Especially in the context under *Purcell*, such a forfeiture or failure to raise an argument cuts strongly against that argument being the basis for a temporary restraining order on the eve of an election. So too with the now waived, for TRO purposes, Quiet Period argument.

Iowa Code chapter 47 establishes that the Secretary of State serves as the state commissioner of elections and "shall supervise the activities of the county commissioners of elections." Iowa Code § 47.1(1).[2] As the state commissioner of elections, the Secretary of State must "prescribe uniform election practices and procedures" and may "issue guidance that is not subject to the rulemaking process to clarify election laws and rules." *Id.* The Secretary of State also has the discretionary authority to examine county elections commissioners' records to ensure those commissioners are complying with state elections laws. *Id.* § 47.1(6).[3]

Iowa law grants the Secretary of State additional authority in the days before an election, giving him discretionary authority to "oversee the activities of a county commissioner of elections during a period beginning sixty days before an election and ending sixty days after an election." *Id.* § 49.2. That oversight authority includes the power to "observe election-related activity" and "correct any activity not in accordance with the law." *Id.* As to provisional ballots, Iowa law authorizes the Secretary of State to prescribe a printed notice that challenged voters will receive. *Id.* § 49.81(3).

---

[2] Chapter 47 further states that "[t]he county auditor of each county is designated as the county commissioner of elections in each county." Iowa Code 47.2(1).

[3] Secretary Pate's October 22, 2023 letter inadvertently referred to this provision as "Iowa Code section[] . . . 47.7(6)." Ex. B attached to Resistance to TRO, at 2; *see also* Supp. Dec. of Ross, ¶ 6.

4

Relying on his statutory authority under Iowa Code sections 47.1(1) and 47.1(6), Secretary Pate sent a letter to Iowa's county auditors informing them that his office had conducted an individualized review of potentially ineligible voters and had "discovered 2,176 registrants who had self-reported as non-citizens that are registered to vote and 154 registrants who had self-reported to the DOT as non-citizens <u>after</u> registering to vote or voting." *See* Ex. B attached to Resistance to TRO at 1. Secretary Pate explained the process his office had conducted and the basis for the State's reasonable suspicion that the individuals on the list might be ineligible to vote. *See id.* Then, under his authority to "issue guidance . . . to clarify election laws and rules," he reminded county auditors of their statutory ballot-challenge obligations under Iowa Code section 49.79 and clarified the provisional-ballot processing rules under Iowa Code section 49.81. *See id.* at 2.

The Secretary of State specifically reminded county auditors of their statutorily mandated duty under Iowa law "to challenge any person offering to vote whom the official knows or suspects is not qualified"—a duty that can be triggered based on suspected noncitizenship and that has existed since 2002. Iowa Code §§ 49.79(1), (2). He then provided detailed instructions for how to process provisional ballots and explained that voters asked to cast provisional ballots "will place their ballot in a provisional ballot envelope for later and further review, such that it can be cured and the vote validly counted." Ex. B attached to Resistance to TRO at 2. He reminded the county auditors that provisional ballots were part of a long-standing process and "no different than when a voter's qualifications as to age or residency are challenged." *Id.*

Put simply, Iowa Code section 47.1(1) vests the Secretary of State with the authority to supervise State election activities, including express authority to "prescribe uniform election practices and procedures" and "issue guidance that is not subject to the rulemaking process to clarify election laws and rules." This "guidance" includes authority to clarify the ballot challenges required under every

5

election official's Iowa Code section 47.79 duty and of the provisional ballot process set forth in Iowa Code section 49.81.

Here, the Secretary of State issued such guidance to the State's county auditors based on recent credible information that he had received regarding self-identified noncitizens. His October 22 letter falls squarely within his statutory authority.

## II. Iowa Code 48A.7A Addresses the Documentation Needed to Process a Voter Registration Under Chapter 48A, Not a Ballot Challenge Under Section 49.79.

Iowa law allows for Election Day voter registration and sets out that process in Iowa Code section 48A.7A. That section sets forth the documentation needed to register. *See* 48A.7A(*b*)(1). It states that "a person may establish identity and residence by presenting to an appropriate precinct election official a current and valid Iowa driver's license or Iowa nonoperator's identification card . . . *for purposes of this section.*" *Id.* (emphasis added). In other words, a driver's license can be used to establish identity and residence for purposes of section 48A.7A—*i.e.*, for purposes of Election Day registration.

Ballot challenges, in contrast, are not governed by Section 48A.71 or chapter 48A at all. They are instead governed by chapter 49. Even if section 48A.7A(*b*)(1) applied to ballot challenges, it specifies that a driver's license may be used to establish "identity and residence;" Iowa law does not allow a driver's license to serve as proof of citizenship. *See* 48A.7A(*b*)(1). Section 48A.7A(*b*)(1) does not logically apply to ballot challenges under section 49.79 because many of the ballot challenge criteria—such as citizenship, felony status, and adjudicated incompetency—would never be found on a driver's license.

Consider a ballot challenge relating to an expunged felon whom a precinct election official or another registered voter reasonably suspected of being a convicted felon. In that circumstance, the challenged voter would have to cast a provisional ballot. The challenged voter's driver license would not prove her status as an expunged felon. Rather, that voter may provide to the County Auditor a

6

Governor's proclamation including an expungement of record. *See* Supp. Dec. of Ross, ¶ 9. That is not an item found on a driver's license or birth certificate, nor is it unique to naturalized citizens. As with all challenges regarding information not found on a driver's license, the extra information that may be needed to show that a challenged vote should be counted could be found on some other documentation not explicitly listed in either chapter 48A or even in chapter 49. *See, e.g., id.* ¶¶ 9–11.

