# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| ORCUN SELCUK; ALAN DAVID GWILLIAM; TINGTING ZHEN; MICHAEL BROKLOFF; and THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA, on behalf of itself and its members,<br><br>Plaintiffs,<br><br>v.<br><br>PAUL D. PATE, in his official capacity as the Iowa Secretary of State; BENJAMIN D. STEINES, in his official capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; JAMIE FITZGERALD, in his official capacity as the Polk County Auditor and Polk County Commissioner of Elections; MELVYN HOUSER, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; ERIN SHANE, in her official capacity as the acting Johnson County Auditor and acting Johnson County Commissioner of Elections; and KERRI TOMPKINS, in her official capacity as the Scott County Auditor and Scott County Commissioner of Elections,<br><br>Defendants. | Case No. 4:24-cv-390<br><br>**SUPPLEMENTAL DECLARATION OF MICHAEL ROSS** |

COMES NOW, Michael Ross, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I am the Chief of Staff and Deputy Secretary of State ("Chief of Staff") for the Secretary of State of Iowa.

2. The facts included in this affidavit are within my personal knowledge.

3. The facts and processes outlined herein are within the normal course of operations and commensurate with my duties as Chief of Staff.

4. The SoS has authority over election processes under Iowa Chapter 47.1 as the state commissioner of elections.

5. This authority includes the ability to proscribe uniform election practices and procedures and to issue guidance under Iowa Chapter 47.1(1).

6. Iowa Code Chapter 47.1(6) affords the SoS the authority to examine records and evaluate complaints to ensure compliance with state election laws.

7. This includes the ability to pose challenges to registered voters or ballots.

8. There are a number of instances where a document other than a driver's license would be required to prove voter qualifications, such as citizenship, which are not indicated on an Iowa Driver's license or to cure a 48A challenge.

9. If a 48A challenge was brought based on allegations that someone was a convicted felon, prior to Executive Order 7, that challenge would be cured by that individual providing a secondary document such as the certificate and/or letter they received from the Governor restoring their right to vote.

10. If a 48A challenge was brought on the basis of the voter having been judged incompetent, the challenged individual would have to cure that by

providing a court-order rescinding that prior determination and finding they were competent once again.

11. Similarly, if someone brought a 48A challenge based on residency, and that person had used an out-of-state driver's license to prove their identity, or an Iowa driver's license issued with a previous address, the challenged individual would have to provide further proof of residency such as through a utility bill.

12. Further, in my role as Chief of Staff, I have assisted in the preparations made by our office for the 2024 elections. These preparations are outlined in detail in State's Exhibit A.

13. Additional preparations Secretary of State's Office Staff ("SOS") have made include exploring ways to maintain the integrity of Iowa's voter rolls.

14. To that end, I have sought to educate myself regarding the processes used by other states in maintaining their own voter rolls.

15. In early July of 2024, I attended the National Association of Secretaries of State ("NASS") conference where I had the opportunity to discuss election security with colleagues from across the U.S.

16. During the NASS conference, I had the opportunity to observe a presentation provided by my colleagues from Georgia regarding the use of federal SAVE files to verify the citizenship status of registered voters. It was mentioned during the course of the state of Georgia's presentation that

it was taking anywhere from four to five months to obtain access to the federal SAVE files.

17. Upon my return to Iowa, I communicated with the SoS elections team regarding our processes for verification of registered voters' citizenship status.

18. Based upon my discussions with the SoS team, I had conversations with my colleagues in Ohio about how their process for verifying citizenship of voters worked. During these conversations, these colleagues mentioned they had been able to verify the citizenship status of registered voters by using records from their Department of Transportation and comparing them against the Ohio voter lists with several unique identifiers.

19. Also in July, I was approached by Iowa legislators with concerns regarding the integrity of Iowa's voter rolls.

20. After multiple discussions with my colleagues at the Iowa Department of Transportation ("IDOT"), I became aware they had information which could assist the SoS in verifying the citizenship status of registered voters.

21. On October 1, 2024, the SoS formally requested the records from IDOT.

22. On October 7, 2024, the SoS received the requested records from IDOT.

23. Between October 7, 2024, and October 22, 2024, my staff and I worked hard to run the comparisons between the two lists making sure to take due diligence to verify all comparative data points.

24. Multiple people on my staff reviewed the list, and ultimately by myself, to ensure the list was as accurate as possible based on the data points we had.

25. As part of my review, I narrowed the list to an ten-year look back period wherein I evaluated whether that individual had registered to vote or voted in the past ten years.

26. If an individual had not registered or voted in the past ten years, I removed them from the list.

27. There is an additional 16 people on the list who fall outside of that range for unknown reasons.

28. Late on the night of Thursday, October 24, an agent from the Iowa field office of the United States Citizenship and Immigration Services ("USCIS") left a message with our call center indicating he had been reading about this situation and that he would be able to look these individuals up to confirm their citizenship status.

29. I received his message and contacted him on Friday, October 25, 2024.

30. During the call, we agreed we would provide the list to him and he would look each person up individually and provide us with the results.

31. That day, we provided the list to USCIS.

32. I had a phone conversation with him that night in which he indicated that he had gone through 146 names at that point, with 18% of those individuals being non-citizens.

33. On Monday, October 28, 2024, the agent indicated he had a few more individuals to review to confirm their citizenship status.

34. Later that day, he informed me the list comparison was complete and advised that SoS needed to fill out certain forms which we filled out and sent back

35. The agent provided additional forms, which we completed that day.

36. The agent informed me that his review had revealed 12% of the self-identified individuals on the list were not citizens.

37. SoS was ultimately informed on Tuesday, October 29, 2024, that the Washington, D.C. branch of USCIS did not want to release the information as it would require extensive review and oversight.

I declare under penalty of perjury the foregoing is true and correct.


Executed on: <u>November 1, 2024</u>          /s/ Michael Ross_____
                                               Michael Ross