IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ORCUN SELCUK; ALAN DAVID GWILLIAM; TINGTING ZHEN; MICHAEL BROKLOFF; and THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA,<br><br>            Plaintiffs,<br><br>vs.<br><br>PAUL D. PATE, in His Official Capacity as the Iowa Secretary of State; BENJAMIN D. STEINES, in His Official Capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; JAMIE FITZGERALD, in His Official Capacity as the Polk County Auditor and Polk County Commissioner of Elections; MELVYN HOUSER, in His Official Capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; ERIN SHANE, in Her Official Capacity as the Acting Johnson County Auditor and Acting Johnson County Commissioner of Elections; and KERRI TOMPKINS, in Her Official Capacity as the Scott County Auditor and Scott County Commissioner of Elections,<br><br>            Defendants. | 4:24-cv-00390-SHL-HCA<br><br>**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**I.     INTRODUCTION.**

On October 22, 2024, Iowa Secretary of State Paul Pate sent a letter to county commissioners in some or all of Iowa's ninety-nine counties stating that the Secretary of State's Office had reviewed voter registration data and identified 2,176 registrants who, in Secretary Pate's view, might not be eligible to vote due to being non-citizens. The basis for Secretary Pate's analysis was that these 2,176 registrants had at some point in time identified themselves to the Iowa Department of Transportation as being non-citizens. Secretary Pate "directed [the commissioners] to inform the Precinct Election Officials in the relevant precincts, that they are required under Iowa law to challenge the ballots of any person in the attached list of registered voters who attempt to vote in the 2024 General Election." (ECF 10, pp. 28–29.) The letter stated that affected voters "will

place their ballot in a provisional ballot envelope for later and further review, such that it can be cured and the vote validly counted." (Id.)

Plaintiffs consist of four naturalized United States citizens whose names were on Secretary Pate's list despite being eligible to vote, as well as a Latino civil rights organization. Plaintiffs ask the Court to enter a temporary restraining order and preliminary injunction declaring that Secretary Pate's actions violate the equal protection clause of the Fourteenth Amendment, among other aspects of federal law. Plaintiffs ask the Court to order Pate and other Defendants (all of whom are county commissioners) to "rescind" the Secretary of State's list of 2,176 voters and "retract" any communications sent to those voters calling their right to vote into question, as well as to restore the status of any voters removed from the voting rolls. (ECF 9.) For the following reasons, the Court DENIES Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

First, the United States Supreme Court recently stayed an injunction (in effect, lifting the injunction) in a case involving the outright removal of approximately 1,600 voters from the voter rolls in Virginia based on a mismatch between voter registration information and one or more agency databases. *See Beals v. Va. Coal. for Immigrant Rts.*, No. 24A407, 2024 WL 4608863 (U.S. Oct. 30, 2024). As Secretary Pate's letter does not remove anyone from the voter rolls—but rather, at most, requires those voters to use provisional ballots—*Beals* casts considerable doubt on whether the Court should impose injunctive relief.

Second, and similarly, the United States Supreme Court also recently refused to review a Pennsylvania Supreme Court decision regarding the interpretation of Pennsylvania electoral laws on the handling of provisional ballots. *See Repub. Nat'l Comm. v. Genser*, No. 24A408, 2024 WL 4647792 (U.S. Nov. 1, 2024). Like *Beals*, *Genser* counsels the Court to act with great caution before awarding last-minute injunctive relief into how Iowa officials handle election issues. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (vacating injunction and cautioning lower courts about the dangers of entering injunctive relief near election day).

Third, although the Court has concerns about whether Secretary Pate's letter is consistent with Iowa law in certain important respects—including, especially, insofar as the letter purports to (i) require local election officials to challenge the votes of each person on the list of 2,176 voters even when the local officials themselves do not suspect the person is ineligible to vote, and (ii) require voters on the list to file provisional ballots even when they have proven citizenship at the polling place—Pate backed away from those positions by the time of the hearing on Plaintiffs'

motion for temporary restraining order and preliminary injunction. For example, Secretary Pate's counsel indicated that Pate is no longer challenging the eligibility of the named Plaintiffs who submitted sworn statements in this case regarding their citizenship status, thus implicitly recognizing that the filing of a provisional ballot is not necessary or appropriate if a voter provides sufficient information to alleviate any uncertainty about the voter's citizenship status. Similarly, Pate's counsel indicated—consistent with the Court's interpretation of Iowa law—that local election officials are not per se required to challenge the votes of any person on the list of 2,176 voters and instead may exercise their own independent judgment based on information available to the official, which would include, but not be limited to, the information in Secretary Pate's letter.

