## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

ORCUN SELCUK; ALAN DAVID
GWILLIAM; TINGTING ZHEN; MICHAEL
BROKLOFF; NINO NATENADZE; and THE
LEAGUE OF UNITED LATIN AMERICAN
CITIZENS OF IOWA, on behalf of itself and
its members,

        *Plaintiffs*,

    v.

PAUL D. PATE, in both his official capacity
as the Iowa Secretary of State and in his
individual capacity; BENJAMIN D. STEINES,
in his official capacity as the Winneshiek
County Auditor and Winneshiek County
Commissioner of Elections; JAMIE
FITZGERALD, in his official capacity as the
Polk County Auditor and Polk County
Commissioner of Elections; MELVYN
HOUSER, in his official capacity as the
Pottawattamie County Auditor and
Pottawattamie County Commissioner of
Elections; JULIE PERSONS, in her official
capacity as the acting Johnson County Auditor
and acting Johnson County Commissioner of
Elections; and KERRI TOMPKINS, in her
official capacity as the Scott County Auditor
and Scott County Commissioner of Elections,

        *Defendants*.

Case No. 4:24-cv-00390

---

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**COME NOW,** Plaintiffs Orcun Selcuk ("Dr. Selcuk"), Alan David Gwilliam ("Mr.

Gwilliam"), Tingting Zhen ("Ms. Zhen"), Michael Brokloff ("Mr. Brokloff"), Nino Natenadze

("Ms. Natenadze"); and the League of United Latin American Citizens of Iowa ("LULAC") both

as an organization and on behalf of its members (collectively, "Plaintiffs") hereby bring this action

for declaratory and injunctive relief against Defendants Paul D. Pate, both in his official capacity

as the Iowa Secretary of State and in his individual capacity (the "Secretary"); Benjamin D. Steines, in his official capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; Jamie Fitzgerald, in his official capacity as the Polk County Auditor and Polk County Commissioner of Elections; Melvyn Houser, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; Julie Persons, in her official capacity as the acting Johnson County Auditor and acting Johnson County Commissioner of Elections[1]; and Kerri Tompkins, in her official capacity as the Scott County Auditor and Scott County Commissioner of Elections (collectively, "Defendants"); and hereby allege as follows:

1.      This action is necessary to protect the fundamental right to vote that serves as the foundation of American democracy. Every American citizen possesses the fundamental right to vote, regardless of where they were born or how recently they became a citizen. This action challenges the Secretary's ill-conceived, faultily executed, and unlawful voter purge effort (the "Voter Purge Program") that abridged that right and violated the U.S. Constitution's Equal Protection and Due Process Clauses, as well as the federal framework set forth in the National Voter Registration Act ("NVRA") and the Voting Rights Act ("VRA"), each of which were designed to protect the right to vote from the types of infringements entailed by the Secretary's Voter Purge Program.

2.      The Voter Purge Program, which the Secretary sprung on voters just days before the November 5, 2024 general election (the "General Election"), targeted recently naturalized citizens for voter challenges, law enforcement investigations, and unwarranted scrutiny for

---

[1] Julie Persons is automatically substituted for Erin Shane as her successor in the relevant offices, pursuant to Fed. R. Civ. P. 25(d).

exercising their right to vote. On October 22, 2024, the Secretary provided a secret list to county election commissioners identifying 2,176 registered voters as subject to "reasonable suspicion" of being a non-citizen (the "List"). The sole basis for targeting those voters for election challenges and investigation was the Secretary's review of Iowa Department of Transportation ("DOT") records showing those individuals had been non-citizens (with legal status) *at the time that they last applied for an Iowa driver's license*. An Iowa driver's license is typically valid for eight years, yet the Secretary's List did not account for the fact that most if not all these noncitizens became U.S. citizens through the naturalization process between the time that they obtained their driver's license and the time they registered to vote. As the Secretary acknowledged, he did not have (and thus did not use) a list of naturalized citizens in constructing his List. *See* Dkt. 14-1 at 9.

3.      The Secretary knows better. According to data maintained by the State, 4,097 persons were naturalized as U.S. citizens in 2022 alone.[2] Indeed, the Secretary has already admitted in this litigation that ***at least 88%*** of the over 2,000 names on the List—the overwhelming majority—are in fact U.S. citizens who have the right to vote. *See* Dkt. 31 at 3. Flagrantly disregarding the rights of Iowa's newest citizens, the Secretary's Voter Purge Program ensured that new citizens, having recently sworn oaths of fidelity to the Constitution, were targeted, challenged, and investigated for exercising their basic right of citizenship and participating in our democracy.

4.      Moreover, the Secretary had other, less restrictive methods to validate the voter rolls available. The United States Citizenship and Immigration Services ("USCIS") maintains the federal Systematic Alien Verification for Entitlements ("SAVE") database, which other states have

---

[2] *See Persons Naturalized in Iowa by Country of Birth: 2022*, STATE DATA CTR. (last accessed Apr. 4, 2025), https://www.iowadatacenter.org/index.php/data-by-source/other/naturalizations.

used to verify citizenship to maintain accurate voter rolls. But the Secretary did not go through the required process to access the SAVE database. Instead, the Secretary purports to have reached out to a single, unknown USCIS employee, who allegedly indicated that USCIS could not validate the Secretary's home-brewed List. Nevertheless, the Secretary continued to impose the Voter Purge Program on the eve of the General Election, knowing that the List was inaccurate.

5. Indeed, based on all currently available information, the Secretary's secret List was fatally flawed and was made up almost entirely—if not completely—of naturalized citizens. Dr. Selcuk is one example: He registered to vote on November 7, 2023, the day after he became a U.S. citizen following years of effort. Yet he was placed on the Secretary's List and wrongfully subjected to investigation and an election challenge for following the law and exercising his right to vote. All named Plaintiffs are naturalized U.S. citizens who had previously lived in Iowa as lawful permanent residents and who possess the fundamental right to vote without facing discrimination or interference.

6. On information and belief, county investigations of individuals on the List have revealed multiple other examples of persons on the Secretary's List who are registered to vote as U.S. citizens and were registered to vote at the time of the General Election. As another example, Linn County forwarded the names of four persons on the List who already voted to the County Sheriff's Office; the County Sheriff's Office then sent the names to federal immigration enforcement officers. According to a report from *The Gazette*, **all four of the individuals are U.S. citizens**—and were U.S. citizens at the time they voted—but were nonetheless subjected to an unwanted law-enforcement investigation.

7. The Secretary's Voter Purge Program is unlawful. Federal law forbids systematic voting list maintenance during the so-called ninety-day "quiet period" right before an election, as

set out under Section 8(c) of the NVRA of 1993. Congress prohibited such systematic programs from occurring during this period precisely to protect voters from erroneously being removed from the list of eligible voters just before an election, when they "will likely not be able to correct the State's errors in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Even the best designed list maintenance program, undertaken with the best of intentions, would be barred by federal law when so dangerously close to an election.

