**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| ORCUN SELCUK; ALAN DAVID GWILLIAM; TINGTING ZHEN; MICHAEL BROKLOFF; NINO NATENADZE; and THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA, on behalf of itself and its members, | |
| *Plaintiffs*, | Case No. 4:24-cv-00390 |
| v. | |
| PAUL D. PATE, in both his official capacity as the Iowa Secretary of State and in his individual capacity; BENJAMIN D. STEINES, in his official capacity as the Winneshiek County Auditor and Winneshiek County Commissioner of Elections; JAMIE FITZGERALD, in his official capacity as the Polk County Auditor and Polk County Commissioner of Elections; MELVYN HOUSER, in his official capacity as the Pottawattamie County Auditor and Pottawattamie County Commissioner of Elections; JULIE PERSONS, in her official capacity as the acting Johnson County Auditor and acting Johnson County Commissioner of Elections; and KERRI TOMPKINS, in her official capacity as the Scott County Auditor and Scott County Commissioner of Elections, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| *Defendants*. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND .................................................................................................2

I.  PLAINTIFFS HAVE STANDING. ...............................................................................6

    A.  Plaintiffs Have Pleaded Redressability Through Damages. ...............................7

    B.  Plaintiffs Have Also Pleaded Redressability Through Injunctive and Declaratory Relief. ...........................................................................................7

    C.  Plaintiff LULAC Has Pleaded Organizational Standing. ...................................9

II.  PLAINTIFFS' CLAIMS ARE NOT MOOT. .............................................................10

    A.  There Is a Live Controversy Over Damages. ...................................................10

    B.  The Secretary Has Not Met His "Formidable Burden" to Show Voluntary Cessation of the Challenged Conduct. ...........................................10

    C.  The "Capable of Repetition Yet Evading Review" Exception Applies. ...........12

III.  PLAINTIFFS PLAUSIBLY PLEAD NUMEROUS VIOLATIONS OF LAW. ...............14

    A.  Plaintiffs Adequately Allege Violations of the NVRA. ...................................14

    B.  Plaintiffs Adequately Allege a Claim Under the Voting Rights Act. ...............17

    C.  Plaintiffs Adequately Allege Unconstitutional Discrimination under the Equal Protection Clause. ..................................................................................18

    D.  Plaintiffs Adequately Allege a Violation of the Due Process Clause. ...............19

CONCLUSION .....................................................................................................................20

## INTRODUCTION

On the eve of the 2024 General Election, Secretary of State Paul D. Pate (the "Secretary") sent county officials a list of voters he claimed were ineligible to vote based on a lack of U.S. citizenship. The Secretary ordered the officials to challenge these voters, requiring them, with no prior notice, to prove their citizenship or lose their fundamental right to vote. But virtually all of the over 2,000 Iowans on this list were in fact naturalized citizens, many of whom had been voting for years. The list had been cobbled together using the names of Iowans who, at some point in the past 20 years, had self-identified as non-citzens while lawfully obtaining driver's licenses from the Iowa Department of Transportation ("DOT"). The completely foreseeable result of this last-minute stunt—challenging thousands of properly registered voters based on outdated DOT data—was the de facto targetting of naturalized citizens, gravely threatening their fundamental right to vote.

The Secretary's ill-concieved actions violated these Iowans' rights in several ways. His motion to dismiss, premised mainly on factual disputes and materials outside the scope of the operative Amended Complaint, must be rejected. Plaintiffs plainly have standing to challenge the government's placing of their names on a targeted list and challenging their right to vote without notice or due process. This case is not moot for multiple reasons—at a minimum because the many individual voter plaintiffs whose rights were violated seek nominal damages, and more broadly because the Secretary's illegal conduct is capable (and indeed likely) of recurring. Plaintiffs have more than adequately pleaded multiple violations of law, including the Equal Protection Clause,

Due Process Clause, the Voting Right Act, and National Voter Registration Act ("NVRA"), based on a program systematically targetting naturalized citizens seeking to exercise their right to vote.

## FACTUAL BACKGROUND

### I.    The Voter Purge Program.

On October 22, 2024—fourteen days before the General Election, and while early voting was already underway, the Secretary sent a list (the "List") of 2,176 individuals (the "Affected Voters") to county election officials. (ECF No. 66 ("Am. Compl.") ¶ 37.) The Secretary told election officials that the Affected Voters were "reasonably suspected" of being ineligible to vote because they were not U.S. citizens. (*Id.* ¶ 38.) On that basis, the Secretary instructed all county election officials to challenge any effort made by an Affected Voter to vote. (*Id.* ¶ 38.) To facilitate these challenges, the Secretary created and distributed a "Challenge due to Citizenship Status Information Form," which instructed local officials that:

> As a precinct election official, you are required per Iowa Code §49.79 to challenge a voter whom you know or suspect is not duly qualified and offer that voter a provisional ballot. If a registered voter who is listed on the documentation provided by the Iowa Secretary of State's office as having self-reported that they are not a U.S. citizen, complete this form and follow your county auditor's instructions for handling provisional ballots.