To put a finer point on it, the only evidence of non-felon- or citizen-status that is required to register to vote is an attestation from the voter stating she is not a felon and is a citizen. So when the State gains credible information in the form of an attestation from the same voter stating she *is* a felon or a noncitizen, then more documentation is needed to if her ballot is challenged. A driver's license cannot confirm to the State whether a would-be voter is an expunged felon or a naturalized citizen. After all, many felons and expunged felons, noncitizens and naturalized citizens alike all possess driver's licenses. Look no further than the reason we are here: hundreds of noncitizens, now in possession of a driver's license, have registered to vote but have also reported to the Iowa Department of Transportation that they are noncitizens.

### III. Plaintiffs' Novel Equal Protection Claim Fails on Its Merits and Under *Purcell*.

The Equal Protection Clause requires "that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The Secretary's list treats all persons similarly who registered to vote in the last ten years but attested to the State that they were not a U.S. citizen. Sharing credible information in that way with local election officials does not amount to differential treatment based on national origin. Further, the statutory ballot-challenge procedure at issue here, which has been in effect for decades, is identical for anyone who offers a ballot—whether that ballot challenge is based on residency, youth, felon status, or self-identification as a non-citizen.

7

Plaintiffs argue that the distinction drawn is based on national origin and thus subject to strict scrutiny. That would be novel in this context. Indeed, as noted at the hearing—and as conceded by Plaintiffs' counsel on rebuttal—nation-of-origin discrimination has never been found under the circumstances alleged. Put another way, national-origin discrimination has not been applied by courts in an election context where the differently situated persons are alleged to be Americans born in America and Americans born anywhere else. National-origin discrimination normally tends to rely on discriminating against persons coming from a nation (or, more rarely, a region). That is why Plaintiffs do not cite a single case supporting such a theory. The only case Plaintiffs cited to support applying strict scrutiny here, *Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), is neither an election law case nor does it deal with nation-of-origin discrimination. More, State Defendants have not found a single election case, or any other type of case in the Eighth Circuit, where status as a naturalized citizen created the presumption of discrimination Plaintiffs call for here.

And that all makes sense. Noncitizens—whose unifying feature is, definitionally, that they are not Americans—have no right to vote. Not under Iowa law nor under federal law. Any distinction drawn by the Secretary is therefore one prescribed by Iowa and federal law. Plaintiffs' theory, in fact, would translate to applying heightened scrutiny to the right to vote in general, because that right distinguishes between citizens and noncitizens. This cannot be so.

Ultimately, the standard to apply here is either rational basis review or *Anderson-Burdick*, under which, as discussed in State Defendant's opposition brief, there is no concern here. Any imposition on naturalized-citizen voters that have self-declared to the State that they are not citizens is not heavy and is justified by the State's compelling interest in preventing illegal votes from being cast. And even if strict scrutiny applied, Plaintiffs have identified no narrowed approach that would still further the

8

State's compelling interest. Indeed, using the 150-person list instead of the 2,176 list still risks leaving many noncitizens eligible to vote without challenge.

Plaintiffs ask the Court to order the Secretary to ignore the credible information that hundreds of noncitizens illegally registered to vote in Iowa and allow hundreds of noncitizens to cast their ballot in this election. Such a harmful result would perfectly undermine the State's compelling interest, and thus is not required even under strict scrutiny.

Finally, given the at-best uncertain state of the law as to Plaintiffs' novel theory of Equal Protection violation, *Purcell* instructs against issuing injunctive relief just a few days ahead of a federal election. Considerations specific to "election cases" require courts to apply far more searching review of election-eve injunctions than typically required when reviewing requests for injunctive relief. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays); s*ee generally Purcell v. Gonzales*, 549 U.S. 1 (2006). So, to succeed, Plaintiffs must show the merits of their claims are "entirely clear." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Unable to do so here, Plaintiffs claim fails.

## CONCLUSION

For these reasons, and for the reasons in the State's initial brief responding to Plaintiffs' request for a temporary restraining order that now may issue mere days before the election, Defendant respectfully requests that the temporary restraining order be denied.

## FEDERAL RULE OF CIVIL PROCEDURE 65/FEDERAL RULE OF APPELLATE PROCEDURE RULE 8 REQUEST

Election day is November 5—two days after the deadline the Court set for itself to rule on Plaintiffs' motion. If this Court grants a temporary restraining order that affects more than the four Individual Plaintiffs here the State respectfully moves to Stay that injunction. *Nken v. Holder*, 556 U.S.

418 (2009). Moving to stay in the district court is necessary to seeking an emergency stay on appeal. State Defendant respectfully requests that if such a restraining order is issued that this Court stays that order pending the Eighth Circuit's consideration, or, in the alternative, that such a stay is explicitly denied in the written order such that State Defendants may immediately file their emergency appeal.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Eric Wessan*
Eric Wessan
*Solicitor General*
Patrick C. Valencia
*Deputy Solicitor General*
Breanne A. Stoltze
*Assistant Solicitor General*
Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
breanne.stoltze@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANT

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on November 2, 2024:

| ☐ U.S. Mail | ☐ FAX |
| ☐ Hand Delivery | ☐ Overnight Courier |
| ☐ Federal Express | ☐ Other |
| ☒ CM/ECF | |

Signature: /s/ Eric Wessan