Fourth, although Plaintiffs challenge Secretary Pate's letter on equal protection grounds relating to national origin—i.e., they argue that he is treating naturalized United States citizens differently than non-naturalized United States citizens—the 2,176 names on his list represent only a small subset of the total number of naturalized citizens in Iowa. For example, according to United States Census Bureau[1] and Office of Homeland Security[2] data, there are more than 79,000 naturalized citizens in Iowa in total, including more than 32,000 who naturalized between 2013 and 2022. Pate's list contains, at most, only a tiny percentage of these citizens, and he did not formulate the list based on national origin in and of itself, but rather based on the mismatch between voter registration information and information provided to the Iowa Department of Transportation. In these circumstances, Plaintiffs have not established a sufficient likelihood of success on the merits to make injunctive relief appropriate, particularly in light of the recent (and not-so-recent) Supreme Court rulings mentioned above cautioning against such relief.

Fifth, and finally, it appears to be undisputed that some portion of the names on Secretary Pate's list are indeed registered voters who are not United States citizens. This portion appears to be relatively small—no more than twelve percent—but, still, the injunctive relief requested by Plaintiffs effectively would force local election officials to permit those individuals to vote. Whatever concerns Plaintiffs might have about the nature and timing of Secretary Pate's letter, it would not be appropriate for the Court to respond by granting injunctive relief that effectively forces local election officials to allow ineligible voters to vote.

---

[1] https://data.census.gov/profile/Iowa?g=040XX00US19 (last visited Nov. 2, 2024).
[2] https://ohss.dhs.gov/sites/default/files/2024-03/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (last visited Nov. 2, 2024).

3

## II.     FACTUAL BACKGROUND.

In late summer 2024, an official in Secretary Pate's office became concerned that non-United States citizens might attempt to vote in the upcoming election. The Secretary of State's Office responded by comparing the list of registered voters in Iowa against records maintained by the Iowa Department of Transportation. This investigation identified 2,176 registered Iowa voters who at some point in time informed the Department of Transportation that they were not United States citizens. In approximately 150 of these cases, the voters were already registered to vote at the time they identified themselves as non-citizens to the Department of Transportation. In all other instances, the voters did not register to vote until sometime after their statements to the Department of Transportation.

The exact time interval between the statements to the Department of Transportation about citizenship status and the filing of voter registration paperwork varies from voter-to-voter, but Plaintiffs have submitted information indicating that some voters did not register to vote until more than twenty years after identifying themselves as non-citizens to the Department of Transportation. It is self-evident that these registered voters could have become United States citizens during the intervening period, and thus that they are eligible to vote. Secretary Pate appears to agree that most of the people on the list of 2,176 are indeed eligible to vote as naturalized United States citizens, although he contends that he cannot tell which of them fall into this category without additional information from United States Citizenship and Immigration Services ("USCIS") and/or the registered voters themselves. Regardless, it appears to be undisputed that the four named Plaintiffs are on Pate's list but are also naturalized United States citizens who are eligible to vote.

## III.    LEGAL BACKGROUND: IOWA ELECTION LAWS.

### A.  The Conduct of Elections Under Iowa Law.

The Iowa Code places responsibilities on both state and local officials to handle voter registration and conduct elections. *See Miller v. Iowa Voter Registration Comm'n*, ---N.W.3d ----, 2024 WL 4469172, at *1 (Iowa Oct. 11, 2024) ("Iowa has a shared system of responsibility for the conduct of elections."). At the statewide level, "[t]he secretary of state is designated as the state commissioner of elections and shall supervise the activities of the county commissioners of elections." Iowa Code § 47.1(1). Specifically, the secretary of state "shall prescribe uniform election practices and procedures, shall prescribe the necessary forms required for the conduct of elections, shall assign a number to each proposed constitutional amendment and statewide public

measure for identification purposes, and shall adopt rules, pursuant to chapter 17A, to carry out this section." *Id.* The secretary of state "may issue guidance that is not subject to the rulemaking process to clarify election laws and rules." *Id.*

The secretary of state "is designated the state registrar of voters, and shall regulate the preparation, preservation, and maintenance of voter registration records, the preparation of precinct election registers for all elections administered by the commissioner of any county, and the preparation of other data on voter registration and participation in elections…" *Id*. § 47.7(1). "In the execution of the duties provided by [Iowa Code Chapter 47], the state registrar of voters shall provide the maximum public access to the electoral process permitted by law." *Id.* The state registrar has the authority to "conduct a verification of all voters in the statewide voter registration file . . . and cancel the registration of a voter found to be ineligible pursuant to section 48A.30." *Id.* § 47.7(2)(f)(1). However, the verification process must occur "**in the first quarter of each calendar year**" and result in "a report to the general assembly by April 30 of each year regarding the number of voter registrations canceled pursuant to this paragraph." *Id.* (emphasis added).