8.      And Defendants' Voter Purge Program was not a well-designed, well-intended effort to maintain Iowa's voting rolls. It was and is an illegal, discriminatory, and error-ridden program that imposed unjustified, harmful burdens on the right of naturalized U.S. citizens to vote and will cause a chilling effect for countless eligible voters into the future unless declared unlawful and enjoined. The Voter Purge Program unlawfully discriminates against naturalized citizens in violation of the Equal Protection Clause, unjustifiably burdens the fundamental right to vote in violation of the First and Fourteenth Amendments, and violates the Due Process Clause by failing to ensure notice to affected voters and by using a secret list to cast a pall of suspicion over the eligibility of new citizens to vote.

9.      ***Again, by the Secretary's own admission,*** at least 88% of the individuals identified on the Secretary's List were, in fact, citizens of the United States and should have been able to vote without being singled out and made to endure extra burdens, hurdles, and law enforcement scrutiny. *See* Dkt. 31 at 3. The Secretary has already admitted to the harm his program has caused to voters, acknowledging in January 2025—after the General Election took place—that "[p]utting those people through that was not the best process."[3]

---

[3] Ophelie Jacobson, *Iowa Secretary of State Files Bill to Verify Voter Citizenship Status*, KCCI Des Moines (Jan. 13, 2025, 10:28 PM CST), https://www.kcci.com/article/iowa-secretary-of-state-files-bill-to-verify-voter-citizenship-status/63413723.

10. However, upon information and belief, the Secretary has not issued a correction or otherwise rescinded his instruction to local election officials to challenge the voters identified on his List. The Secretary's instruction was not limited to the General Election.

11. Plaintiffs thus seek injunctive and declaratory relief prohibiting the Secretary from: (1) using the List again in the future; and (2) using any new list based on substantially the same methodology in the future. Plaintiffs also seek damages for the violations of both their constitutional and statutory rights during the General Election.

## JURISDICTION AND VENUE

12. This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA] . . . may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

13. This action is also brought pursuant to 42 U.S.C. § 1983, which imposes liability on any person acting under color of law who deprives another of their statutory and constitutional rights.

14. This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1357 because the claims in this action arise under the Constitution and laws of the United States, including the First Amendment, the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant monetary, declaratory, and injunctive relief, as well as all other forms of relief available under federal law, including 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, and the principles articulated in *Ex Parte Young*, 209 U.S. 123 (1908).

15. This Court has personal jurisdiction over Defendants, who are all elected or appointed officials and citizens of Iowa.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants engage in their official duties in this District, a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District, at least one Defendant resides in this District, and all Defendants are Iowa residents.

## PARTIES

17.    Plaintiff Dr. Selcuk is an individual residing in Winneshiek County, Iowa. Dr. Selcuk is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

18.    Plaintiff Mr. Gwilliam is an individual residing in Johnson County, Iowa. Mr. Gwilliam is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

19.    Plaintiff Ms. Zhen is an individual residing in Polk County, Iowa. Ms. Zhen is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

20.    Plaintiff Mr. Brokloff is an individual residing in Scott County, Iowa. Mr. Brokloff is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

21.    Plaintiff Ms. Natenadze is an individual residing in Johnson County, Iowa. Ms. Natenadze is a naturalized U.S. citizen who was previously a lawful permanent resident of the United States.

22.    Plaintiff LULAC is the Iowa chapter of one of the oldest and most widely recognized Hispanic civil rights member organizations in the United States. Among other things, LULAC regularly holds voter registration drives and citizenship-awareness sessions. LULAC has more than 500 active members and twenty separate councils in Iowa. LULAC's members include naturalized citizens of the United States, and at least some LULAC members are Affected Voters

as defined herein. LULAC brings this action in its representational capacity on behalf of such members. Additionally, LULAC bring this action in its organizational capacity due to the direct injury it has sustained because of Defendants' actions. LULAC spent money and other resources developing and implementing its voter education and registration efforts in the year leading up to the General Election. Due to the Voter Purge Program, LULAC had to spend resources it would otherwise have devoted to continuing those efforts to instead informing concerned members about the Secretary's unlawful directives and helping Affected Voters navigate the burdensome voting process created by the Voter Purge Program. This forced LULAC to divert resources from its voter engagement efforts.

23.     Defendant Paul D. Pate is the Iowa Secretary of State. Pursuant to Iowa state law, the Secretary is the chief elections officer for the State of Iowa and, as such, is responsible for administering state voting laws and ensuring that Iowa's elections are conducted in a legal fashion. The Secretary is also responsible for administering Iowa's responsibilities under the NVRA and the VRA. The Secretary is sued in his official capacity with respect to some causes of action, and in his personal capacity with respect to others, to the extent he operated under color of Iowa law but hampered Plaintiffs' federal rights.

24.     Defendant Benjamin D. Steines ("Steines") is the Winneshiek County Auditor and the Winneshiek County Commissioner of Elections. In these roles, Steines is responsible for administering elections in Winneshiek County, Iowa. Steines is sued in his official capacity.

25.     Defendant Jamie Fitzgerald ("Fitzgerald") is the Polk County Auditor and Polk County Commissioner of Elections. In these roles, Fitzgerald is responsible for administering elections in Polk County, Iowa. Fitzgerald is sued in his official capacity.

26.     Defendant Melvyn Houser ("Houser") is the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections. In these roles, Houser is responsible for administering elections in Pottawattamie County, Iowa. Houser is sued in his official capacity.

27.     Defendant Julie Persons ("Persons") is the acting Johnson County Auditor and acting Johnson County Commissioner of Elections. In these roles, Persons is responsible for administering elections in Johnson County, Iowa. Persons is sued in her official capacity.

28.     Defendant Kerri Tompkins ("Tompkins") is the Scott County Auditor and Scott County Commissioner of Elections. In these roles, Tompkins is responsible for administering elections in Scott County, Iowa. Tompkins is sued in her official capacity.

## LEGAL BACKGROUND

### *Federal Protection of the Fundamental Right to Vote*

29.     The right to vote is a fundamental right protected by the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution, among other constitutional provisions.

30.     Voters are also protected by a number of federal statutory provisions. Section 11(a) of the VRA prohibits any person acting under color of state law from "fail[ing] or refus[ing] to permit" a qualified voter to vote. 52 U.S.C. § 10307(a). Section 11(a) also forbids anyone from "willfully fail[ing] or refus[ing] to tabulate, count, and report such person's vote." *Id.*

31.     In addition, Section 11(b) of the VRA prohibits any person, whether acting under color of law or otherwise, from intimidating, threatening, coercing, or attempting to intimidate, threaten, or coerce any person for voting or attempting to vote. *Id.* § 10307(b).