(*Id.*) The Secretary directed county election officials to "[t]ell the voter that because they have reported to the Department of Transportation that they are not a U.S. citizen, you are required to challenge their eligibility to vote." (*Id.* ¶ 39.) Finally, the directive required that challenged voters cast a provisional ballot in lieu of a regular ballot, which would count only if the Affected Voter adequately proved his or her citizenship. (*Id.*)

From the start, the Secretary knew that this attempt to systematically target thousands of voters (the "Voter Purge Program") was riddled with errors and inaccuracies. The List was hastily generated shortly before the election by comparing Iowa's voter rolls with DOT records showing

2

individuals who had, when they registered for Iowa driver's licenses, self-identified as non-citizens. (*Id.* ¶ 37.) Under Iowa law, non-citizen Iowa residents may obtain driver's licenses if they submit proof of lawful status in the United States. (*Id.* ¶ 44); *see also* Iowa Admin. Code r. 761-601.5(321) (2022). And Iowa DOT records, including those for persons who self-report as non-citizens when applying for a driver's license, go back many years. (*Id.* ¶ 45.) But in the meantime, many of these Iowa residents go on to become naturalized citizens. Indeed, according to State-maintained data, 4,097 persons were naturalized as U.S. citizens in Iowa in 2022 alone. (*Id.* ¶ 3.)

Despite this unreliability of the source material for the Secretary's List, the Secretary did not check whether any of the Affected Voters had become naturalized U.S. citizens before directing that they be challenged. (*Id.* ¶ 45.) It was thus foreseeable that the List would be filled with naturalized citizens who obtained driver's licenses, subsequently naturalized, and then registered to vote. Indeed, the Secretary has since admitted that *at least 88%* of the over 2,000 people on the List *are* U.S. citizens who are entitled to vote. (*Id.*) To this day, the Secretary has not corrected the List or advised county officials which of the over 2,000 Affected Voters are in fact U.S. citizens whose right to vote never should have been challenged. (*Id.* ¶ 39.)

## II.    The Secretary Implements the Flawed Voter Purge Program.

The Secretary kept his List secret, ordering county officials not to share it. (*Id.* ¶ 2.) The Affected Voters—again, virtually all of whom are naturalized U.S. citizens who were registered to vote—received no notice that they would be challenged or would be required to produce additional documentation to cast a regular ballot or have their ballot counted. (*Id.* ¶ 49.) By being named on the List, the Affected Voters were subjected to arbitrary additional burdens on their right to vote in the 2024 General Election, including by being forced to endure a baseless voter challenge and to prove their citizenship (on short notice, days before the election) in order to cast a regular

ballot and have a ballot counted. (*see e.g.*, *id.* ¶¶ 41, 50, 59, 92, 101, 121, 160.) Affected Voters who were unable to do so in the time allotted did not have their ballots counted. (*Id.*)

The Secretary's conduct targeted a select group of lawful Iowa voters—obviously and foreseeably comprised of naturalized citizens—for multiple burdens on their right to vote, including the potential loss of that right. The Secretary did this in a haphazard, secretive manner, without any advance notice. As the Secretary later admitted in January 2025, "[p]utting those people through that was not the best process." (*Id.* ¶ 9.)

The burdens on the Affected Voters included fear and intimidation. (*see e.g.*, *id.* ¶ 105.) In issuing the List (which, again, was comprised almost entirely if not entirely of lawful, naturalized U.S. citizens), the Secretary appeared to publicly threaten Affected Voters with criminal prosecution, stating: "It is a felony for noncitizens to either vote or register to vote, and we will work with the authorities to ensure that those who break the law are prosecuted to the fullest extent." (*Id.* ¶ 54.) Following the Secretary's guidance, Linn County provided the names of four Affected Voters—all of whom were U.S. citizens—to federal immigration officers. (*Id.* ¶ 6.) These people were then subjected to a law-enforcement investigation of their citizenship status. (*Id.*)

U.S.-born voters were not subjected to this treatment. (*Id.* ¶ 160.)

### III. Plaintiffs.

The individual Plaintiffs are naturalized citizens who found themselves on the Secretary's List and were subjected to unlawful burdens on their right to vote in the 2024 General Election. (*Id.* ¶¶ 81–117.) Plaintiff LULAC expended significant time and resources pushing back against the Secretary's unlawful directives leading up to the 2024 General Election. (*Id.* ¶¶ 22, 123–24.) Plaintiffs seek injunctive and declaratory relief to ensure that the Secretary's List and the improper tactics that led to its creation and use are barred, as well as damages, including nominal damages, to redress their injuries. (*Id.* at Prayer for Relief.)