The secretary of state's duties as state election commissioner and state registrar of voters are circumscribed by a "state voter registration committee," which is required to "meet as necessary to make and review policy, adopt rules, and establish procedures to be followed by the registrar in discharging the duties of that office, and to promote interagency cooperation and planning." *Id*. § 47.8(1). "The commission membership shall be balanced by political party affiliation pursuant to [Iowa Code] section 69.16." *Id.* § 47.8(1)(b).

"The state commissioner . . . may . . . oversee the activities of a county commissioner of elections during a period beginning sixty days before an election and ending sixty days after an election." *Id*. § 49.2. "For purposes of this section, '*oversee*' means to observe election-related activity, correct any activity not in accordance with law, and issue a written notice and instructions pursuant to [Iowa Code] section 39A.6 for any technical infractions that are observed." *Id.*

At the local level, "[t]he county auditor of each county is designated as the county commissioner of elections in each county." *Id*. § 47.2(1). "The county commissioner of elections shall conduct voter registration pursuant to chapter 48A and conduct all elections within the county." *Id.* "It is true that the Secretary of State may at his discretion 'oversee' those activities. Yet, the County Auditor conducts voter registration in his county." *Miller*, 2024 WL 4469172, at *7. Thus, although a county commissioner "does not possess home rule powers with respect to the

5

exercise of powers or duties related to the conduct of elections prescribed by statute or rule, or guidance issued pursuant to [Iowa Code] section 47.1," Iowa Code § 47.2(1), the county commissioner nonetheless has standing to challenge the secretary of state's compliance with his statutory responsibilities, *see Miller*, 2024 WL 4469172, at *8. Moreover, the secretary of state's interpretation of relevant provisions of state and federal law "is not legally final . . . ." *Id.*

     B. *Voter Registration Under Iowa Law*.

Voter registration in Iowa is governed by Iowa Code Chapter 48A. Any eligible person wishing to vote is required to register in the manner set forth therein. Iowa Code § 48A.5(1). "To be qualified to register to vote an eligible elector shall: *a.* Be a citizen of the United States. *b.* Be an Iowa resident . . . *c.* Be at least eighteen years of age…. *d.* Not claim the right to vote in more than one place." *Id.* § 48A.5(2). "An eligible elector may register to vote by appearing personally and completing a voter registration form at the office of the commissioner in the county in which the person resides, at a motor vehicle driver's license station, including any county treasurer's office that is participating in county issuance of driver's licenses under chapter 321M, or at any voter registration agency." *Id.* § 48A.7. Election-day registration is also permitted, *id.* § 48A.7A(1), although such registration does not appear to be relevant to this dispute.

Iowa Code § 48A.11(1) establishes a list of information that must be included on a voter registration form, such as the registrant's full name, address, date of birth, political party affiliation, and Iowa driver's license number (or nonoperator identification card number or social security number). In addition, the voter registration form must include "[a] statement that lists each eligibility requirement, contains an attestation that the registrant meets all of the requirements, and requires the signature of the registrant under penalty of perjury." *Id.* § 48A.11(1)(l). "The voter registration form shall include, in print that is identical to the attestation portion of the form, the following: *a.* Each voter eligibility requirement. *b.* The penalty provided by law for submission of a false voter registration form, which shall be the penalty for perjury as provided by [Iowa Code § 902.9(1)(e)]." *Id.* § 48A.11(2).

Upon receipt of a voter registration form, the county commissioner "shall compare the Iowa driver's license number, the Iowa nonoperator's identification card number, or the last four numerals of the social security number provided by the registrant with the records of the state department of transportation." *Id.* § 48A.25A(1)(a). "To be verified, the voter registration record shall contain the same name, date of birth, and Iowa driver's license number or Iowa nonoperator's

identification card number or whole or partial social security number as the records of the state department of transportation." *Id.* If the information cannot be verified, "the voter's record shall be designated as pending status" and the voter will be required present identification described in Iowa Code § 48A.8(2), which requires a "current and valid photo identification card" and proof of residence. *Id.* The state voter registration committee is required to adopt administrative rules pursuant to Iowa Code Chapter 17A to address situations where the Iowa Department of Transportation has not provided a report within the voter registration period for whether a voter's information has been verified. *Id.* § 48A.25A(2).