32.     And the NVRA specifically protects voters from voter roll purges that lack adequate safeguards or that occur close to an election. In particular, Section 8(c)(2)(A) of the

NVRA requires that all states "complete, not later than 90 days prior to the date of a primary or general election for Federal office, *any* program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). This limitation applies to "any" and all list maintenance programs—phrasing that "suggests that the 90 Day Provision has a broad meaning," *Arcia*, 772 F.3d at 1346.

33.    Section 8(c) of the NVRA contemplates a distinction between individualized list maintenance and systematic list maintenance. Individualized removals "do not present the same risks as systematic removals because they are 'based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance of mistakes.'" *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL 6581284, at *5 (M.D.N.C. Nov. 4, 2016) (quoting *Arcia*, 772 F.3d at 1346). NVRA Section 8(c) is an acknowledgement that—ninety days out from a federal election—there is neither enough time for states to properly execute a *systematic* purge of registered voters nor correct for erroneous removals. *See Arcia*, 772 F.3d at 1346 ("Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.").

34.    For purposes of the General Election, the ninety-day quiet period began on August 7, 2024.

### *The Iowa Voter Registration File*

35.    The Secretary is designated as the State's registrar of voters and is made responsible "for the preparation, preservation, and maintenance of voter registration records, the preparation of precinct election registers for all elections administered by the commissioner of any county, and

the preparation of other data on voter registration and participation," as well as for maintaining Iowa's statewide voter registration file. *See* Iowa Code § 47.7. Iowa law in turn prescribes specific procedures for "adding, changing, or deleting information from the state voter registration file." *Id.* § 47.7(d).

36.    State law requires systematic voter maintenance to be conducted well in advance of the general election. In particular, Iowa Code § 47.7 requires the Secretary to verify voters' continued eligibility during the "first quarter of each calendar year." The statute further requires the Secretary, at the conclusion of this process, to submit a report to the Iowa Legislature by April 30 of each year, and to publish the report on the internet. *Id.* § 47.7(f).

## FACTUAL ALLEGATIONS

### *The Voter Purge Program*

37.    In or around October 2024, the Secretary completed a purported investigation that compared Iowa's voter rolls to DOT records showing individuals who had, at some point in the past, purportedly self-identified as non-citizens. Based on that inquiry, the Secretary placed 2,176 individuals (the "Affected Voters") on a list of persons who had apparently registered to vote in Iowa after previously self-identifying to the DOT as a non-citizen. The Secretary explained his process and findings in guidance that he sent to county election officials on October 22, 2024 (the "Guidance")—just two weeks prior to the General Election, which included various elections for federal office.

38.    The Secretary maintained and maintains that all persons on this List were and are reasonably suspected of being ineligible to vote. Based on that judgment, the Secretary mandated that all county election commissioners challenge any effort by an Affected Voter to vote, including in the General Election. The Secretary instructed county election officials that they were bound by

Iowa law to challenge ballots cast by Affected Voters. To facilitate these challenges to the Affected

Voters, the Secretary created a "Challenge due to Citizenship Status Information Form," (the

"Challenge Information Form") which was distributed to election officials. The form instructed

local officials that:

> As a precinct election official, you are required per Iowa Code §49.79 to challenge
> a voter whom you know or suspect is not duly qualified and offer that voter a
> provisional ballot. If a registered voter who is listed on the documentation provided
> by the Iowa Secretary of State's office as having self-reported that they are not a
> U.S. citizen, complete this form and follow your county auditor's instructions for
> handling provisional ballots.

39.     The Challenge Information Form also instructed precinct election officials to "[t]ell

the voter that because they have reported to the Department of Transportation that they are not a

U.S. citizen, you are required to challenge their eligibility to vote."

40.     The Secretary further mandated that county election officials require Affected

Voters to cast a provisional ballot that would only count if the Affected Voter could sufficiently

document their citizenship and voter eligibility. That instruction was implemented for the General

Election and, upon information and belief, has not been rescinded for purposes of future elections.

41.     Inclusion on the List subjected voters to arbitrary additional burdens, investigation,

and scrutiny to ensure their ballot would count in the General Election. Affected Voters who were

made to vote by provisional ballot shouldered substantially greater burdens than other voters. For

their votes to count, Affected Voters who cast provisional ballots were required, within days of

the election, to present additional proof of citizenship to local officials. Failure to do so within the

time allotted resulted in the voter's ballot not being counted. Moreover, as detailed below, some

Affected Voters were subjected to law enforcement investigations and scrutiny as a result of their

inclusion on the List.

42.     Ahead of the General Election, at least one county election commissioner advised that all recently naturalized citizens bring their proof of citizenship with them to their polling place.

43.     Upon information and belief, and as set forth further below, many if not all the Affected Voters were naturalized U.S. citizens and, as such, were eligible to vote at the time of the General Election and are eligible to vote today.

44.     Under Iowa law, to obtain an Iowa driver's license or non-operator's identification card, one must, among other things, submit proof of lawful status in the United States. *See* Iowa Admin. Code r. 761-601.5(321) (2022). In other words, non-citizen Iowa residents may obtain a driver's license in Iowa. In particular, to satisfy the "lawful status" requirement, an applicant may verify their lawful status by submitting, among other things, an unexpired Permanent Resident Card (Form I-551) issued by the U.S. Department of Homeland Security or the U.S. Immigration and Naturalization Service, an unexpired employment authorization document issued by the U.S. Department of Homeland Security (Form I-766 or Form I-688B), or an unexpired foreign passport with a U.S. visa affixed, accompanied by the approved I-94 Form documenting the applicant's most recent admittance into the United States. *Id.* r. 761.601.5(1), (5).

45.     The DOT's records, including their records of which persons self-reported as non-citizens when applying for a driver's license, go back many years. The self-reports to the DOT of lawful permanent resident status that the Secretary relied on in constructing the List may have been more than ten years old and long outdated. Upon information and belief, many (the vast majority, if not all) of the Affected Voters are naturalized citizens who lawfully obtained a driver's license at some point prior to naturalizing, and who lawfully and properly registered to vote after naturalizing, completing all required steps according to Iowa law (including attesting to their being U.S. citizens). Before issuing the List, the Secretary did not take any specific steps to establish

whether any of the Affected Voters became naturalized U.S. citizens after self-identifying as non-citizens to the DOT. As noted *supra*, the Secretary has now confirmed that the List is massively overinclusive—and that at least ***88% of the persons on the List are in fact U.S. citizens***. The State now affirmatively claims that merely thirty-five of the 2,176 voters on the List (1.6%) were non-citizens at the time of the General Election.