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, "all reasonable inferences" are drawn in the plaintiff's favor. *Hull Partners, LLC v. Clean Fuels All. Am.*, 642 F. Supp. 3d 809, 815 (S.D. Iowa 2022). The complaint may be sufficient for pleading purposes even if it "strikes a savvy judge that actual proof of those facts is improbable." *Id.* at 816 (quoting *Twombly*, 550 U.S. at 556).

In analyzing a Rule 12(b)(6) motion, courts cannot consider matters outside the pleadings without converting the motion into one for summary judgment. *See, e.g.*, *Young v. Principal Fin. Grp., Inc.*, 547 F.Supp.2d 965, 973 (S.D. Iowa 2008) (citing Fed. R. Civ. P. 12(d)). Only a "narrow class" of supplemental materials may be considered as not "outside the pleadings," *id.*, such as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Conversely, courts may not consider written evidence "in support of or in opposition to the pleadings that provide some substantiation for and does not merely reiterate what is said in the pleadings." *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007).

A motion to dismiss based on mootness or lack of standing typically proceeds under Rule 12(b)(1). Under this rule, the Court "must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings." *See e.g.*, *Croyle by & through Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (quotation omitted). A "facial attack"—like the Secretary's attack here—is subject to the same form of analysis as a motion under Rule 12(b)(6), with well-pleaded facts accepted as true

and construed in favor of the non-moving party. *Id.*; *see Warth v. Seldin*, 422 U.S. 490, 501 (1975). Where the facts surrounding jurisdiction are contested—including attacks on standing—such disputes are not resolvable based on one-sided, untested, or incomplete evidence; rather, "the proper course is to request an evidentiary hearing on the issue." *Osborn*, 918 F.2d at 730 (citing *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986) (Posner, J.)). Moreover, courts may defer deciding on fact-bound jurisdictional challenges "when the jurisdictional issue is so bound up with the merits that a full trial … may be necessary to resolve the issue." *Id.*

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING.

The Secretary makes a "facial" attack on Plaintiffs' standing to sue, (*see* ECF No. 76, at 1 (invoking only Rule 12(b)(6) and not Rule 12(b)(1) as a basis for dismissal)), but the pleadings are more than sufficient. To establish Article III standing, Plaintiffs must show: (1) that they suffered an injury-in-fact that is (2) traceable to defendants and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue, so long as their claimed injuries are distinct from a generally available grievance about the government." *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 869 (M.D.N.C.) (citing *Baker v. Carr*, 369 U.S. 186, 206 (1962)) (cleaned up).

Here, the Secretary does not contest the injury in fact and traceability prongs of the standing analysis; he claims only that Plaintiffs' alleged harm is not redressable.[1] (ECF No. 76-1 at 7-8.) This argument fails.

---

[1]    As the Secretary has not raised such arguments in his opening brief, any such arguments are waived. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

A.      **Plaintiffs Have Pleaded Redressability Through Damages.**

The redressability prong of the standing inquiry requires that a plaintiff show only that the alleged injury "would likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. ---, 145 S.Ct. 2121, 2133 (2025). Here, at a minimum, Plaintiffs' injuries are redressable because they have requested nominal and compensatory damages under 42 U.S.C. § 1983. (ECF No. 66 ¶¶ 11, 14, Prayer for Relief ¶ 8.) Plaintiffs allege that they experienced monetary losses, including in the form of time away from work and other expenditures of time, money and resources, complying with the various added burdens due to the Voter Purge Program. (*Id.* ¶ 122; ¶¶ 92, 101, 105, 111.) Such losses may be compensable. *See Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (economic losses are compensable with money damages). Plaintiffs also seek nominal damages, which are available in Section 1983 cases and in any case involving a violation of constitutional rights. *See FKFJ, Inc. v. Village of Worth*, 466 F. Supp. 3d 853, 863 (N.D. Ill. 2020); *see also generally Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021) ("[E]very violation of a [constitutional] right imports damage" (cleaned up)).

*Uzuegbunam*, in particular, defeats the Secretary's argument. There, the Court held that nominal damages alone "provide the necessary redress for the completed violation of a legal right" and are sufficient to establish Article III standing. 592 U.S. at 293. Here, the allegations in the Amended Compliant support claims for both nominal and compensatory damages.