The registration of a registered voter must be canceled in a handful of circumstances pursuant to Iowa Code § 48A.30(1), including but not limited to if the voter dies, votes in another jurisdiction, is convicted of a felony, or "submits documentation under [Iowa Code § 607A.4(5)] that indicates that the voter is not a citizen of the United States."

   C.  *Challenges to Voter Registration Under Iowa Law.*

"The registration of a registered voter may be challenged by another registered voter of the same county subject to the conditions and limitations of this section." *Id.* § 48A.14(1). "A challenge shall be a statement in writing to the commissioner alleging one or more of the following reasons the challenged registrant's registration should not have been accepted or should be canceled: *a*. The challenged registrant is not a citizen of the United States . . . ." *Id.* "A challenge shall contain a statement signed by the challenger in substantially the following form:

> I am a registered voter in (name of county) County, Iowa. I swear or affirm that information contained on this challenge is true. I understand that knowingly filing a challenge containing false information is an aggravated misdemeanor."

*Id.* § 48A.14(3). "A challenge may be filed at any time. A challenge filed less than seventy days before a regularly scheduled election shall not be processed until after the pending election unless the challenge is filed within twenty days of the commissioner's receipt of the challenged registrant's registration form or notice of change to an existing registration." *Id.* § 48A.14(4). The commissioner must hold a hearing on a valid challenge "not less than twenty nor more than thirty days from the commissioner's receipt of the challenge." *Id.* § 48A.15(3). At the hearing, "the commissioner shall accept evidence on the challenge from the challenger and the challenged registrant, or from any person appearing on behalf of either, and review any documents or statements pertaining to the challenge received before the hearing." *Id.* § 48A.16(1). "On the basis

7

of the evidence submitted, the commissioner shall either reject the challenge or cancel the registration of the challenged registrant." *Id.* The losing party may appeal the commissioner's decision to the district court in the commissioner's county. *Id.*

Iowa Code § 49.79(1) states that a voter "may be challenged as unqualified by any precinct official or registered voter. It is the duty of each official to challenge any person offering to vote whom the official knows or suspects is not duly qualified. A ballot shall be received from a voter who is challenged, but only in accordance with [Iowa Code] section 49.81."  A voter may be challenged on many grounds, including, among other things: not being a United States citizen; being less than eighteen years of age; not residing at the address where the person is registered (unless appropriate documentation is provided); not being a resident of the precinct where the person is attempting to vote; having falsified information on the person's registration form or declaration of eligibility; and having been convicted of a felony without having voting rights restored. *Id.* § 49.79(2). In making the challenge, a registered voter must use the same or substantially similar language to that found in Iowa Code § 48A.14(3); i.e.:

> I am a registered voter in (name of county) County, Iowa. I swear or affirm that information contained in this challenge is true. I understand that knowingly filing a challenge containing false information is an aggravated misdemeanor.

*Id.* § 49.79(3)(a). A precinct election official is not required to submit a form with that language. *Id.*

"When the status of any person as a registered voter is so challenged, the precinct election officials shall explain to the person the qualifications of an elector, and may examine the person under oath touching the person's qualifications as a voter." *Id.* § 49.80(1). "The challenged elector shall be allowed to present to the official such evidence and facts as the elector feels sustains the fact that the person is qualified to vote." *Id.* § 49.80(2)(b). "Upon completion thereof, if the challenge is withdrawn, the elector may cast the vote in the usual manner. If the challenge is not withdrawn, [Iowa Code] section 49.81 shall apply." *Id.*

Iowa Code Chapter 39A governs election misconduct. Section 39A.2 states that a person "commits the crime of election misconduct in the first degree if the person willfully commits any of the following acts [among others]:

a. *Registration fraud.*

(1) Produces, procures, submits, or accepts a voter registration application that is known by the person to be materially false, fictitious, forged, or fraudulent.

8

  (2) Falsely swears to an oath required pursuant to section 48A.7A.

 b. *Vote fraud.*

  (1) Destroys, delivers, or handles an application for a ballot or an absentee ballot with the intent of interfering with the voter's right to vote.

  (2) Produces, procures, submits, or accepts a ballot or an absentee ballot, or produces, procures, casts, accepts, or tabulates a ballot that is known by the person to be materially false, fictitious, forged, or fraudulent.