46.    The examples of individual voters illustrate the point. For example, some Affected Voters in Pottawattamie County self-reported to the DOT they were lawful permanent residents as early as 2017, but when registering to vote in 2021 indicated they were now U.S. citizens. Another Affected Voter in Pottawattamie County self-reported being a lawful permanent resident in *2007*, while later identifying as a U.S. citizen in *2023* when registering to vote. The Secretary's approach in constructing the List willfully failed to account for naturalization and was effectively designed to facilitate a baseless mass challenging of voters.

47.    Moreover, by design, the Affected Voters are all persons who were once lawful permanent residents of the United States (i.e., non-citizens who were entitled to obtain a driver's license under Iowa law). The Affected Voters were once citizens of countries other than the United States. Inclusion on the List is therefore necessarily premised on the Affected Voters' non-U.S. national origin. The List was thus constructed to facilitate baseless mass-challenging of eligible U.S.-citizen voters based on their national origin.

48.    By waiting until two weeks prior to the General Election to send his List of purportedly ineligible voters to county election commissioners, and by keeping the names on the List secret, the Secretary essentially guaranteed that there would be no way for these errors to be corrected before eligible U.S. citizen voters were subjected en masse to undue and unlawful

barriers to their right to vote. The Secretary's actions compounded the procedural unfairness inherent in his delayed and last-minute tactics by failing to individually notify the Affected Voters.

49.     Despite the List of Affected Voters being a public record under the Iowa Open Records Act and the NVRA, the Secretary intentionally kept the List a secret, refused to publicly identify the Affected Voters, refused to disclose the List, and refused to notify the Affected Voters in advance of their voting.

50.     The Secretary disclosed the secret List to county election commissioners with detailed, purportedly mandatory instructions to challenge the right of the Affected Voters to vote, but instructed them to keep the List secret. In particular, he precluded county election precinct staff and county election officials—including Steines, Fitzgerald, Houser, Persons (via her predecessor), and Tompkins—from releasing the names of the Affected Voters. Upon information and belief, the Secretary gave this directive despite acknowledging that the identity of the Affected Voters is part of the public voter registration record, and therefore subject to disclosure under both the NVRA and the Iowa Open Records Act. He explicitly directed county election commissioners and election staff—including Steines, Fitzgerald, Houser, Persons (via her predecessor), and Tompkins—to "not release the names or other details [of the list] publicly." His directive further stated: "The number of affected voters in your county may be shared, but not any data that could identify the voters – even information that is technically part of the voter registration record."

51.     The Secretary's directive to keep the identity of the Affected Voters a secret made it significantly harder for Affected Voters to (1) learn they were on the List; (2) take measures to ensure they could lawfully vote in the General Election; and (3) prepare for future elections.

52.    The Secretary directed all county election precinct staff to review the List of Affected Voters prior to the General Election and to challenge *any ballot* cast by an Affected Voter through a non-citizen Challenge Information Form.

53.    Moreover, county election commissioners subsequently referred voters to law enforcement for investigation to try to resolve the eligibility of Affected Voters. As a result, Affected Voters were and will continue to be subjected to criminal investigations for registering to vote or seeking to cast ballots. Upon information and belief, media reports of such criminal investigations have already created a chilling effect among newly naturalized citizens and those who live in mixed-status households.

54.    This is particularly true given the Secretary's comments, shortly before the General Election, that "[i]t is a felony for noncitizens to either vote or register to vote, and we will work with the authorities to ensure that those who break the law are prosecuted to the fullest extent of the law."[4]

55.    The Secretary has refused—and continues to refuse—to identify the potential Affected Voters that are subject to criminal prosecution or were subject to criminal prosecution at the time of the General Election.

56.    The Voter Purge Program is designed to not only prevent thousands of registered voters from voting, but also to ultimately remove those supposedly ineligible voters from the list of eligible persons based on purported lack of citizenship.

---

[4] Katarina Sostaric, *Iowa Secretary of State Flags Alleged Noncitizens Who Voted in Past Elections*, IOWA PUB. RADIO (Oct. 22, 2024, 5:01 PM CST), https://www.iowapublicradio.org/political-news/2024-10-22/iowa-secretary-of-state-noncitizen-voting-2024-election.

57.    Upon information and belief, Steines has received a list of Affected Voters registered in Winneshiek County.

58.    Upon information and belief, Steines, acting at the Secretary's directive, has not and will not release the identity of the Affected Voters registered to vote in Winneshiek County.

59.    Upon information and belief, Steines, acting at the Secretary's directive, will challenge, and already has challenged, any ballot cast by an Affected Voter, including Dr. Selcuk (as described below). No subsequent statements or actions indicate that Steines will not continue to challenge the right of Affected Voters to vote in future elections.

60.    Taken in total, Steines's actions, acting at the Secretary's directive, constituted list maintenance within the ninety-day quiet period, the purpose of which was to systematically remove voters from the list of eligible persons based on purported lack of citizenship.

61.    Upon information and belief, Fitzgerald has received a list of Affected Voters registered to vote in Polk County.

62.    Upon information and belief, Fitzgerald, acting at the Secretary's directive, has not and will not release the identity of the Affected Voters registered in Polk County.

63.    Upon information and belief, Fitzgerald, acting at the Secretary's directive, will challenge, and possibly already has challenged, any ballot cast by an Affected Voter.

64.    Taken in total, Fitzgerald's actions, acting at the Secretary's directive, constituted list maintenance within the ninety-day quiet period, the purpose of which was to systematically remove voters from the list of eligible persons based on purported lack of citizenship.

65.    Upon information and belief, Houser has received a list of Affected Voters registered to vote in Pottawattamie County.

66.    Upon information and belief, Houser, acting at the Secretary's directive, has not and will not release the identity of the Affected Voters registered in Pottawattamie County.

67.    Upon information and belief, Houser, acting at the Secretary's directive, will challenge, and possibly already has challenged, any ballot cast by an Affected Voter.

68.    Taken in total, Houser's actions, acting at the Secretary's directive, constituted list maintenance within the ninety-day quiet period, the purpose of which was to systematically remove voters from the list of eligible persons based on purported lack of citizenship.

69.    Houser has publicly advised that "[a]nybody that has recently acquired citizenship and wants to vote should bring proof of citizenship to the polls." Upon information and belief, this statement was based on the Secretary's directives pursuant and related to the Voter Purge Project.

70.    Upon information and belief, Persons (via her predecessor) has received a list of Affected Voters registered to vote in Johnson County.

71.    Upon information and belief, Persons (via her predecessor), acting at the Secretary's directive, has not and will not release the identity of the Affected Voters registered in Johnson County.

72.    Upon information and belief, Persons (via her predecessor), acting at the Secretary's directive, will challenge, and possibly already has challenged, any ballot cast by an Affected Voter.