B.      **Plaintiffs Have Also Pleaded Redressability Through Injunctive and Declaratory Relief.**

Plaintiffs have also pleaded facts establishing standing to seek injunctive and declaratory relief. For injunctive relief, a party must plead that further injury is imminent or that they are likely to suffer the alleged injuries again in the future. *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). For a declaratory judgment, a party must plead that "a specific live grievance

exists in the form of an ongoing injury, or an immediate threat of injury, to have standing….” *Id.* (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479 (1990)) (cleaned up). Here, the Individual Plaintiffs have pleaded that they are Affected Voters who were and are on the Secretary's List. (ECF No. 66 ¶¶ 87–90; 97–100; 105–06; 114–17). They also pleaded that the List and related instructions to challenge Affected Voters have not been rescinded or countermanded, and that the List will be “subjected to similar treatment in future elections.” (*Id.* ¶ 124.)

The Secretary claims that he has withdrawn his directive to challenge the Affected Voters, rendering Plaintiffs' injuries non-redressable. (ECF No. 76-1 at 8.) This argument seeks an end-run around Rule 12(b)(6), because it relies on extrinsic materials—including a non-public June 4, 2025 email from the Secretary's own counsel (ECF No. 76-2 (the “Exhibit”)), and press releases asserting unverified claims, (*id*.at 6-7)—none of which may be considered on a Motion to Dismiss.

As already noted, the Secretary has not even invoked Rule 12(b)(1), let alone sought an evidentiary hearing on the factual basis for standing. At a minimum, the materials he cites would require the close scrutiny that jurisdictional discovery and a hearing afford. These self-serving, unsworn assertions made by the Secretary and his in-house counsel do not purport to be affidavits, deposition testimony, sworn live testimony, or any other type of sworn statement that could support summary judgment. In light of the Secretary's failure to properly assert a factual challenge to Plaintiffs' standing, the fairest and most reasonable approach is to deny his motion on facial grounds and allow proper development of any contested jurisdictional facts in discovery.

In any event, none of the extrinsic facts that the Secretary asserts are even relevant to standing. Standing is assessed as of the time the action was brought. *E.g.*, *McNaught v. Nolen*, 76 F.4th 764, 769 (8th Cir. 2023) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169, (2000). This action was brought in November 2024, and the Amended

Complaint was filed in April 2025. The materials in the Exhibit on which the Secretary relies to support his standing argument were created *after* this action and the operative pleadings were filed. Thus, it is impossible for the Exhibit to show that Plaintiffs lacked standing *when this action was brought*. *See id*. Even if this temporal problem was not fatal to the Secretary's argument, the contents of the Exhibit do not show that injunctive and declaratory relief would provide Plaintiffs with no redress. To the contrary (and as the parties must explore in discovery), the Exhibit shows that Plaintiffs' rights are still threatened, because the Secretary plans to use the same DOT data for similar voter maintenance purposes again, and indeed purports to have obtained new "authority" from the Legislature to do just that. (*See* ECF No. 76-1 at 5-8; the Exhibit.)

### C.       Plaintiff LULAC Has Pleaded Organizational Standing.

The Secretary's attack on LULAC's organizational standing to sue is irrelevant; only one plaintiff needs standing for the suit to proceed. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). In any case, LULAC has standing because it has pleaded "the deflection of its financial and human resources arising from the challenged action." *Animal Legal Defense Fund v. Reynolds*, 297 F. Supp. 3d 901, 913 (S.D. Iowa 2018).

An organization has standing when the defendant's challenged action "directly affect[s] and interfere[s] with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Put another way, an organization must be "perceptibly impaired" by the defendant's actions. *Am. Ass'n of Univ. Professors v. Rubio*, ---F. Supp. 3d---, 2025 WL 1235084, at *18 (D. Mass. Apr. 29, 2025) (quoting *All. For Hippocratic Med.*, 602 U.S. at 395).

LULAC alleges that its core activities were "perceptibly impaired" by the Secretary's actions. Because of the Voter Purge Program, LULAC unexpectedly had to expend additional resources on the eve of the election "informing concerned members about the Secretary's unlawful

directives and helping Affected Voters navigate the burdensome voting process created by the Voter Purge Program." (ECF No. 66 ¶ 22.) These efforts "required the diversion of staff and volunteer time and other resources from LULAC's other initiatives and intended activities during the relevant time period, such as voter engagement and voter turnout efforts." (*Id.* ¶ 123.) These are precisely the type of allegations that courts have held support organizational standing. *See, e.g.*, *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024).

## II.   PLAINTIFFS' CLAIMS ARE NOT MOOT.

"The difference between standing and mootness...is merely one of 'time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *McNaught*, 76 F.4th at 769. Here, for many of the same reasons that the Secretary's standing arguments fail, his mootness arguments fail, too.