  (3) Votes or attempts to vote more than once at the same election, or votes or attempts to vote at an election knowing oneself not to be qualified.

  (4) Makes a false or untrue statement in an application for an absentee ballot or makes or signs a false certification or affidavit in connection with an absentee ballot.

  (5) Otherwise deprives, defrauds, or attempts to deprive or defraud the citizens of this state of a fair and impartially conducted election process.

*Id.* § 39A.2(1). Election misconduct in the first degree also includes intimidating, threatening, or coercing a person (or attempting to do so) to refrain from registering to vote, voting, or attempting to register to vote or to exercise any right set forth in Iowa Code Chapters 39 through 53. *Id.* § 39A.2(c). Finally, an election official may be liable for election misconduct if the official "fails to perform duties prescribed by chapters 39 through 53, except for [Iowa Code] section 48A.41, or fails to follow or implement guidance issued pursuant to [Iowa Code] section 47.1, or performs those duties and responsibilities in such a way as to hinder or disregard the object of the law." *Id.* § 39A.2(g).

  Election misconduct in the second degree occurs when, among other things, a person "[s]olicits or encourages a person to vote in an election knowing that person is not qualified to vote in the election" or "[f]iles a challenge containing false information under [Iowa Code] section 48A.14 or 49.79." *Id.* § 39A.3(1)(a)(3)–(4). Election misconduct in the third degree occurs when, among other things, an election official permits a person to vote in a manner prohibited by law, refuses or rejects the vote of a person qualified to vote, or wrongfully acts or refuses to act "for the purpose of avoiding an election, or of rendering invalid a ballot cast from a precinct or other voting district." *Id.* § 39A.4(1)(a)(9)–(11).

### IV.  PRELIMINARY INJUNCTION STANDARD.

  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the

movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up).

## V.   LEGAL ANALYSIS.

### A. The United States Supreme Court Has Made Clear that Courts Must Exercise Great Caution Before Enjoining the Actions of State Election Officials.

The United States Supreme Court has made clear that lower courts must be very careful before imposing injunctive relief in the immediate run-up to an election. *See Purcell*, 549 U.S. at 5. This guidance was reiterated in the Supreme Court's decision a few days ago staying injunctive relief in *Virginia Coalition for Immigrant Rights v. Beals*, which involved a more aggressive version of what Secretary Pate is doing here. In *Beals*, Virginia election officials removed voters from the rolls altogether based on mismatches between voter registration records and records held by other state agencies with respect to citizenship. *See Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024), *injunction stayed by Beals*, 2024 WL 4608863. This triggered scrutiny under the National Voter Registration Act ("NVRA"), which, among other things, imposes a "quiet period" during the ninety days before an election during which state officials may not impose a program to systematically remove people from voter rolls based on alleged ineligibility. *See id.* at *1. Nonetheless, the Supreme Court stayed the injunction that had been imposed by the district court and affirmed by the United States Court of Appeals for the Fourth Circuit. *See Beals*, 2024 WL 4608863.

Here, Secretary Pate has not removed anyone from the voter rolls, but rather is simply requiring voters on the list of 2,176 to vote via provisional ballots. The NVRA is thus not implicated to the same degree as *Beals*, if at all.[3] The fact that the Supreme Court nonetheless

---

[3] Plaintiffs' Complaint alleges that Secretary Pate's letter violated four provisions of the NVRA: (i) the "90-Day Provision," 52 U.S.C. § 20507(c)(2)(A) (Count 4); (ii) the anti-discrimination provision, *id*. § 20507(b)(1) (Count 5); (iii) the proof-of-citizenship provision, *id*. §§ 20508(b)(1), 20505(a)(1)–(2) (Count 6); and the "Public Disclosure" provision, *id*. § 20507(i) (Count 7). (ECF 1.) By the time of the hearing on the motion for temporary restraining order

stayed the injunction in *Beals* therefore makes it difficult to conclude that injunctive relief should be issued here. In essence, this Court would be disregarding how the Supreme Court handled a situation in which the plaintiffs had an even stronger legal argument than Plaintiffs have here. This the Court cannot do. *See also Genser*, 2024 WL 4647792 (refusing to stay state court decision interpreting state election laws).