73.    Taken in total, Persons' (via her predecessor) actions, acting at the Secretary's directive, constituted list maintenance within the ninety-day quiet period, the purpose of which was to systematically remove voters from the list of eligible persons based on purported lack of citizenship.

74.     Upon information and belief, Tompkins has received a list of Affected Voters registered to vote in Johnson County.

75.     Upon information and belief, Tompkins, acting at the Secretary's directive, has not and will not release the identity of the Affected Voters registered in Johnson County.

76.     Upon information and belief, Tompkins, acting at the Secretary's directive, will challenge, and possibly already has challenged, any ballot cast by an Affected Voter.

77.     Taken in total, Tompkins' actions, at the Secretary's directive, constituted list maintenance within the ninety-day quiet period, the purpose of which was to systematically remove voters from the list of eligible persons based on purported lack of citizenship.

78.     Upon information and belief, some Affected Voters who tried to cast ballots in the General Election were either turned away or did not have their ballots counted.

79.     Upon information and belief, county precinct workers have access to the List of Affected Voters and had access to the List at the time of the General Election.

80.     Although the Secretary's Office was and is aware that many if not all the Affected Voters are naturalized citizens and were naturalized citizens at the time of the General Election, the Secretary kept the List and his directives regarding its use in effect for the General Election, and he has not withdrawn the List since the General Election.

### *Plaintiffs Attempt to Vote Through Early In-Person Voting*

81.     Dr. Selcuk is originally from Turkey and is a political science professor at Luther College in Decorah, Iowa.

82.     Dr. Selcuk moved from Turkey to the United States in 2013.

83.     Dr. Selcuk previously applied for and obtained a driver's license through the DOT. When he applied for his license, he verified his lawful permanent resident status to the DOT.

84.    Dr. Selcuk became a naturalized citizen of the United States on November 6, 2023.

85.    Since becoming a naturalized citizen, Dr. Selcuk has voted in two elections without incident.

86.    Dr. Selcuk's most recent Iowa driver's license—which is still valid and unexpired— indicates he is a lawful permanent resident of the United States.

87.    Dr. Selcuk is an Affected Voter as defined herein.

88.    On October 22, 2024, Dr. Selcuk took advantage of early in-person absentee voting at the Winneshiek County Auditor's Office inside the Winneshiek County Courthouse. Dr. Selcuk submitted his absentee ballot at the courthouse that same day.

89.    On October 26, 2024, Dr. Selcuk received a letter from Steines dated October 23, 2024, informing him that his absentee ballot was being challenged based on the erroneous allegation that Dr. Selcuk is not a U.S. citizen. The letter informed Dr. Selcuk that he had until six days after the upcoming General Election to prove that he is a citizen, or his ballot would not count.

90.    The letter from Steines was sent pursuant to the Secretary's directives as alleged herein.

91.    The letter from Steines caused Dr. Selcuk uncertainty about whether his vote would count in the upcoming General Election.

92.    In order to prove his citizenship, Dr. Selcuk was required to provide information beyond what other, non-challenged voters are required to provide, including additional documentation of his naturalization as a U.S. citizen.

93.    Mr. Gwilliam is originally from Wales and is a retired attorney residing in Iowa City, Iowa.

94.    Mr. Gwilliam moved from Wales to the United States in 1981.

95.     Mr. Gwilliam previously applied for and obtained a driver's license through the DOT in 2023. When he applied for his license, he verified his lawful permanent resident status to the DOT.

96.     Mr. Gwilliam became a naturalized citizen of the United States on August 16, 2024, and registered to vote shortly thereafter.

97.     Mr. Gwilliam is an Affected Voter as defined herein.

98.     Mr. Gwilliam's most recent Iowa driver's license—which is still valid and unexpired—indicates he is a lawful permanent resident of the United States.

99.     On or about October 29, 2024, Mr. Gwilliam was informed that he was on the list of Affected Voters in Johnson County. He was told he needed to prove he is a U.S. citizen before his vote would be counted.

100.    The knowledge of his status as an Affected Voter caused Mr. Gwilliam uncertainty about whether his vote would count in the upcoming General Election.

101.    In order to prove his citizenship, Mr. Gwilliam was required to provide information beyond what other, non-challenged voters are required to provide, including additional documentation of his naturalization as a United States citizen.

102.    Ms. Zhen moved to the United States from China in 2018. She was a lawful permanent resident until she was naturalized.

103.    Ms. Zhen obtained her Iowa driver's license in January 2022, while she was a legal permanent resident, and her license does not expire until March 2030.

104.    Ms. Zhen became a naturalized U.S. citizen on November 13, 2023, and subsequently registered to vote on September 23, 2024.

105.    Based on her previous status as a lawful permanent resident, Ms. Zhen suspected that she was on the Secretary's List. Despite her efforts to clarify her status, neither the Polk County Auditor nor the Secretary's Office was willing to confirm whether she was on the List. She was intimidated by the prospect of facing an election challenge when attempting to vote in General Election.

106.    After counsel for Ms. Zhen contacted the Polk County Auditor to confirm that her vote would be counted, Ms. Zhen voted in the General Election.

107.    Mr. Brokloff was born in Canada and moved to the United States in 1997. He was a lawful permanent resident until he was naturalized.

108.    Mr. Brokloff obtained his Iowa driver's license in March 2020, and it does not expire until 2028.

109.    Mr. Brokloff became a naturalized U.S. citizen in 2021. He subsequently registered to vote and did vote during the 2022 election. He did not face any issues or challenges voting at that time.

110.    When Mr. Brokloff attempted to vote early in October 2024, he was flagged by poll workers and was told he needed to prove his citizenship. Mr. Brokloff had to return to the Scott County Auditor's Office with his passport to attempt to establish his citizenship. The Scott County Auditor's Office refused to confirm his eligibility to vote and told Mr. Brokloff that his documentation would be reviewed on November 12, at which time his provisional ballot would be accepted or rejected.

111.    Mr. Brokloff left the Scott County Auditor's Office on October 28 without knowing whether his ballot would be counted, despite both being a U.S. citizen and having voted in the past.

112.    Ms. Natenadze was born in the Republic of Georgia and moved to the United States in February 2011. She was a lawful permanent resident until she was naturalized.

113.    Ms. Natenadze became a naturalized U.S. citizen on December 8, 2017. She subsequently registered to vote and voted in the 2020 election. She did not face any issues or challenges voting at that time.

114.    Ms. Natenadze went to vote early in-person the day before the General Election at the North Liberty Public Library. She was told her driver's license was expiring in two weeks, but she already had an appointment to get her driver's license updated. The poll worker checked Ms. Natenadze's address and said everything was in order. Nothing was said to Ms. Natenadze regarding her citizenship and/or eligibility to vote being challenged. Ms. Natenadze cast her ballot and left the precinct.