### A.   There Is a Live Controversy Over Damages.

"A case is moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 650 (8th Cir. 2025) (cleaned up). Here, Plaintiffs seek nominal and compensatory damages. "[T]he availability of nominal damages is enough to stave off mootness." *Id.* (Section 1983 action was not moot where nominal damages were still at stake). The Secretary's mootness arguments can be rejected on this ground alone.

### B.   The Secretary Has Not Met His "Formidable Burden" to Show Voluntary Cessation of the Challenged Conduct.

The Secretary's assurances are not legally sufficient to moot Plaintiffs' claims. Relying on an email from his in-house lawyer, the Secretary argues that Plaintiffs' claims are moot because the 2024 election is over, and he has now changed his ways. (*See* ECF No. 76-1 at 3–7.) Even if those unsworn materials could be credited without the benefit of discovery—and setting aside

Plaintiffs' claims for damages—the Secretary may not engage in strategic mooting. "[A] defendant cannot always moot a case simply by voluntarily ceasing its unlawful conduct after the plaintiff files suit." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Rather, voluntary cessation of a challenged practice will only moot a case if the defendant can show that the practice cannot "reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). This is a "formidable burden." *Id.* "Were the rule more forgiving, a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off; it might even repeat 'this cycle' as necessary until it achieves all of its allegedly 'unlawful ends.'" *Federal Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Nike*, 568 U.S. at 91). Even considering the Secretary's extrinsic materials (which in the absence of discovery the Court may not do), the Secretary fails to meet this formidable burden.

The Secretary's brief now states that "he is no longer challenging [Plaintiffs'] eligibility to vote" and he has "withdraw[n] the noncitizen ballot challenge directive from October 22, 2024." (ECF No. 76-1 at 5.) He relies on the June 4, 2025 email sent by his counsel, which based on the address field appears to have been sent only to other employees of his own office. Such mere say-so assurances, made in an internal email and a legal brief, do not bind the Secretary. Even if his counsel's carefully worded, internal assertions in the Exhibit could be credited, the Secretary *still*, to this day, has not actually withdrawn or corrected the List. Plaintiffs have no assurance that county election officials will not act on the list, and the Secretary has not identified any affirmative corrective actions to ensure that does not happen. And he (and any successor) remains free to place

Plaintiffs on a "new" list based on the same DOT data—for the same reason and based on the same unlawful methods that Plaintiffs allege here.[2]

Indeed, the Secretary's assurances are especially insufficient because he fails to repudiate the *procedures* he used to create the List in the first place, to acknowledge that they were improper, or to commit that those procedures—not merely the List itself—will not be used again to target Iowa voters. To the contrary, the Secretary has suggested he will do just that. This is another reason why Plaintiffs' claims remain live.

## C.    The "Capable of Repetition Yet Evading Review" Exception Applies.

Plaintiffs' claims also remain live because the Secretary's violations are "capable of repetition yet evading review." *See Arkansas AFL-CIO v. F.C.C.*, 11 F.3d 1430, 1435 (8th Cir. 1993) (en banc). The exception applies when "(1) the challenged conduct is of too short a duration to be litigated fully prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Nat'l Right to Life Pol. Action Comm. v. Conner*, 323 F.3d 684, 691 (8th Cir. 2003) (citation omitted). Election issues are "frequently saved from mootness by this exception." *Van Bergen v. Minn.*, 59 F.3d 1541, 1547 (8th Cir. 1995) (collecting cases). Both prongs of the test are met here.

*First*, the challenged conduct took place during an incredibly narrow window. The Secretary does not contest this, nor could he, as "[b]allot issues are notorious examples of this situation." *Arkansas AFL-CIO*, 11 F.3d at 1436  (collecting cases). The Secretary issued the List on October 22, 2024, giving Plaintiffs only 14 days before the General Election to fully litigate the

---

[2] *Cf. Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 928 (D.S.D. 2022) ("The fact that the Defendants so readily amended the redistricting plan, albeit materially improving it, indicates a fluidity that renders the case far from moot.")

validity of the Voter Purge Program before it supposedly became moot. (ECF No. 66 ¶ 2.)

*Second*, Plaintiffs are "reasonably likely to be subject to the challenged statutory provisions again." *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021). This is not an onerous burden. *Id.* at 1048. The controversy must only be "*capable* of repetition" and a plaintiff need not "demonstrate[] that a recurrence of the dispute was more probable than not." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 795 (8th Cir. 2016) (quoting *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (emphasis in original)).