Plaintiffs argue that Secretary Pate brought this problem upon himself by sending his letter so close to the election. There is some support under Iowa law for this position, as Secretary Pate waited until two weeks before the election to provide the list of 2,176 potentially ineligible voters to county officials despite the Iowa Code contemplating that a review of voter eligibility will occur "in the first quarter of each calendar year." Iowa Code § 47.7(2)(f)(1). Even so, however, it is important—and likely outcome-determinative—that Secretary Pate did not remove anyone from the voter rolls, but decided to require the use of provisional ballots by some voters. Moreover, and more generally, it would not be appropriate to interpret federal or state law as requiring Secretary Pate or any other election official to remain completely quiet on election issues in the leadup to election day even if the official becomes aware of information regarding potential voter eligibility issues. Thus, although the timing of his letter might not be ideal, *Purcell* and *Beals* weigh heavily against injunctive relief.

> B. *Although There May Be Problems With Secretary Pate's Letter Under Iowa Law, the Injunctive Relief Requested by Plaintiffs Would Not Cure Those Problems—and Might Make Them Worse.*

Based on the Court's independent review of Iowa law, it has concerns with Secretary Pate's letter. The letter purports to use his authority to issue "guidance" under Iowa Code § 47.1(1) to compel local election officials to challenge the eligibility of an entire swath of registered voters irrespective of whether local officials independently believe there is reasonable suspicion that any of those voters is ineligible. Meaning: local officials are being directed to lodge a challenge to voter eligibility based on non-citizenship even if the officials have personal knowledge that the voters are United States citizens (or, at least, do not believe there is reasonable suspicion to conclude otherwise). This places the local officials in an untenable position: one on hand, they face criminal sanctions for failing to follow Pate's guidance, *see* Iowa Code § 39A.2(1)(g) (defining first degree election misconduct to include "fail[ing] to follow or implement guidance issued

---

and preliminary injunction, however, Plaintiffs were focusing entirely on their constitutional claims—presumably because it became clear that Secretary Pate's letter did not remove anyone from the voter rolls.

pursuant to section 47.1"); on the other hand, they also face criminal sanctions for performing their duties in a way that hinders the Iowa Legislature's goal of allowing all eligible citizens to vote, *see id.*.

This conflict is more than abstract. Some county commissioners affirmatively reached out to state and federal officials to confirm the citizenship status of the individuals in their counties who were identified on Secretary Pate's list. For example, Linn County election commissioner Joel Miller worked with county and federal law enforcement sources to confirm that the fifteen people from Secretary Pate's list who had voted early in Linn County or requested a mail-in ballot were indeed United States citizens. (ECF 10, pp. 113–14.) Nonetheless, Pate's letter "direct[s]" Miller to "inform the Precinct Election officials in the relevant precincts, that they are required under Iowa law to challenge the ballots of any person in the attached list of registered voters who attempt to vote in the 2024 General Election." (ECF 10, p. 29.) In the context of those fifteen voters, Pate's letter arguably directs Miller to violate Iowa law, not follow it.

The same is true in any other situation in which registered voters or county commissioners have taken steps to confirm the voters' citizenship status at or before the time those voters cast their ballots. In Johnson County, for example, the county commissioner sent a letter to registered voters who were identified on Secretary Pate's list to tell them to bring proof of citizenship with them to the County Auditor's office. (ECF 26-1, p. 3.) To the extent the voters did so, the Court is unaware of any valid interpretation of Iowa law that would allow a local official to challenge the voter's eligibility on the basis of citizenship anyway and make them vote a provisional ballot, as Secretary Pate's letter directs.

Moreover, and more generally, Secretary Pate's letter concludes that there is reasonable suspicion to question voter eligibility even in situations where there almost certainly is not. For example, Secretary Pate challenges the eligibility of a registered voter who did not register to vote until 2022 based on a statement she made about her citizenship status more than twenty years earlier, in 2000. (ECF 10, p. 86.) The registered voter would have had ample opportunity to become a naturalized citizen between 2000 and 2022, and thus the statement she made to the Department of Transportation in 2000 is so stale as to be insufficient, standing alone, to create reasonable suspicion that she is not eligible to vote. *Cf. State v. Sallis*, 981 N.W.2d 336, 344–45 (Iowa 2022) (discussing staleness in the context of Fourth Amendment searches and seizures). By indicating otherwise, Secretary Pate's letter pushes a definition of "reasonable suspicion" that is hard to

defend. Indeed, by his logic, there would be reasonable suspicion to challenge the vote of anyone whose address changed in the past twenty years, as the voter surely would have provided an address to the Department of Transportation at some point in the past that is different than the address the voter now uses. It is difficult to imagine that any court would agree with such an expansive interpretation of "reasonable suspicion."