115.    Within a few days, Ms. Natenadze received a letter in the mail from Johnson County questioning her citizenship. She initially disregarded this notice, thinking it did not apply since she already voted. Shortly after, a representative from the Christina Bohannan campaign reached out to Ms. Natenadze and asked about her experience voting.

116.    Ms. Natenadze's husband contacted the Johnson County Administration Building on Ms. Natenadze's behalf regarding whether her vote was counted, and he was informed they were "sure it was counted."

117.    Ms. Natenadze was not comfortable emailing a copy of her passport and citizenship paperwork. Ms. Natenadze does not know whether her General Election ballot was counted.

### *The Implementation and Aftermath of the Voter Purge Program*

118.    The Secretary's Voter Purge Program functioned as would have reasonably been expected—it caused confusion, intimidation, and inconsistent results, with the burdens targeting

naturalized U.S. citizen voters. For example, upon information and belief, many voters had to scramble on Election Day to find documentation to prove their citizenship in order to have their vote counted.

119.    The Secretary had full notice that the Voter Purge Program was creating chaos and confusion shortly before the General Election. On November 1, 2024, Erin Shane ("Shane")—then Johnson County Auditor and Johnson County Commissioner of Elections—submitted an affidavit in this case. *See* Dkt. 26-1. Shane confirmed that she had not received any communication from the Secretary until "voting was already underway and some people on the list had already cast absentee ballots." *Id.* ¶ 5. Shane noted that after receiving the Secretary's List of 295 voters for Johnson County, she was "very concerned that many of the dates list[ed] as when the voter had previously indicated to the DOT they were non-citizens were dates that reached back as far as 2007." *Id.* ¶ 6. In particular, "people [Shane knew] personally and neighbors" were on the List, and Shane "did not share Secretary Pate's conclusive suspicion as to [their] ineligibility to vote." *Id.* Shane further confirmed that given "there is not a legal requirement that a person provide proof of U.S. citizenship at the time of voting, voters on the list would have no way of knowing they would need to produce such documentation in order to vote." *Id.* ¶ 7.

120.    Shane stated that the Secretary's Guidance, issued so close to an election, was "difficult to implement." *Id.* ¶ 8. And she noted that voters were "frustrated and confused about why this is happening" and that "[i]n many cases, they have reported that they have voted in prior elections without issue and that nothing has changed in their status." *Id.* ¶ 11.

121.    Implementation of the Voter Purge Program during the General Election caused numerous harms and burdens to the individual Plaintiffs and other Affected Voters. These voters were intimidated and had their right to vote hampered because of their status as naturalized U.S.

citizens—and they were also deprived of process or even the basic information necessary to challenge their targeting or to alleviate the extra burdens placed on their fundamental rights.

122.    The individual Plaintiffs also suffered monetary losses because of the Secretary's directive and the Voter Purge Program. For example, multiple Plaintiffs had to undertake additional efforts and spend additional time to prove their U.S. citizenship, which involved additional trips to their polling places, time away from work and other activities because of the challenge to their voting rights, all of which caused them to suffer considerable distress and monetary damages.

123.    As a result of the last-minute implementation of the Secretary's Voter Purge Program, LULAC was forced to divert valuable resources to attempt to protect its members from disenfranchisement. For example, LULAC spent time and money trying to obtain the List, and to contact members and ensure that they were aware of what steps to take if their ballots were challenged, which required the diversion of staff and volunteer time and other resources from LULAC's other initiatives and intended activities during the relevant time period, such as voter engagement and voter turnout efforts.

124.    Upon information and belief, Affected Voters on the Secretary's List will be subjected to similar treatment in future elections absent relief from the Court. The Challenge Information Form provided to precinct election officials related to the Secretary's List is not limited to the General Election, and upon information and belief, the Secretary has not rescinded the List or any related instructions requiring election officials to challenge Affected Voters. Moreover, LULAC will be required to divert resources from its other voter engagement and turnout efforts in future elections to deal with the continued use of the List to impinge on the voting rights of the Affected Voters, including its members.

125.    Upon information and belief, Affected Voters on the Secretary's List will also be subjected to erroneous removal from the list of eligible voters, either through the removal of their names from the voter rolls or the functional equivalent. Indeed, ***after*** the General Election took place, the Secretary and Attorney General Brenna Bird made clear in a federal court filing that "[t]he Secretary is required by federal law to maintain the State's voter-registration list 'in a manner that ensures that . . . voters . . . who are not eligible are removed' from the list." Complaint, *Bird v. Mayorkas*, No. 24-cv-423 ¶ 30 (S.D. Iowa Dec. 3, 2024). And according to news reports, Secretary Pate's Communications Director "said that the office is seeking clarification for what processes are available for taking further action on noncitizens participating in elections or being registered to vote, ***but that these efforts may not begin until after the 2024 general election***."[5]

126.    Given the Secretary's repeated insistence that the List contains ineligible voters and given the Secretary's acknowledgment that he is obligated to remove ineligible voters from the rolls, Plaintiffs have every reason to believe that the Secretary will continue to target Affected Voters on the List for subsequent challenges and/or future removal.

## COUNT ONE

**Violation of the Fourteenth Amendment — Equal Protection Clause**

127.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

128.    The Fourteenth Amendment to the U.S. Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in

---

[5] Robin Opsahl, *Iowa Secretary of State Says 87 Noncitizens Voted in Elections*, IOWA CAP. DISPATCH (Oct. 22, 2024, 3:19 PM CST) https://iowacapitaldispatch.com/2024/10/22/iowa-secretary-of-state-says-87-noncitizens-voted-in-elections/ (emphasis added).

the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Iowa may not engage in "arbitrary and disparate treatment" of similarly situated voters. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *see also id.* at 104 ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.").

129.    Under the Equal Protection Clause, discrimination based on naturalized citizenship and/or on national origin is presumptively unconstitutional and subject to strict scrutiny.

130.    The Affected Voters were and are being treated differently from other registered voters on the basis of their naturalized citizenship status and/or national origin. Specifically, the Voter Purge Program effectively required registered voters on the List of Affected Voters to re-register and provide additional documentation regarding their citizenship beyond what is required of other voters—including by undergoing an additional verification process—in order to cast a ballot and have it counted in the General Election (and in future elections).

131.    By design and at the Secretary's direction, voting precincts across Iowa had two lists of voters for the General Election—and may continue to have two lists of voters in future elections—Iowa's general voter rolls, and the list of Affected Voters prepared by the Secretary.

132.    As described above, inclusion on the List of Affected Voters necessarily stems from the Affected Voter's national origin and/or naturalized citizenship status. The Secretary has classified the Affected Voters and treated them differently with respect to a fundamental right based on national origin and/or naturalized citizenship status.