Here, the misconduct is plainly capable of repetition. The Secretary has not provided any reasonable assurances that he will refrain from similar actions in the future, and nothing prevents him from doing so. Indeed, the email from his counsel that the Secretary touts suggests that similar actions are contemplated. The email lionizes existing "processes," including the one that led to the creation of the List, as "secure and efficient," and suggests that the Secretary, although he is withdrawing the directive, plans to take further action to "evolve Iowa's voter registration and list maintenance processes to incorporate … new opportunities." (The Exhibit.) Those referenced "opportunities" include "new authority" that the Secretary sought and obtained from the Legislature regarding use of citizenship-related data from DOT for list-maintenance purposes. (*See id.*) In other words: The Secretary sought new "authority" to do the very same faulty DOT data-matching that led to the creation of the List in the first place. Here, as in similar cases, the capable-of-repetition exception applies. *See Arcia*, 772 F.3d at 1342 (finding that challenge to program for removing non-citizens from voter rolls was excepted from mootness doctrine).

Finally, a ruling of mootness would create the specter of unreviewable disenfranchisement given the Court's decision that it could not enjoin the misconduct in close proximity to the election. Permitting election officials to violate the right to vote on the eve of an election, dodge preliminary

relief, and then engage in a bait-and-switch after the election to avoid redressability would be inimical to the basic safeguards of our constitutional order.

## III.    PLAINTIFFS PLAUSIBLY PLEAD NUMEROUS VIOLATIONS OF LAW.

### A.    Plaintiffs Adequately Allege Violations of the NVRA.

#### 1.    The Voter Purge Program Violates the Ninety-day Quiet Period.

The Secretary argues that he did not actually remove any voters from Iowa's registration rolls. Even assuming this is true (which it may not be), actual removal is not an element of an NVRA claim.

Under the NVRA's Quiet Period provision, "[a] State shall complete, not later than 90 days prior to the date of the primary or general election for Federal office, *any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). States thus may not implement any voter removal program or any step in such a program during this period.

*Arcia v. Florida Secretary of State*, where the Eleventh Circuit enjoined a similar program to the Secretary's, is squarely on point. 772 F.3d at 1339. In *Arcia*, shortly before an election, Florida's Secretary of State compiled a list of registered voters who had previously presented the state with identification suggesting they were noncitizens, such as green cards or foreign passports. *Id.* He sent that list to county election officials and instructed them to perform additional research, then initiated a notice and removal program. *See id.*

The Eleventh Circuit concluded that the NVRA means what it says: States may not operate any *program* with the purpose of systematically removing ineligible voters within the 90-day window. 772 F.3d at 1348. The Court explained that Congress' use of "the phrase 'any program' suggests that the Quiet Period has a broad meaning . . . [because] read naturally, the word 'any' has an expansive meaning, that is one or some indiscriminately of whatever kind." *Id.* at 1344

(quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))(cleaned up). Similarly, in *Mi Familia Vota v. Fontes (Vota I)*, a district court reviewed an Arizona law requiring county recorders to conduct monthly reviews of registered voters without documentary proof of citizenship on file. 691 F. Supp. 3d 1077, 1085-86 (D. Ariz. 2023). The law required recorders to compare those lists with local, state, and federal databases and issue notice of pending cancellation to individuals suspected of being noncitizens. *Id.* The court adopted *Arcia's* reasoning, holding that "states must pause any such systematic purge within 90 days of a federal election . . ." *Id*. at 1092.

Congress had a strong rationale for broadly prohibiting removal programs during the Quiet Period: To protect voters. As the Eleventh Circuit observed, "individualized removals" that arise from "rigorous individualized inquiry" may still occur during the NVRA's Quiet Period because such inquiries have "a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346 (emphasis added). However, "systematic programs" for reviewing voters' eligibility, such as through database matching, is necessarily more prone to errors and voters being "incorrectly removed." *Id.* And while "[a]t most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors, … [e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Id.* (emphasis added). <u>That is exactly what happened here.</u>

Plaintiffs allege that the Secretary did precisely what the statute forbids:  He implemented a program: (1) to systematically review the voting rolls to assess voters' eligibility and prevent supposedly ineligible voters from voting, (2) deep into the 90-day Quiet Period before the General Election. (ECF No. 66 ¶ 153.) Plaintiffs allege, consistent with the cases, that the Voter Purge Program was indeed "systematic," in violation of the NVRA. (*Id.* ¶ 154.) The Secretary challenged more than 2,000 voters at one time, all based on the exact same data matching process. (*Id.*) He

had no personal or firsthand knowledge of any of the Affected Voters and their citizenship status, only his data-merging of the DOT and voter registration records. (*Id.*) Accepting these allegations as true, which the Court must do at this stage, the Voter Purge Program constitutes a systematic list maintenance program that is barred under the NVRA's ninety-day Quiet Period.