Fortunately, by the time of the hearing on Plaintiffs' motion for temporary restraining order and preliminary injunction, Secretary Pate backed away from the bright-line positions in his letter. His counsel stated, for example, that Secretary Pate is no longer challenging the eligibility of the named Plaintiffs who submitted statements, under oath, in this proceeding confirming they are United States citizens. Similarly, Secretary Pate is not challenging the ballots of the voters whose citizenship was confirmed by county commissioners through interactions with law enforcement agencies or otherwise. Likewise, but more generally, Secretary Pate has advised county commissioners not to challenge the ballots of persons known by the commissioners or other local election officials to be United States citizens. (ECF 16-1, p. 7; ECF 16-3.) Secretary Pate appears to be acknowledging that his letter imposed more of an obligation on local election officials than Iowa law reasonably can sustain; which is to say, he has implicitly admitted that local officials retain the authority to make independent judgments as to whether a valid basis exists for challenging a voter's eligibility.

With this understanding in mind—and even before reaching the merits—the Court must consider whether Plaintiffs have sufficiently established irreparable harm and, if so, whether the injunctive relief they request would redress it. The answer in both respects is "no." Secretary Pate's letter is likely to impose a modest additional burden on at least some voters who should not have to bear that burden. All the same, those voters are still permitted to vote and have their ballots counted. The harm is therefore not irreparable.

Even if the Court were to conclude otherwise, it could not fashion injunctive relief that would solve the problem. Secretary Pate's letter was sent to county commissioners, not directly to voters, and thus it is unclear what purpose it would serve to require him to "retract" the letter. Similarly, county commissioners have already taken steps to comply with Secretary Pate's letter, including, for example, in Johnson County where hundreds of letters have been sent to registered voters to make sure they bring proof of citizenship to the County Auditor's office or polling place.

An order requiring the county commissioners to "retract" those letters or cease other efforts to confirm citizenship likely would engender more confusion than it resolves.

Moreover, some portion of the 2,176 names on Secretary Pate's list—reportedly twelve percent (ECF 31-1, p. 7)—are indeed ineligible to vote due to non-citizenship. If the Court were to order a "retraction" of the list or otherwise stop his efforts to challenge those voters, local election officials arguably would be required to let those voters cast a ballot despite their ineligibility to do so. It goes without saying that this would be inappropriate. In addition, even setting those voters aside, there are situations in which Secretary Pate provided sufficient information to create reasonable suspicion about the voters' eligibility. For example, there are approximately 150 registered voters on his list who registered to vote *before* admitting to the Department of Transportation that they were not United States citizens. Unless local election officials already have information explaining the discrepancy and confirming the eligibility of those voters, it is appropriate for their ballots to be challenged. Similarly, absent information to the contrary, reasonable suspicion exists as to individuals who registered to vote within a reasonably short timeframe after identifying themselves to the Iowa Department of Transportation as non-citizens. The Court will not impose injunctive relief that would prevent these legitimate challenges from being made.

The bottom line is that this situation exemplifies why the Supreme Court has cautioned federal courts against interfering in the conduct of state elections. The harm here does not appear to be irreparable, and the injunctive relief proposed by Plaintiffs would create as many problems as it would solve.

### C. Plaintiffs Have Not Shown a Sufficient Likelihood of Success on the Merits to Warrant Injunctive Relief.

Notwithstanding the legal and practical issues identified above, the Court would consider imposing injunctive relief if Plaintiffs established a sufficient likelihood of success on the merits. For reasons set forth below, the Court concludes they have not. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (interpreting *Purcell* to mean that federal courts should issue injunctive relief only when, *inter alia*, "the underlying merits are entirely clearcut in favor of the plaintiff").

At the outset, Plaintiffs have wisely conceded that the NVRA does not provide a basis for injunctive relief given that Secretary Pate has not removed anyone from the voter rolls, but rather has simply required the use of provisional ballots.

As for Plaintiffs' constitutional claims, "the Constitution of the United States protects the right of all qualified citizens to vote." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). It does so through a combination of amendments. *See Bernbeck v. Gale*, 829 F.3d 643, 649 n.4 (8th Cir. 2016) (describing the right to vote as "deeply fundamental" and "constitutionally recognized"). The Fourteenth Amendment provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In the right-to-vote context, this equal protection of the laws has been interpreted to provide 'a constitutionally protected right [for each citizen] to participate in elections on an equal basis with other citizens in the jurisdiction.'" *Carlson v. Wiggins*, 675 F.3d 1134, 1138 (8th Cir. 2012) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). A naturalized citizen "stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency." *Luria v. United States*, 231 U.S. 9, 22 (1913). Therefore, while states may restrict voters based on qualifications such as age, residence, and citizenship, all other classifications are suspect and subject to strict scrutiny. *Carlson*, 675 F.3d at 1139; *see also Eggers v. Evnen*, 48 F.4th 561, 565–66 (8th Cir. 2022) (the right to vote is "fundamental" for equal protection purposes).