133.    The Voter Purge Program, as designed by the Secretary, discriminates against naturalized citizens by creating a process that singles out only naturalized U.S. citizens for unwarranted scrutiny and investigation, while excluding all persons born in the United States from such treatment. Pursuant to the Voter Purge Program, Defendants did treat and will continue to

treat naturalized U.S. citizens differently from U.S.-born citizens and burden those naturalized citizens by requiring them to cast a provisional ballot that will only count if the voters submit new and additional information to verify their U.S. citizenship.

134.    Defendants further treated and will continue to treat naturalized U.S. citizens differently than citizens born in the United States pursuant to the Voter Purge Program by publicly referring naturalized U.S. citizens—who have previously lawfully interacted with the State of Iowa through the DOT—for criminal investigation and subjecting them to criminal investigation for the act of registering and/or voting. Citizens born in the United States, on the other hand, will not be subjected to investigation and the threat of prosecution under the Voter Purge Program.

135.    Throughout the General Election, county election officials acting at the Secretary's direction subjected Affected Voters to automatic election challenges and unwarranted scrutiny, investigation, uncertainty, and burdens in order to vote. Defendants will continue to do so in future elections unless and until the Voter Purge Program is declared unlawful and enjoined.

136.    Aside from their national origin and/or naturalized citizenship status, the Affected Voters are similarly situated to U.S.-born Iowa voters; they have all registered to vote and fulfilled the federal and state requirements to vote.

137.    The Voter Purge Program and the List of Affected Voters create a classification that is neither justified by nor narrowly tailored to promote substantial or compelling state interests that could not be achieved through less restrictive means.

138.    By implementing the Voter Purge Program, the Defendants—including the Secretary—acted under color of Iowa law and deprived Plaintiffs of their constitutional rights.

## COUNT TWO

**Violation of the Fundamental Right to Vote Under the First and Fourteenth Amendments**

139.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

140.    The First and Fourteenth Amendments protect the right of individuals to vote and participate in the electoral process. State election laws and practices may not burden a person's right to vote unless relevant and legitimate state interests of sufficient weight justify the magnitude and character of the burdens imposed. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Any burden on the right to vote, "[h]owever slight[,] must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008).

141.    The Secretary's directive severely burdens the Affected Voters' right to vote. The Affected Voters have been and will continue to be forced to prove their citizenship, often on a surprise basis, in order to exercise their fundamental right to vote. These burdens go far beyond what is or might be required under state and federal law. The Voter Purge Program subjected and continues to subject Affected Voters to investigation, fear of law enforcement, and the burdens of having their eligibility challenged in order to exercise their fundamental right to vote.

142.    The burdens imposed by the Voter Purge Program and the Secretary's directives, forcing naturalized U.S. citizens to further "prove" their citizenship in order to cast a ballot and have it counted, are unnecessary and are not justified by relevant and legitimate state interests.

143.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their constitutional rights.

## COUNT THREE

### Violation of the Fourteenth Amendment — Due Process Clause

144.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

145.    The Secretary has intentionally kept and continues to keep the List of Affected Voters secret. As such, the Voter Purge Program fails to provide notice to Affected Voters regarding the potential deprivation of their right to cast a ballot and have it counted.

146.    Because the List of Affected Voters was (and continues to be) kept secret, many of the Affected Voters were (and continue to be) denied any opportunity to contest their placement on the List, thus jeopardizing their right to vote in the General Election and future elections.

147.    By refusing to make the List public, the Secretary has placed and continues to place severe burdens on the Affected Voters' rights to cast a ballot and undermining their ability to resolve their eligibility.

148.    In some cases, the Affected Voters may not have been able to provide proof of citizenship in time to survive a challenge to their ballot, meaning that they were deprived of their right to vote entirely in the General Election. Affected Voters may be similarly deprived of their legal right to vote in future elections under the Voter Purge Program.

149.    Because the Voter Purge Program does not provide a meaningful opportunity for notice and hearing prior to imposing heavy burdens on the fundamental right to vote, it deprives Affected Voters of procedural due process.

150.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their constitutional rights.

## COUNT FOUR

**Violation of Section 8(c) of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**

151.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

152.    The NVRA requires that Iowa complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters . . . not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Iowa may not take any steps to implement any program to systematically remove voters within the ninety-day period before the date of a general election—the "quiet period."

153.    The Voter Purge Program violates the NVRA's 90-Day Provision because it: (1) is a program with the purpose of systematically reviewing the voting rolls to assess voters' eligibility; and (2) was undertaken during the ninety-day quiet period before the General Election.

154.    The Voter Purge Program is the very definition of "systematic." As the Eleventh Circuit has explained, list maintenance predicated on "a mass computerized data-matching process to compare the voter rolls with other state and federal databases" constitutes systematic list maintenance. *Arcia*, 772 F.3d at 1346. The Secretary has challenged more than 2,000 voters at one time, all based on the exact same data matching process. He attests to no personal or firsthand knowledge of any of the Affected Voters and their citizenship status, citing only his data-merging of the DOT and voter registration records. The Voter Purge Program thus constitutes a systematic list maintenance program barred under the ninety-day quiet period.

155.    The Voter Purge Program also has the purpose and/or effect of removing these voters from the ranks of eligible voters in Iowa. This Voter Purge Program is thus squarely prohibited under NVRA Section 8(c).

156.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their statutory rights.

157.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program began fewer than thirty days before the General Election. Plaintiffs can, therefore, bring a civil action without notice to Iowa's chief election official. Moreover, if not enjoined, the State may renew or revise the List within the proscribed period.

## COUNT FIVE

**Violation of Section 8(b) of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**

158.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

159.    The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

160.    The Voter Purge Program violates the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory" because it targets voters based on national origin and/or citizenship status. Because Defendants' Voter Purge Program is triggered by DOT data indicating a voter previously identified as a non-citizen but does not take subsequent naturalization into account, the Voter Purge Program treats naturalized citizens (i.e., citizens born outside the United States) differently from similarly situated citizens born within the United States. It inevitably, predictably, and indeed, by design, identifies and places additional burdens on citizens born outside the United States whom Defendants know or should know may be naturalized. Therefore, Defendants' Voter Purge Program is neither "uniform" nor "nondiscriminatory."

161.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their statutory rights.

162.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program began fewer than thirty days before the General Election. Plaintiffs can, therefore, bring a civil action without notice to Iowa's chief election official.

**COUNT SIX**

**Violation of the National Voter Registration Act, 52 U.S.C. §§ 20508(b)(1), 20505(a)(1)-(2)**

163.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

164.    The NVRA limits proof of citizenship for purposes of federal elections to an attestation under penalty of perjury that the registrant is a U.S. citizen. *See Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1 (2013); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(2)(A)–(B).

165.    The NVRA provides that, for purposes of federal elections, a voter registration form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(1). Under the NVRA, the voter registration form "shall include a statement that (A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* §§ 20505(a)(1)-(2), 20508(b)(2); *see also id.* § 20504(c).

166.    By requiring certain voters to provide additional evidence of their U.S. citizenship to remain eligible to cast a ballot and have it counted in the General Election and future elections, the Voter Purge Program violates the NVRA's command that voters need only complete a voter registration form and attest to their citizenship status to be a registered voter in federal elections.

167.    Houser's statement that "[a]nybody that has recently acquired citizenship and wants to vote should bring proof of citizenship to the polls" is further evidence of this conduct. Upon information and belief, this statement was made by Houser in response to the Secretary's direction as part of the Voter Purge Program.

168.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their statutory rights.

169.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Voter Purge Program began fewer than thirty days before the General Election. Plaintiffs can, therefore, bring a civil action without notice to Iowa's chief election official.

## COUNT SEVEN

### Violation of the National Voter Registration Act, 52 U.S.C. § 20507(i)

170.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

171.    The so-called Public Disclosure Provision of the NVRA provides that states "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through

which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision covers individualized records for registered voters subject to removal programs. *See PILF v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); 52 U.S.C. § 20507(i)(2).

172.    Upon information and belief, the Secretary has violated the Public Disclosure Provision of the NVRA by refusing to provide records relating to the design and implementation of the Voter Purge Program and the construction of the List of Affected Voters within a reasonable time period despite having those records in his Office's possession at the time interested parties requested these records on October 23, 2024. Instead, he has kept those records, including the List, secret from the public and even from the Affected Voters on the List.

173.    The Secretary and his Office's continued refusal to provide the requested records, even after the filing of this lawsuit is unlawful, and the requested records must now be produced immediately.

174.    The Secretary's refusal to provide the requested documents in violation of the Public Disclosure Provision fell within the thirty-day period prior to the General Election, and thus parties aggrieved by the refusal have immediate standing to sue to vindicate their rights. *See* 52 U.S.C. § 20510(b)(3).

175.    By implementing the Voter Purge Program, the Defendants acted under color of Iowa law and deprived Plaintiffs of their statutory rights.

## COUNT EIGHT

### Violation of Section 11(a) of the Voting Rights Act, 52 U.S.C. § 10307(a)

176.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Amended Complaint.

177.   Section 11(a) of the Voting Rights Act provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who … is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 52 U.S.C. § 10307(a).

178.   The term "to vote," under the Voting Rights Act, "include[s] all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 52 U.S.C. § 10310(c)(1).

179.   The majority of the Affected Voters identified for challenge by the Secretary as part of the Voter Purge Program, are adult U.S. citizens who are "qualified to vote" and who have successfully registered to be "qualified electors" in Iowa after completing their naturalization process.

180.   As a result of Defendants' actions and as directed by the Secretary under color of Iowa law, Affected Voters identified on the Secretary's List were not permitted to cast a regular ballot in the General Election. In some instances, those voters were denied the opportunity to cast a regular ballot even when they were able to provide a U.S. passport or other proof of U.S. citizenship.

181.   Acting under color of Iowa law, Defendants failed or refused to count, tabulate, and report the votes cast by qualified voters for purposes of the General Election.

182.   Defendants failed or refused to count, tabulate, and report those votes despite being aware that at least 88% of the Affected Voters on the Secretary's List of voters to be challenged are U.S. citizens who have registered to vote, and that the Voter Purge Program is therefore extremely likely if not certain to disenfranchise eligible voters.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

1.     Declare that the Voter Purge Program violates federal law and the U.S. Constitution;

2.     Order Defendants to rescind the Secretary's List of Affected Voters and all directives to treat voters differently based on their inclusion on the List;

3.     Order the Secretary to immediately notify all county election commissioners that the Secretary's List of Affected Voters cannot be used as grounds to challenge the eligibility of voters in any and all upcoming elections and that self-reported citizenship status from past applications to the Department of Transportation, without more, is not a valid basis to challenge a voter's present eligibility;

4.     Enjoin Defendants from initiating list maintenance and/or removal of anyone on the Secretary's List of Affected Voters by virtue of that voter's placement on the List;

5.     Order Defendants to restore the status of any persons who were removed from Iowa's voting rolls, including by being placed on inactive status, as a result of the Secretary's investigation and preparation of the List;

6.     Order Defendants to take all such steps as are necessary to alert all individuals on the List of Affected Voters and the public that any notice letters sent pursuant to an Affected Voter's status are rescinded and that all eligible voters on the List of Affected Voters are on the voter rolls and need not re-register to vote;

7.     Enjoin Defendants from conducting any materially similar purge program in the future;

8.      Award Plaintiffs monetary damages, including nominal damages or otherwise, as a result of Secretary Pate's actions pursuant to 42 U.S.C. § 1983 and to the extent permitted by law;

9.      Award Plaintiffs their costs and reasonable attorneys' fees in this action;

10.     Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

11.     Grant Plaintiffs such other relief as this Court may deem just and proper.


Dated: April 4, 2025                              Respectfully submitted,

/s/ *Jesse Linebaugh*
Jesse Linebaugh (AT0004744)
Email: jesse.linebaugh@faegredrinker.com
Joe R. Quinn (AT0015363)
Email: joe.quinn@faegredrinker.com
Emily R. O'Brien (AT0015757)
Email: emily.obrien@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Telephone: +1 515 248 9000

Craig S. Coleman**
Email: craig.coleman@faegredrinker.com
Jeffrey P. Justman**
Email: jeff.justman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: +1 612 766 7000

Rita Bettis Austen (AT0011558)
Email: rita.bettis@aclu-ia.org
Thomas D. Story (AT0013130)
Email: thomas.story@aclu-ia.org
AMERICAN CIVIL LIBERTIES UNION OF
IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
Telephone: +1 515 243 3988

Ari Savitzky*
Email: asavitzky@aclu.org
Jonathan Topaz*
Email: jtopaz@aclu.org
Ming Cheung*
Email: mcheung@aclu.org
Sophia Lin Lakin*
Email: slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: +1 212 549 2500

Patricia Yan*
Email: pyan@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
915 15th Street NW
Washington, DC 20005
Telephone: +1 202 457 0800

*Admitted Pro Hac Vice
**Application for Admission Pro Hac Vice
Forthcoming

*Attorneys for Plaintiffs Orcun Selcuk, Alan David
Gwilliam, Tingting Zhen, Michael Brokloff, Nino
Natenadze, and the League of United Latin
American Citizens of Iowa*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing document was filed electronically through the Court's CM/ECF filing system on April 4, 2025, which will send notice to all counsel of record.

*/s/ Emily R. O'Brien*
Emily R. O'Brien