### 2. The Program Also Violates the NVRA's "Uniform" and "Nondiscriminatory" Requirement.

The Voter Purge Program further violates the NVRA by impermissibly classifying voters based on a registrant's national origin and placing discriminatory burdens on naturalized citizens. Any list maintenance program shall be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . ." 52 U.S.C. § 20507(b)(1). This provision reflects Congress's view that the right to vote "is a fundamental right," and that discriminatory and unfair registration laws can "disproportionately harm voter participation by various groups, including racial minorities." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012).

The Voter Purge Program classifies registrants as presumptively ineligible to vote because they were not citizens when they obtained their driver's licenses. However, DOT records may be decades out of date and necessarily fail to account for people who have become naturalized citizens. The foreseeable and actual result of the program was to sweep in thousands of naturalized citizens, based solely on the fact that at some point they used to be non-citizens. Courts have repeatedly affirmed that citizenship matching protocols that similarly burden naturalized citizens are unlawful. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("methodology" for identifying suspected noncitizens impermissibly swept in many naturalized citizens; "burdensome" program "was likely to have a discriminatory impact" on eligible voters in violation of § 20507(b)(1)); *Tex. League of United Latin Am. Citizens v. Whitley*, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (program likely violated NVRA by "burden[ing]"

16

naturalized voters with "ham-handed and threatening correspondence from the state," while "[n]o native born Americans were subjected to such treatment."). So too is the case here.

### 3. The Voter Purge Program Also Violates the NVRA's Public Disclosure Provision.

The Public Disclosure Provision of the NVRA provides, in relevant part, that States *"shall* maintain for at least 2 years and *shall make available for public inspection* . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1) (emphasis added). This provision covers records regarding registered voters subjected to removal programs. *See PILF v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021); 52 U.S.C. § 20507(i)(2). Where such information includes data protected by other privacy provisions of federal law, courts may simply require the exclusion of protected "sensitive personal information." *Public Interest Legal Found. v. Dahlstrom*, 673 F.Supp.3d 1004, 1016 (D. Ala. 2023).

The Secretary's failure, to this day, to disclose the List to the Plaintiffs (ECF No. 66 ¶ 49) continues to violate the Public Disclosure Provision. To the extent he claims that Iowa law protects the List, the Secretary is mistaken. Federal law, including the NVRA, is supreme. *See* U.S. Const. art. VI, ¶ 2. And the federal Drivers Privacy and Protection Act ("DPPA") is totally irrelevant to whether the Secretary may disclose the List, because that law restricts information sharing only by "[a] State department of motor vehicles," and not by the Secretary. *See* 18 U.S.C. § 2721(a).[3]

### B. Plaintiffs Adequately Allege a Claim Under the Voting Rights Act.

Section 11(a) of the Voting Rights Act provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who … is otherwise qualified to vote." 52 U.S.C.

---

[3] In addition, the DPPA expressly provides that disclosure is permitted "[f]or use in connection with any civil … proceeding in any Federal … court." 18 U.S.C. § 2721 (b)(4).

§ 10307(a). Here, the Amended Complaint plausibly alleges that "Affected Voters identified on the Secretary's List were not permitted to cast a regular ballot in the General Election," and that "Defendants failed or refused to count, tabulate, and report the votes cast by qualified voters for purposes of the General Election." (ECF No. 66 ¶¶ 180–81.) Plaintiffs also allege that defendants did so despite the knowledge that at least 88% of the individuals included on the List were eligible U.S. citizen voters and thus should not have been challenged or stymied from voting. (*Id.* ¶ 182.) Plaintiffs have pleaded that the Secretary violated the plain terms of Section 11(a).

### C. Plaintiffs Adequately Allege Unconstitutional Discrimination under the Equal Protection Clause.

Despite acknowledging that his List was comprised of at least 88% eligible U.S. citizen voters, the Secretary now claims that he only discriminated against noncitizens. This argument is at odds with reality—to say nothing of the pleadings.

"[A] naturalized citizen stands on an equal footing with the native citizens in all respects, save that of eligibility to the Presidency." *Luria v. United States*, 231 U.S. 9, 22 (1913). "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Discrimination based on naturalization and national origin is presumptively unconstitutional and subject to strict scrutiny. *See Graham v. Richardson*, 403 U.S. 365, 371–72 (1975).

The Secretary's scheme discriminates against naturalized citizens by creating a process that, foreseeably and by design, targets naturalized citizens and only naturalized citizens with increased burdens on the right to vote. The program targeted Iowans who were previously non-citizen lawful residents, based on outdated DOT data from the time they obtained their driver's license. These targeted persons are necessarily foreign born (if they were U.S.-born, they would have been citizens at the time they obtained their driver's license), and thus of a different national

18

origin than U.S. born citizens. The Voter Purge Program requires these naturalized citizens to prove their citizenship at the polls and to vote a provisional ballot or be denied the vote entirely, while imposing no such burden on any U.S.-born citizens.[4]  Plaintiffs have more than adequately pleaded facts showing that the program effectively targeted naturalized citizens in violation of the Constitution.

### D.    Plaintiffs Adequately Allege a Violation of the Due Process Clause.

Procedural due process requires both notice and an opportunity to be heard before a person is deprived of important rights. *Garcia v. Fed. Nat'l Morg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Schmidt v. Des Moines Public Schools*, 655 F.3d 811, 817 (8th Cir. 2011). Plaintiffs establish a violation by: (1) setting forth the interest at stake; and (2) proving that the defendant deprived them of such an interest without due process of law. *Schmidt*, 655 F.3d at 817.

As to the first prong of the inquiry, it is "[b]eyond debate" that "the right to vote is a constitutionally protected liberty interest." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see Self Advocacy Solutions N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020). And as to the second, the Secretary's directive to local election officials failed to provide Affected Voters any form of pre-deprivation notice whatsoever. Rather, the Secretary specifically instructed county election commissioners to keep the identity of the Affected Voters secret, while challenging Affected Voters only when they vote. (ECF No. 66 ¶ 50, 52.). Plaintiffs and other Affected Voters thus did not know they were on the List—or that the List existed—until they arrived at the polls.

---

[4] That the Secretary's List did not include *all* of the naturalized citizens in Iowa does not save the Secretary from liability. The fact that he merely discriminated against only *some* naturalized citizens in violation of their constitutional rights does not make such discrimination lawful.

(*See id.* ¶¶ 48–49, 51, 119.) With no notice, these voters had no meaningful opportunity to contest their inclusion prior to having their fundamental right to vote being burdened by a cumbersome (and illegal) verification process via an arbitrary challenge to their ballot. (*See id.* ¶¶ 110, 117.) Nor could they have had such an opportunity given that the Secretary's directive was not issued until October 22, 2024, just before the election.

On the facts as pleaded, the Secretary created an error-riddled list of thousands of U.S. citizen registered voters, kept the List and the names on it a secret from the public, and instructed county officials, on the eve of the election, to challenge all the voters on the secret List once they showed up to the polls. This disturbing and inexplicable course of action was a textbook due process violation, combining an enormous "risk of an erroneous deprivation" of weighty and fundamental rights for thousands of U.S. citizen voters with an utter absence of any articulable (let alone sufficient) government interest. *E.g.*, *Padda v. Becerra*, 37 F.4th 1376, 1382 (8th Cir. 2022) (internal quotation marks omitted).

## **CONCLUSION**

For the foregoing reasons, the Secretary's motion to dismiss should be denied.

Dated: August 1, 2025

Respectfully submitted,

*/s/ Jesse Linebaugh*

Jesse Linebaugh (AT0004744)
Email: jesse.linebaugh@faegredrinker.com
Joe R. Quinn (AT0015363)
Email: joe.quinn@faegredrinker.com
Emily R. O'Brien (AT0015757)
Email: emily.obrien@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Telephone: +1 515 248 9000

Martin S. Chester***
Email: martin.chester@faegredrinker.com
Craig S. Coleman**
Email: craig.coleman@faegredrinker.com
Jeffrey P. Justman**
Email: jeff.justman@faegredrinker.com
Kacie Phillips Tawfic***
Email: kacie.tawfic@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: +1 612 766 7000

Rita Bettis Austen (AT0011558)
Email: rita.bettis@aclu-ia.org
Thomas D. Story (AT0013130)
Email: thomas.story@aclu-ia.org
AMERICAN CIVIL LIBERTIES UNION OF
IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
Telephone: +1 515 243 3988

Ari Savitzky*
Email: asavitzky@aclu.org
Jonathan Topaz*
Email: jtopaz@aclu.org
Ming Cheung*
Email: mcheung@aclu.org
Sophia Lin Lakin*
Email: slakin@aclu.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: +1 212 549 2500

Patricia Yan*
Email: pyan@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
915 15th Street NW
Washington, DC 20005
Telephone: +1 202 457 0800

*Admitted Pro Hac Vice
**Application for Pro Hac Vice Pending
***Application for Admission Pro Hac Vice
Forthcoming

*Attorneys for Plaintiffs Orcun Selcuk, Alan David
Gwilliam, Tingting Zhen, Michael Brokloff, Nino
Natenadze, and the League of United Latin
American Citizens of Iowa*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true copy of the foregoing document was filed electronically through the Court's CM/ECF filing system on August 1, 2025, which will send notice to all counsel of record.

*/s/ Jesse Linebaugh*
Jesse Linebaugh