To determine the governing standard for Plaintiffs' equal protection argument, there are two layers of analysis. First, under the so-called *Anderson/Burdick* test, the "rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). When those rights are subject to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

Here, the restrictions are not so severe in and of themselves to trigger the higher standard of scrutiny because: (i) consistent with the clarifications provided by Secretary Pate after his initial letter, many of the voters on his list of 2,176 will be entitled to vote a regular, non-provisional ballot; and (ii) those who are required to vote provisionally will have their votes counted if they provide timely evidence of citizenship status. Voters in the first group will suffer no burden at all on their right to vote, while voters in the second group will face only a relatively minimal burden.

15

*See Ariz. Dem. Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021) (concluding that state imposed only "minimal burden" when it imposed an election-day deadline for mail-in voters who forgot to sign their ballots).

This is not to say, of course, that the additional burden imposed on voters in the second group is justified in every instance. To the contrary, for reasons explained in the preceding section, it is a near certainty that there will be voters in the second group who are forced to take additional steps to have their votes counted even though there is no reasonable suspicion to question their eligibility. There are, however, other voters in the second group for whom reasonable suspicion *does* exist to justify the additional burden. This situation therefore does not represent the kind of "clearcut" scenario in which *Purcell* can be disregarded and injunctive relief should be imposed. *See Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

This feeds into the second layer of analysis regarding the governing standard. The lower *Anderson/Burdick* standard applies only when the voting restriction is imposed in a "nondiscriminatory" manner. *Burdick*, 504 U.S. at 434. Here, Plaintiffs argue their equal protection rights are being violated because Secretary Pate's letter subjects them, as naturalized United States citizens, to additional burdens that do not apply to non-naturalized United States citizens. Plaintiffs therefore argue that strict scrutiny should apply.

The Court will not definitively rule on Plaintiffs' argument beyond reiterating that this is not the type of "clearcut" situation in which *Purcell* should be disregarded. Although it is true that some naturalized citizens will be subjected to heightened voting requirements as a result of Secretary Pate's letter, it is important to put that letter into the proper context. Secretary Pate did not impose an extra, across-the-board requirement on all naturalized United States citizens in Iowa. Instead, his office compared voter registration records with Iowa Department of Transportation records to identify inconsistencies in self-reported citizenship status. In other words, it was the inconsistency that resulted in a name appearing on his list, not national origin in and of itself. As a result, in contrast to the 79,000 naturalized United States citizens in Iowa, there are only 2,176 names on Secretary Pate's list. This is less than three percent. And even that number is falling thanks to Secretary Pate's clarification that local election officials retain discretion not to challenge the eligibility of voters on the list of 2,176. This situation is therefore nothing like the equal protection problem in the case on which Plaintiffs rely, *Parada v. Anoka County*, 54 F.4th 1016 (8th Cir. 2022), where prison officials implemented a blanket policy of placing a hold on all

16

detainees who were born somewhere other than the United States. *Id.* at 1020. The Eighth Circuit held that this blanket policy violated the detainee's equal protection rights because, among other things, prison officials "had national-origin-neutral alternatives at its disposal" such as focusing on citizenship status or adopting a reasonable-suspicion-like standard for making referrals to immigration officials. *Id.* at 1021. Here, Secretary Pate at least arguably imposed the type of "national-origin-neutral" policy that *Parada* suggests would pass constitutional muster.

One final issue requires attention. In addition to their equal protection argument, Plaintiffs rely on the due process clause of the Fourteenth Amendment, which provides that states may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. While it is well established that the equal protection clause applies to the right to vote, it is less clear whether or to what extent the due process clause applies. *See Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 228–31 (5th Cir. 2020). For someone's procedural due process rights to be violated, they must establish: (i) "there exists a liberty or property interest which has been interfered with by the State" and (ii) "the procedures attendant upon that deprivation were [not] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Given the uncertain state of the law on whether the due process clause even applies in this context—much less whether Plaintiffs' due process rights have been violated—the Court again concludes that Plaintiffs have not established a sufficient likelihood of success to overcome *Purcell*.

### VI. CONCLUSION.

The Court DENIES Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (ECF 9.)

Dated: November 3, 2024

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE